Jason M. Drangel (JMD 7204)

Robert L. Epstein (RE8941)

William C. Wright (WCW 2213)

EPSTEIN DRANGEL LLP

Attorneys for Plaintiffs

60 East 42nd Street, Suite 2410

New York, NY 10165

Tel: 212-292-5390

Fax: 212-292-5391

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------X
                                                :
CJ Products LLC and Ontel Products              :
Corporation                                     :
                                                :
Plaintiffs                                      :
                    v.                          :        Civ Action No.  11- 0715 (RRM)
                                                :
Snuggly Plushez LLC and Berkant Keiskbas       :
Defendants                                      :
                                                :
-------------------------------------------------X


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER
TO SHOW CAUSE FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................... 1

II. FACTS ...................................................................................................................... 2

III. ARGUMENT ......................................................................................................... 10

   A.   THE STANDARDS FOR ISSUANCE OF A PRELIMINARY INJUNCTION ......................................... 10

   B.   PLAINTIFFS HAVE SUFFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION ...................................... 11

       1.   Lanham Act (False Advertising and False Designation of Origin) and Common Law Unfair Competition Claims ....................................................................................... 11

       2.   Copyright Claim .................................................................................................. 12

       3.   Irreparable Harm to Plaintiffs and Consumers ................................................. 13

   C.   PLAINTIFF'S ARE LIKELY TO SUCCEED ON THE MERITS ...................................................... 15

       1.   False Advertising Claim ...................................................................................... 15

          a)   Defendants' Use of the "As Seen On TV" Designation is Literally False ................................ 16

          b)   Defendants Identify their Products as Authentic and Website as Official "Pillow Pets" ........ 17

          c)   Defendant's Use Favorable Plaintiff Product Reviews as Their Own ..................................... 17

       2.   Unfair Competition, Passing Off and False Designation of Origin Under § 43(a) of the Lanham Act ..................................................................................................... 18

       3.   New York Unfair Competition .............................................................................. 21

       4.   Copyright Infringement ....................................................................................... 22

          a)   Plaintiff CJ Owns the Copyright to Plaintiff's Plush Toy Designs .......................................... 23

          b)   Defendants Copied Plaintiff's Plush Toy Designs ................................................................. 23

              i.   Defendants' Access to Plaintiffs' Plush Toy Designs .......................................... 23

              ii.   The Similarities Between Plaintiffs' and Defendants' Plush Toys are Probative of Copying .. 23

          c)   There is a Substantial Similarity Between Defendants' Designs and Plaintiffs' Designs ....... 25

IV. PLAINTIFFS HAVE SHOWN SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS OF ITS CLAIMS TO MAKE THEM A FAIR GROUND FOR LITIGATION AND THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN PLAINTIFF'S FAVOR ................ 27

V.  CONCLUSION ....................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240 (3rd Cir. 1983)......................................28

*Atari, Inc., v. North American Philips Consumer Elecs. Corp.*, 672 F.2d 607 (7th Cir. 1982)......................12

*Bi-Rite Enters., Inc. v. Button Master*, 555 F. Supp. 1188, 1192-93 (S.D.N.Y. 1983)...............................18

*Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992)........................................................15

*Chloe v. Queen Bee of Beverley Hills, LLC*, 2009 U.S. Dist. LEXIS 42351, 2009 WL 1227927, at *11 (S.D.N.Y. 2009)...................................................................................................................................................11

*Church of Scientology*, 794 F.2d 38 (2d Cir. 1986)..............................................................................11

*CJ Products et al v. Concord Toys Int'l., et* al, 2011 U.S. Dist. LEXIS 4983 (E.D.N.Y. 2011)................13

*Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir. 1982).......................................16

*Crossbow, Inc. et al. v. Dan-Dee Imports, Inc.*, 266 F. Supp. 335 (S.D.N.Y. 1967)...............................20

*Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.1, 156 L. Ed. 2d 18, 123 S. Ct. 2041 (2003) 18

*Detective Comics, Inc. v. Bruns Publications, Inc.*, 28 F.Supp. 399 (S.D.N.Y. 1939)...............................23

*Dun & Bradstreet, Inc.*, 803 F. Supp. 820 (S.D.N.Y. 1992) ..................................................................13

*Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119 (2d Cir. 1994).....................................24, 25

*Flexitized, Inc. v. National Flexitized Corporation*, 335 F.2d 774 (2d Cir. 1964), cert. denied, 380 U.S. 913, 85 S. Ct. 899, 13 L. Ed. 2d 799 (1965)..................................................................................................20

*Hamil Am., Inc. v. GFI*, 193 F.3d 92 (2d Cir. 1999)............................................................................22

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995)...............................22

*Knitwaves, Inc. v. Lollytogs, Ltd.*, 71 F.3d 996 (2nd Cir. 1995).....................................................23, 26

*Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 128 (S.D.N.Y. 1993)................21

*McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991).........................16

*McNeil-PPC, Inc. v. Pfizer, Inc.*, No. Civ. 7684(DC), 2005 WL 23307 at *15 (S.D.N.Y. 2005)..............11

*Otokoyama Co. v. Wine of Japan Import*, 985 F. Supp. 372, 379 (S.D.N.Y. 1997)................................27

*Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487 (2d Cir. 1960).................................................22

*Pantone, Inc. v. A.I. Friedman; Inc.*, 294 F.Supp. 545 (S.D.N.Y. 1968) ..............................................12

*Polyglycoat Corp. v. Environmental Chemicals, Inc.*, 509 F.Supp. 36 (S.D.N.Y. 1980)..........................28

*Polyglycoat Corp. v. Emtl. Chems.*, 509 F. Supp. 36, 39 (S.D.N.Y. 1980)............................................27

*Project Strategies Corp., et al. v. National Comm. Corp. et al.*, 38 U.S.P.Q.2d 1053 (E.D.N.Y. 1995)....15

*Random House, Inc. v. Rosetta Books LLC*, 283 F.3d 490 (2d Cir. 2002) ..............................................10

*Resource Dev., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134 (2d Cir. 1991)..........16, 18

*Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc.*, 823 F. Supp. 1077, 1095-96 (S.D.N.Y. 1993) ..............22

*Telebrands Corp. v. E. Mishan & Sons*, 46 U.S.P.Q.2d 1493, 1508-1509...............................................21

*Telebrands Corp. v. Wilton Industries, Inc. et al.*, 983 F. Supp. 471, 475 (S.D.N.Y. 1997)......................16

*Tienshan Inc. v. C.C.A. Int'l (N.J.), Inc.*, 895 F. Supp. 651 (S.D.N.Y. 1995)........................................27

*W.W.W. Pharmaceutical Co. v. Gillette*, 984 F.2d 567, 572 (2d Cir. 1993)...........................................21

*Yurman Design Inc. v. Chaindom Enters., Inc.*, 1999 WL 1075942 (S.D.N.Y. Nov. 29, 1999) ........ 13, 23, 24, 25, 26

*Zervos v. Verizon New York, Inc.*, 252 F.3d 163 (2d Cir. 2001)...........................................................10

# I.     INTRODUCTION

Since 2003, Plaintiff CJ Products LLC "(CJ") has primarily been in the business of selling what has become a wildly successful plush toy called PILLOW PETS™.  The plush toy can be described best as a combination stuffed animal and functional pillow product sold under CJ's distinctive PILLOW PETS™, MY PILLOW PETS®, IT'S A PILLOW, IT'S A PET, IT'S A PILLOW PET® trademarks (cumulatively referred hereinafter as "Pillow Pets Marks") ("Pillow Pets Product").

When Plaintiffs filed this lawsuit in February, 2011, Defendants infringing conduct was primarily limited to selling Plushez and Napies branded plush toys.  The Plushez and Napies plush toys are also a combination stuffed animal and functional pillow product that violate a number of CJ's copyrighted and trade dress designs for Pillow Pets Products. At the time Plaintiffs filed the lawsuit, Defendants' copyright and trade dress violations were limited to sales on Defendant's Plushez.com website.  However, more recently, Defendants are engaging in false advertising, false designation of origin and unfairly competitive activities using the "official" PILLOWPETS.CO website as the hub for a classic "bait and switch" scheme to sell Defendants' "authentic" "As Seen On TV" plush toys to unsuspecting consumers, wholesalers and retailers. There can be no dispute that Plaintiffs are the only source of "authentic" and "official" "As Seen On TV" PILLOW PETS™ products dating back to 2003.  Defendants did not even begin to sell their "Plushez" or "Napies" plush toys until late 2010.

In order to draw consumers to the PILLOWPETS.CO website, Defendants purchase Google Adwords for "pillow pets", "my pillow pets" and variations thereof despite Defendants' products being called Plushez and Napies. The advertisements resulting from the Adwords identify Defendants' website as "Official Site" and "Official PillowPets.Co".  Defendants also

use PILLOW PETS branded visual internet advertisements with no mention of Plushez or Napies plush toys to lure consumers to the PILLOWPETS.CO website.   Defendants have also established "coupon" and "wholesale" websites (PILLOWPETSCOUPON.COM and PILLOWPETSWHOLESALE.COM) offering discounts on Defendants' plush products using Plaintiffs Marks and copyrighted tags and product images to misdirect consumers to Defendants' PILLOWPETS.CO website.

Given Defendants' unlawful conduct, Plaintiffs apply to the Court for an Order to Show Cause for Preliminary Injunction.  This motion is made upon the grounds set forth in this Memorandum of Law, upon the evidence presented in the declarations of Jason M. Drangel and Brian Wright and upon such evidence as may be presented at a hearing.   In short, the indisputable evidence establishes Defendants' willful, persistent and illegal copyright infringement, false advertising and false association and unfair competition. Accordingly, Plaintiffs are undoubtedly entitled to a preliminary injunction.

## II.    FACTS

Plaintiff CJ Products LLC "(CJ") is a gift and toy company involved in, among other things, the development, production, sale, and distribution of gift and toy products. One of the main components of CJ's business encompasses the  production, sale and distribution of a combination of a stuffed animal and functional pillow product sold under the distinctive PILLOW PETS™, MY PILLOW PETS®, IT'S A PILLOW, IT'S A PET, IT'S A PILLOW PET® trademarks (cumulatively referred hereinafter as "Pillow Pets Marks") ("Pillow Pets Product").  A sampling of the Pillow Pets Products are shown below and **Exhibit A** of the *Declaration of Brian Wright, ¶ 3 ("Wright Dec.")*.

2



The Pillow Pets Products have achieved great success since their introduction in 2003. The success of the Pillow Pets Product is due in part to CJ's unique pillow and stuffed animal plush toy combination design shown below:



*Wright Dec., ¶ 4.*

The success is also due to CJ's marketing and promotional efforts and the use of the highest quality materials and processes in making the Pillow Pets Product. *Wright Dec., ¶ 5.* CJ has spent substantial time, money and effort in building up and developing consumer recognition, awareness and goodwill in its Marks and Pillow Pets Products. For example, CJ spent over One Million Three Hundred and Fifty Thousand Dollars ($1,350,000.00) on media advertising from September 2009 to March 2010 alone, and at one point in 2010 was spending nearly One Million ($1,000,000.00) Dollars per month. *Wright Dec., ¶ 6.*

The success of CJ's Pillow Pets Products, and other related products and services is not due to CJ's promotional efforts alone. Rather, CJ owes a substantial amount of the success of the Pillow Pets Products to its consumers, and word of mouth buzz consumers have generated. *Wright Dec., ¶ 7.* Furthermore, CJ has won several family oriented consumer awards, such as the 2009 iParenting Media Excellent Product Award and the 2009 Dr. Toy Best Vacation Product Award, both of which have a substantial market following for credible and objective testing and reviewing. *Wright Dec., ¶ 8.*

For the Christmas 2010 season, Pillow Pets Products were recognized on the Toys R Us 2010 Hot Holiday Toy List, given a Five Star Rating by Wal-Mart for Toys for 2010, were the number on selling toy on Amazon.com and identified as a Top Five "Hard to Find Gift" by Ebay, among other top holiday gift lists. *Wright Dec., ¶ 9, Ex. B.*

In 2010, CJ granted Ontel the exclusive license to manufacture, market, advertise and promote, sell, offer for sale and distribute Pillow Pets Products in a number of markets and in association therewith has granted Ontel an exclusive license to all related intellectual property (Marks and Copyright Works). *Wright Dec., ¶ 11.* In 2010, Ontel began to sell the Pillow Pets Products to its mass market customers and since that time has sold millions of Pillow Pets Products. *Wright Dec., ¶ ¶ 10, 12.*

CJ and Ontel's (collectively "Plaintiffs") efforts, promotions, and the word of mouth buzz, have put the Pillow Pets Marks and Pillow Pets Products, at the forefront of people's minds. *Wright Dec., ¶ 13.* Consumers, purchasers and the members of the public have become familiar with CJ's Pillow Pets Marks and Pillow Pets Products and services, and have come to recognize the Pillow Pets Marks, Pillow Pets Products, and services and associate them exclusively with CJ. *Wright Dec., ¶ 14.*

Among others, CJ owns the following U.S. trademark registrations/applications for its Pillow Pets Marks:

**MY PILLOW PETS®**          U.S. Reg. No. 3,762,061

**IT'S A PILLOW, IT'S A PET**

**. . . IT'S A PILLOW PET!®**          U.S. Reg. No. 3,944,372

 ®          U.S. Reg. No. 3,762,062

**PILLOW PETS™[1]**          U.S. Ser. No. 77,940,244

*Wright Dec., ¶ 15.*

CJ owns copyrights in and related to the Pillow Pets Products (CJ's Copyrights"). CJ's Copyrights protect the various proprietary animal designs within the line of Pillow Pets Products. The line is updated from time to time to add new animal designs. *Wright Dec., ¶ 16, Ex. C.* (hereinafter referred as ("CJ's Copyrights"))

Plaintiffs investigate and enforce against infringing activity and through such efforts learned of Defendants' advertising, marketing, sale and offer for sale of infringing products. *Wright Dec., ¶ 17.* When Plaintiffs filed this lawsuit in February, 2011, Defendants promoted infringing and unauthorized merchandise called Plushez[2] and Napies that violated many of CJ's Copyright Works and product line trade dress at the website: Plushez.com. *Declaration of Jason Drangel, ¶ 3, Ex. A ("Drangel Dec.")* More recently, Defendant's infringing conduct shifted from the Plushez.com website to a near mirror image PILLOWPETS.CO website where Defendants now prominently use PILLOWPETS.CO™ and "Pillow Pets" as trademarks.

---

[1] Defendant Snuggly Plushez opposed this application on the grounds that the mark is generic/highly descriptive.
[2] Defendant Snuggly Plushez has filed an application for PLUSHEZ PILLOW PETS which has been opposed by Plaintiff CJ Products.

*Drangel Dec., ¶ 4, Ex. B.* At the PILLOWPETS.CO website, nearly all references to "Plushez" were removed and replaced with simply "Pillow Pets"; *Drangel Dec., ¶ 5.* Defendants prominently display their knock-offs of Plaintiff's most popular Pillow Pets Products and even, incredibly, quote favorable third party reviews of Plaintiff's Pillow Pets Products. *Drangel Dec., ¶¶ 6-7, Exs. A, C-D.*

Plaintiff's Pillow Pets™ have been the subject of a multi-year, tens of millions of dollars As Seen On TV promotion. *Wright Dec., ¶ 6.* The PILLOWPETS.CO website includes the phrase "As Seen On TV" in an attempt to associate their infringing products with Plaintiffs although their products are not advertised on television. *Drangel Dec., ¶ 5, Exs. A-B.* Defendants also identify some of their goods as "As Seen On TV" products, yet, as indicated above, Defendants have never been sold or advertised on television. *Drangel Dec., ¶ 15.*



In order to draw consumers to the PILLOWPETS.CO website, Defendants purchase Google Adwords for "pillow pets", "my pillow pets" and variations thereof in order to position favorably ranked paid advertising links on Google search result pages misdirecting consumers seeking Plaintiff's unique PILLOW PETS™ plush toys to the PILLOWPETS.CO website. The advertisements resulting from the Adwords identify Defendants' websites as "Official Site" and "Official PillowPets.Co." *Drangel Dec., ¶ 8, Ex. E.*

Defendants' Plushez and Napies are themselves designated as "Authentic Pillow Pets". *Drangel Dec., ¶ 16, Ex. O.*



There can be no dispute that Plaintiffs are the only source of "authentic" and "official" Pillow Pets™ products.  Defendants did not even incorporate until August 13, 2010 and claims a date of first use in commerce of Plushez Pillow Pets in its trademark applications of August 1, 2010 and the alleged proprietary Plushez copyrighted designs as of 2010.  *Drangel Dec., ¶  9, Exs. F-H.*

Defendants also include PILLOW PETS branded visual advertisements on third party websites with no reference to Defendants' alleged Plushez or Napies trademarks. The ads are very similar to images used to promote Plaintiff's Pillow Pets and even appear on certain websites where Plaintiffs' products are discussed:

  

**Defendants' Advertisement Sample**     **Plaintiffs' Advertisement Samples**

*Drangel Dec., ¶ 10, Ex. I-J.*

Defendants utilize Plaintiffs Marks and copyrighted tag images in internet-based advertisements allegedly offering discounts on Plaintiff's Products yet leading consumers to Defendant's PILLOWPETS.CO website. An example of one such internet based advertisement link appears below:



**Exclusive!** Save 20% OFF when Your Order more Than One Pet

<u>Activate Coupon</u>

*Drangel Dec., ¶ 11, Ex. K.*

Defendants have a "coupon" website (PILLOWPETSCOUPON.COM) where they identify themselves as: *"The reliable source for your pillow pets coupons and as seen on tv deals."* This page has resulted in at least one instance of actual confusion by a customer attempting to use the coupon code through Plaintiff's website and then discussing the inability to do so with Plaintiff's customer service. *Drangel Dec., ¶ 13, Ex. M.* Defendants also have established a wholesale website (PILLOWPETSWHOLESALE.COM) offering discounts on Defendants Products using Plaintiffs Marks. *Drangel Dec., ¶ 12, Ex. L.*

Plaintiffs have spent a great deal of time and effort to create what is known as a "collectible market" for its soft plush toys. By marketing the Pillow Pets line with emphasis on its status as a collection, Plaintiffs have created a "niche" in the market for the Pillow Pets Product line. *Wright Dec., ¶ 24.* When an item which looks substantially or exactly like one of CJ's plush toys is offered for sale in connection with the trademark Pillow Pets™ (or variations thereof) and terms such as "authentic", "official" and "As Seen on TV" are used, it destroys not only the collectible market created by Plaintiffs but the inherent value of Plaintiffs intellectual property, because its copyrighted designs and trademarks will no longer be considered unique by the public, and therefore are no longer desirable as collectible items. *Wright Dec., ¶¶ 25-30.*

Products purchased from Defendants were inspected to determine authenticity. *Wright Dec., ¶ 18.* A comparison of many items offered by Defendants (Lady Bug, Panda, Bumble Bee,

Penguin, Bear, Duck, Dolphin, Cow, Frog and Monkey) to the CJ Copyrighted Works show that they are all slavish imitations. *Wright Dec., ¶¶ 18-23, Exs. D-G.*

Plaintiffs take great care in instituting quality care for the manufacture of the Pillow Pets Product line.  The products are all made of new, quality materials.  Since the product is both a pillow and a children's toy it is subjected to numerous state and Federal laws, including Federal and state children's products labeling laws. *Wright Dec., ¶ 30.*  Labeling laws require the label to include a description of the material composition of the product and the name and address of the importer.  Plaintiff's product bear proper labels. *Wright Dec., ¶ 31.*  Nowhere on Defendants labels (or otherwise on the product) is there a certification by the manufacturer that "the materials are described in accordance with law"; nor the address of the importer identified. *Wright Dec., ¶ 32.*

Also, the Consumer Product Safety Act requires mandatory self-certification and testing for all such products.  Plaintiffs are in full compliance with U.S. federal and state testing requirements. *Wright Dec., ¶ 33, Ex. H.*  It is not clear Defendants have complied with testing requirements.

The Delaware Attorney General's Office recently conducted seizures of counterfeit Pillow Pets products at kiosks in Malls in Delaware and New Jersey after receiving consumer complaints.   Delaware Attorney General Beau Biden indicated in a press release that there is a concern since the goods are for children and since the manufacture and distribution of these goods bypasses regulatory controls, they are potentially dangerous. *Wright Dec., ¶ 39, Ex. K.*

On Amazon.com, where Defendants list their products (for only a short period of time) as "Pillow Pets", we have seen evidence of consumer confusion and complaints indicating:

> 'it had very little stuffing and the velcro did not work'; 'would not recommend this item at all. Very cheap and ugly face on it"; it had two

holes in it'; 'the fabric was VERY cheap and not very soft. When you rubbed the fabric in the wrong direction, it was apparent that the fabric was anything but plush. It looked as though a lot of the fur had been pulled out, but it hadn't... That was the way it had been manufactured. CHEAP!!!'; 'This thing just feels cheap – it's already falling apart after only a few hours of cuddling. The nose is made of cheaply sewn threads that fall apart, and the fur sheds off when rubbed too heavily; 'the yellow started coming off the first day but I think she'll get to enjoy it for a while; 'Although the product was new, it arrived very flat and with 2 seams needing repair. I repaired the seams and fluffed it as best I could (I think it needed more stuffing)'; 'the mane is made of some fluffy stuff that comes off in bunches, like a cat's or dog's hair and all over the apartment. When you lay on it it goes into your mouth, nose etc, very irritating.'

*Wright Dec., ¶ 38, Ex. J.*

In Missouri, the Attorney General contacted Plaintiff CJ to notify of a complaint about a Plushez product.  The Attorney General wrongly assumed the product originated with CJ and sent CJ the notice and demand that they take care of the complaint.  The unit received by the consumer had hair falling out and a hole in the neck.  There is no question that Defendants actions will impair Plaintiffs' reputation for quality goods. *Wright Dec., ¶¶ 34-37. Ex. I.*

## III.   ARGUMENT

### A. THE STANDARDS FOR ISSUANCE OF A PRELIMINARY INJUNCTION

Plaintiffs have satisfied the well-settled requirements for a preliminary injunction:

> A party seeking a preliminary injunction in this Circuit must show:
> (1) irreparable harm in the absence of the injunction and (2) either
> (a) a likelihood of success on the merits or (b) sufficiently serious
> questions going to the merits to make them a fair ground for
> litigation and a balance of hardships tipping decidedly in the
> movant's favor." *Random House, Inc. v. Rosetta Books LLC*, 283
> F.3d 490, 491 (2d Cir. 2002) (citing *Zervos v. Verizon New York,
> Inc.*, 252 F.3d 163, 172 (2d Cir. 2001)).

As shown below, Plaintiffs have demonstrated irreparable harm, as well as a likelihood of success on the merits, with respect to its claims for copyright infringement, false advertising and false designation of origin and unfair competition.  Further, the balance of the equities warrants

the relief Plaintiffs seek. Defendants' business practices are illegal, destroy Plaintiffs, their reputations and trademarks and undermine the hard work and creative efforts of Plaintiffs' copyrighted designs. There is also a question as to whether the goods are sanitary and/or contain harmful materials since it is believed the goods do not include proper labeling and/or are untested. *Wright Dec.*, *¶¶ 30-33, Ex. H.*   Given that the goods are for small children to play and sleep with, there is a need to enjoin further distribution of same.

## B. PLAINTIFFS HAVE SUFFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT A PRELIMINARY INJUNCTION

### 1. Lanham Act (False Advertising and False Designation of Origin) and Common Law Unfair Competition Claims

"Irreparable injury usually follows almost inevitably from a [Lanham Act] case once a strong likelihood of confusion is demonstrated, since damage to reputation is difficult to prove or quantify." *Church of Scientology v. Elmira Mission*, 794 F.2d 38, 43 (2d Cir. 1986); *Project Strategies Corp., et al. v. National Comm. Corp. et al.*, 38 U.S.P.Q.2d 1053, 1055 (E.D.N.Y. 1995). Where there is persuasive evidence that challenged advertisements are literally false, courts in this Circuit have routinely granted injunctions. *See, e.g., McNeil-PPC, Inc. v. Pfizer, Inc.*, No. Civ. 7684(DC), 2005 WL 23307 at *15 (S.D.N.Y. 2005); *Coca-Cola Company v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir. 1982). "In the context of [ ] false designation of origin claims, the second prong is automatically satisfied by actual success on the merits, as irreparable harm is established by a showing of likelihood of confusion." *Chloe v. Queen Bee of Beverley Hills, LLC*, 2009 U.S. Dist. LEXIS 42351, 2009 WL 1227927, at *11 (S.D.N.Y. 2009).

Defendants have unfairly piggy-backed onto a market created by the Plaintiffs through substantial sales, advertising and promotion of its Pillow Pets Products for nearly eight (8)

years. *Wright Dec., ¶¶ 24-29.* Among both consumers and retailers, Plaintiff CJ is known as the "official" source for "authentic" PILLOW PETS™ branded plush toys. Here, consumers, distributors and retailers are exposed to the Defendants literally false claims in advertising and promotion and false designations of origin of their Plushez products by:

      1.   using the Pillowpets.Co website to sell Plushez products;
      2. designating their PillowPets.Co website as the "official" source of Pillow Pets™;
      3. designating the products as "Authentic Pillow Pets";
      4. using favorable third party reviews of Plaintiff's Pillow Pets Products on its own PillowPets.Co website as its own;
      5. using Plaintiff's Pillow Pets Marks and Copyrighted Works as domain names, keywords, advertisements and coupon and wholesale websites; and
      6. designating the products "As Seen on TV".

As indicated in *Section III.C.2* below, it cannot be disputed that consumers have been actually confused and are likely to be confused by Defendants false advertising, false designations of origin and unfairly competitive activities. Also, as indicated in *Section III.B.3* below, there is no question that there is likely to be damage to Plaintiffs' reputation and harm to consumers.

## 2. Copyright Claim

Damages incurred by copyright infringement are by their nature irreparable and not susceptible of monetary measurement, rendering any remedy at law inadequate. See *Atari, Inc., v. North American Philips Consumer Elecs. Corp.*, 672 F.2d 607, 620 (7th Cir. 1982). Moreover, longstanding authority holds that in copyright infringement actions, a presumption of irreparable harm arises upon a showing of a likelihood of success on the merits and the establishment of a prima facie case. See *Pantone, Inc. v. A.I. Friedman; Inc.*, 294 F.Supp. 545, 551 (S.D.N.Y. 1968). Even if irreparable harm were not presumed, upon showing proof of infringement, Plaintiffs are suffering actual irreparable harm from Defendants' sale of items which are substantially similar to its copyrighted works. *Wright Dec., ¶¶ 17-23, Exs. D-G.*

Courts in this Circuit routinely grant injunctive relief in connection with claims for copyright infringement. See, e.g., *Yurman Design Inc. v. Chaindom Enters., Inc.*, 1999 WL 1075942 (S.D.N.Y. Nov. 29, 1999) (Keenan, J.), *aff'd*, 2001 U.S. App. Lexis 2520 (2d Cir. 2001) (preliminarily enjoining Defendant from the manufacture and sale of infringing jewelry designs and ordering a recall of existing stock of the infringing jewelry designs). In fact, in *CJ Products et al v. Concord Toys Int'l., et* al, 2011 U.S. Dist. LEXIS 4983 (E.D.N.Y. 2011), Judge Vitaliano recently issued a temporary restraining order and injunction against a third party distributing copies of Plaintiff's copyrighted Pillow Pets works.

### 3. Irreparable Harm to Plaintiffs and Consumers

Defendants must be enjoined from illegal conduct which destroys the reputation of Plaintiffs, and their goodwill, resulting in irreparable harm to Plaintiffs which cannot be remedied by monetary damages. *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 124 (2d Cir. 1994)(irreparable injury presumed in prima facie case of copyright infringement). Because customers associate the Pillow Pets Marks and Pillow Pets Products with Plaintiffs, any defects or dissatisfaction with the Defendant's version of these items will likely be attributed to Plaintiffs. Such injuries are clearly not compensable by money damages.

On Amazon.com, where Defendants list their products (for only a short period of time) as "Pillow Pets", we have seen confusion and complaints *Wright Dec., ¶ 38, Ex. J.* In Missouri, the Attorney General contacted Plaintiff CF to notify of a complaint about a Plushez product. *Wright Dec., ¶¶ 34-37, Ex. I.* There is no question that Defendants actions will impair plaintiff's reputation for quality goods.

Further, sales of the Pillow Pets line of plush toys are a substantial part of Plaintiff's business, and the great popularity of the Pillow Pets line of plush toys enables Plaintiffs to obtain new accounts and business relationships. Even when the popularity of the Pillow Pets line of

plush toys begins to wane, Plaintiffs may well be able to sell new designs to accounts that have purchased the Copyrighted Plush Toys. If Defendants are permitted to market substantially similar plush animals using false advertising and false designations, Plaintiffs will never know of the accounts and business relationships that it has lost due to Defendant's sales. Such loss cannot be compensated by money damages and is irreparable in nature. One of the most important aspects of the toy business is the trust and confidence that its customers (both the ultimate retail customer and retail resellers) develop in the exclusivity of the design and in the materials and craftsmanship utilized in its production. Defendants' sale of imitation goods impairs the integrity of the brand name as well as Plaintiffs' reputation and good will, all developed over many years at substantial expense. *Wright Dec., ¶¶ 26-29.*

Perhaps more important, Defendant's products could pose a potential public health risk. In Delaware, Attorney General Beau Biden recognized the rights of consumers (especially kids) to purchase legitimate and safe products and began seizure actions. Attorney General Biden indicated in a press release that there is a concern with knock-off Pillow Pets since the goods are for children and since the manufacture and distribution of these goods bypasses regulatory controls, they are potentially dangerous. *Wright Dec., ¶ 39, Ex. J.*

Since the product is both a pillow and a children's toy it is subjected to numerous state and federal laws, including Federal and state children's products labeling laws. *Wright Dec., ¶ 30.* Defendant's product contains only one label that indicates: "all new material – polyester fibre – ages 3 and up – surface washable – made in china". Nowhere on the label (or otherwise on the product) is there a certification by the manufacturer that "the materials are described in accordance with law"; nor the RN number or address of the importer identified. *Wright Dec., ¶ 32.* Also, the Consumer Product Safety Act requires mandatory self-certification and testing for

14

all such products.  It is not clear if Defendants completed such mandatory testing.  Plaintiffs are in full compliance with U.S. federal and state testing and labeling requirements. *Wright Dec., ¶¶ 30-33, Ex. H.*

There is no question that there is a risk involved in allowing wide-scale distribution of a product for children ages three and up that the child will play and sleep with that has not been tested for harmful or hazardous materials in accordance with U.S. laws. Plaintiffs Pillow Pets are loved by children. In fact, there are numerous examples of charity drives for Pillow Pets. *Wright Dec., ¶ 40, Ex. L* Defendants have even falsely associated themselves with a charity drive for Plaintiffs goods – agreeing to supply goods. *Wright Dec., ¶ 40, Ex. M* Since a majority of these units are for children in hospitals, there is a concern that improperly labeled and untested plush toys would end up in the hands of sick children.

Plaintiffs stand to suffer a loss of their hard-earned sales, their good will and consumer and retail confidence that they may never be able to recoup. However, the risk to consumers is even more overwhelming.  This is irreparable harm.

## C. PLAINTIFF'S ARE LIKELY TO SUCCEED ON THE MERITS

### 1. <u>False Advertising Claim</u>

There are two types of false advertising prohibited by § 43(a) of the Lanham Act, advertising that is literally false, and advertising that is true, but in context has a tendency to mislead or deceive the public. *Castrol, Inc. v. Quaker State Corp.*, 977 F.2d 57, 62 (2d Cir. 1992).  The general rule is that in order for a false or misleading statement to be actionable, the statement must constitute a "material misrepresentation," in other words, one that would have an impact on a consumer's decision whether to purchase the product. *Project Strategies Corp., supra.*  However, if an advertisement is literally false, it may be enjoined without reference to

its impact on the consumer. *See, McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991).

To the extent statements are not considered literally false, they, must be considered to be implicitly false.  If an advertisement is implicitly false, in most cases it would be necessary for the plaintiff to demonstrate that the advertisement is confusing or misleading by reference to public reaction before an injunction will issue. *See, Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 317 (2d Cir. 1982).  However, where Defendant acted willfully or in bad faith, a plaintiff is not required to provide consumer evidence or other extrinsic evidence in order to prove materiality of the false claim. *Resource Dev., Inc. v. Statue of Liberty-Ellis Island Found., Inc.*, 926 F.2d 134 (2d Cir. 1991).  Here, Defendants make a number of literally false claims in connection with advertising and promoting Plushez plush toys.  To the extent any of the following claims are determined to be only implicitly false, the facts of this case show that Defendants set on an intentional course of action to deceive consumers and retailers for its own benefit. *Drangel Dec., ¶¶ 3-16; Wright Dec., ¶¶ 17-23, 34-40.*

### a) Defendants' Use of the "As Seen On TV" Designation is Literally False

The designation "AS SEEN ON T.V." is a nameplate for infomercials, *i.e.,* "products advertised on TV and orderable thorough an 800 number." Where a party used the AS SEEN ON TV logo but never ran a direct response television advertisement, it is often held that a "plaintiff need not demonstrate the impact of the packaging of Defendants' product with that logo on the consumer in order to obtain relief." *Telebrands Corp. v. Wilton Industries, Inc. et al.*, 983 F. Supp. 471, 475 (S.D.N.Y. 1997); *Project Strategies,* 38 U.S.P.Q.2d *at* 1056.

Plaintiff's Pillow Pets™ have been the subject of a multi-year, tens of millions of dollars As Seen On TV promotion. *Wright Dec., ¶ 6.*  Defendants' PILLOWPETS.CO website includes the phrase "As Seen On TV" in an attempt to associate their infringing products with Plaintiffs

although their products are not advertised on television. *Drangel Dec., ¶ 5, Exs. A-B.* Defendants also identify some of their goods as "As Seen On TV" products. *Drangel Dec., ¶ 16, Ex. O.* Defendants have never broadcast a direct response television commercial. *Drangel Dec., ¶ 5.* There is no question that the designation "AS SEEN ON T.V." is literally false as applied to the Plushez product distributed by Defendants.

### b) Defendants Identify their Products as Authentic and Website as Official "Pillow Pets"

Defendants buy up Google adwords in order to position themselves atop a search page result for consumers seeking "authentic" Pillow Pets™. When consumers search for "pillow pets and "my pillow pets", one of the first paid advertisements they see links to Defendants PillowPets.Co website. The advertisement for this link identifies the linked website as "Official PillowPets.Co" and "Official Site." Also, the product itself confusingly identifies the product as "Authentic Pillow Pets". *Drangel Dec., ¶ 8, Ex. E.*

There can be no dispute that Plaintiffs are the only source of "authentic" and "official" Pillow Pets™ products. Defendants did not even incorporate until August 13, 2010 and claims a date of first use in commerce of Plushez Pillow Pets in its trademark applications of August 1, 2010 and the alleged proprietary Plushez copyrighted designs as first created in 2010. *Drangel Dec., ¶ 9, Exs. F-H.*

Use of "original" and "authentic" in combination with Plaintiffs' Pillow Pets Marks as trademarks, domain names, keywords and the like, is therefore literally false advertising, and absolutely critical to purchase decisions made by consumers.

### c) Defendant's Use Favorable Plaintiff Product Reviews as Their Own

Defendants quote favorable third party reviews of Plaintiff's Pillow Pets Products on the "About Us" section of their PILLOWPETS.CO website. *Drangel Dec., ¶ 7, Exs. A, C-D.*

There is no question that use of said quotes is literally false.

## 2. <u>Unfair Competition, Passing Off and False Designation of Origin Under § 43(a) of the Lanham Act</u>

Plaintiffs bring a claim for false designation of origin, pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). One actionable false designation of origin claim is called passing off (also known as "palming off"). Passing off is where the producer misrepresents its goods or services as someone else's. *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 n.1, 156 L. Ed. 2d 18, 123 S. Ct. 2041 (2003).

The application of Section 43(a) of the Lanham Act to this type of activity has been firmly established. In general, the test used for false designation of origin is the same used for trademark infringement, namely, proving a likelihood of confusion. *See, Bi-Rite Enters., Inc. v. Button Master*, 555 F. Supp. 1188, 1192-93 (S.D.N.Y. 1983). However, where a defendant adopted the plaintiff's mark with the intent of obtaining benefit from the plaintiff's business reputation, this fact alone may be sufficient to justify the inference that there is a likelihood of confusion. *Resource Dev.,* 926 F.2d *at* 141 ("once it is shown that a defendant deliberately engaged in a deceptive commercial practice, we agree that a powerful inference may be drawn that the defendant has succeeded in confusing the public. Therefore, upon a proper showing of such deliberate conduct, the burden shifts to the defendant to demonstrate the absence of consumer confusion.")

Defendants created a knock off plush toy, in all likelihood was likely unsuccessful selling it using the name Plushez and Napies and began to use Plaintiff's Pillow Pets Marks to market the product and to establish the PillowPets.Co website. *Drangel Dec., ¶ ¶ 3-4, Exs. A-B.* Defendants then instituted a classic "bait and switch" scheme by selling "knock-off" plush toys

(that infringe Plaintiff's Copyrighted designs) to unsuspecting consumers and retailers using Plaintiff's Pillow Pets Marks. *Drangel Dec., ¶ ¶ 5-8, Exs. A-E.*

Defendants also conduct on-line marketing attempting to confuse consumers. For instance, Defendants have established a number of on-line coupon links using CJ's Marks to lead consumer's to the PILLOWPETS.Co website. One link even uses Plaintiff's proprietary, well-known trademark and copyrighted design:



**Exclusive!** Save 20% OFF when Your Order more Than One Pet

<u>Activate Coupon</u>

*Drangel Dec., ¶ 11, Ex. K.*

Defendants also have a "coupon" website (PILLOWPETSCOUPON.COM) where they identify themselves as: "*The reliable source for your pillow pets coupons and as seen on tv deals.*" This link has resulted in at least one known instance of consumer confusion. *Drangel Dec., ¶ 12-13, Exs. L-M.* Defendants also include PILLOW PETS branded visual advertisements on third party websites with no reference to Defendants' alleged trademark "Plushez". The ads are very similar to images used to promote Plaintiff's Pillow Pets :






**Defendants Advert**                    **Plaintiffs Advert**

Defendants advertisement even appears on pages discussing Plaintiffs' Pillow Pets products. *Drangel Dec., ¶ 10, Exs. I-J.*

As indicated above, Defendants are selling their knock-offs using claims of "official" and "authentic" Pillow Pets and "As Seen on TV" when their products are not. *Drangel Dec., ¶ 8, Ex. E.* Defendants are also referencing third party favorable reviews of Plaintiff's Pillow Pets Products on its PILLOWPETS.CO website. *Drangel Dec., ¶ 7, Exs. A, C-D.*

Defendants knowing that the Pillow Pets Products are copyright protected, attempted to change the designs but not enough to avoid infringement. Defendants clearly sought to benefit by "palming off" its goods as those of Plaintiff's in an attempt to profit at the Plaintiff's expense. Defendants conduct has "tended to create the impression that Defendants' product were precisely the same as Plaintiffs. *Crossbow, Inc., Dan-Dee Imports, Inc.*, 266 F. Supp. 335, 340 (S.D.N.Y. 1967). Defendant's conduct is part of an intentional plan to deceive consumers and retailers, a violation of § 43(a) of the Lanham Act.

> Here, defendant's copying of plaintiffs' product when combined with use of plaintiffs' product as a model, the copying of much of plaintiffs' packaging, acceptance by its salesmen of orders for *Drink-Lite*, plaintiffs' product, show acts and omissions likely to confuse and deceive customers as to the source of defendant's product. These acts evidence intentional conduct by defendant to "palm off" its goods as those of plaintiffs and evidence "a clear attempt to profit at the expense of plaintiff." *Crossbow, Inc. et al. v. Dan-Dee Imports, Inc.*, 266 F. Supp. 335 (S.D.N.Y. 1967) *quoting, Flexitized, Inc. v. National Flexitized Corporation*, 335 F.2d 774 (2d Cir. 1964), cert. denied, 380 U.S. 913, 85 S. Ct. 899, 13 L. Ed. 2d 799 (1965).

In the event Plaintiff were still required to prove likelihood of confusion, it easily could do so based on an analysis of the eight (8) *Polaroid* factors. Plaintiff is the owner of the following relevant trademarks:

**MY PILLOW PETS®**          U.S. Reg. No. 3,762,061

**IT'S A PILLOW, IT'S A PET**

**... IT'S A PILLOW PET!®**      U.S. Reg. No. 3,944,372



**PILLOW PETS**™3

U.S. Reg. No. 3,762,062

U.S. Ser. No. 77,940,244

*Wright Dec., ¶ 15.*

It cannot be disputed that: the respective marks used by Plaintiffs and Defendants are identical *Drangel Dec., ¶ 4; Wright Dec., ¶¶ 15, 34-38*; the products are identical (so no bridging the gap analysis is required) *Wright Dec., ¶¶ 17-23, Exs. D-G*; there is actual confusion in the marketplace *Drangel Dec., ¶¶ 12-13, Exs. L-M; Wright Dec., ¶¶ 34-40, Exs. I - M*; the Defendants have acted in bad faith *Drangel Dec., ¶¶ 3-16; Wright Dec., ¶¶ 17-40*; the quality of Defendants' products are inferior *Wright Dec., ¶ 34-38*; and that purchases of plush toys with a $19 to $25 price tag, are likely considered impulse purchases, which require little sophistication and result in a better chance of confusion.

While no single *Polaroid* factor is dispositive and each factor should be weighed in the context of the others to determine if a likelihood of confusion exists, every factor in this case weighs in Plaintiff's favor and, in particular, the evidence of actual confusion, is strongly indicative of a likelihood of confusion. *W.W.W. Pharmaceutical Co. v. Gillette*, 984 F.2d 567, 572 (2d Cir. 1993); *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 128 (S.D.N.Y. 1993).

### 3. New York Unfair Competition

This common law tort claim is broadly construed by New York courts to prevent the misappropriation of the "results of the labor, skill and expenditures of another." *Telebrands Corp. v. E. Mishan & Sons*, 46 U.S.P.Q.2d 1493, 1508-1509 ("The inexorable conclusion is that

---

3 Defendant Snuggly Plushez opposed this application on the grounds that the mark is generic/highly descriptive.

defendant did not bother to exercise its independent faculties to develop a can opener or even to test the product for the claims made in its television advertising, nor did it even produce or test its own television commercial which is strong evidence that defendant was intending to ride on plaintiff's coattails.")

In order to recover for unfair competition pursuant to New York State common law, a plaintiff must show a likelihood of confusion in order to receive equitable relief. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34 (2d Cir. 1995) A plaintiff who demonstrates likelihood of confusion for purposes of § 43(a) of the Lanham Act also satisfies the likelihood of confusion requirement under New York's common law unfair competition. *See Stern's Miracle-Gro Products, Inc. v. Shark Products, Inc.*, 823 F. Supp. 1077, 1095-96 (S.D.N.Y. 1993). For the reasons set forth above in *Section III.C.2*, consumers and retailers are likely to be confused by Defendants unauthorized and unlawful conduct.

### 4. **Copyright Infringement**

> To prevail on a claim of copyright infringement, the plaintiff must demonstrate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant. See *Hamil Am., Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999).

> To establish infringement, the copyright owner must demonstrate that "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Hamil America*, 193 F.3d at 99 (internal quotations omitted).

> The standard test for substantial similarity between two items is whether an "'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.'" *Hamil America*, 193 F.3d at 100 n.3 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960) (L. Hand, J.)). If "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work," then the two products are substantially similar. *Hamil America*, 193 F.3d at 100; *see*

> *Knitwaves, Inc. v. Lollytoqs, Ltd.*, 71 F.3d 996, 1003 (2nd Cir. 1995). The fact- finder must examine the works for their "'total concept and feel.'" *Hamil America*, 193 F.3d at 102 (quoting *Knitwaves*, 71 F.3d at 1002).

*Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109, 110-11 (2d Cir. 2001).

### a) Plaintiff CJ Owns the Copyright to Plaintiff's Plush Toy Designs

Plaintiffs have standing to bring suit for copyright infringement because CJ obtained copyright registrations for the designs infringed by Defendants and Ontel is the exclusive licensee. *Wright Dec., ¶¶ 11, 15, Ex. C.*

### b) Defendants Copied Plaintiff's Plush Toy Designs

#### i. Defendants' Access to Plaintiffs' Plush Toy Designs

Access can be established either by demonstrating that "(1) the infringed work has been widely disseminated, or (2) a particular chain of events exists by which the alleged infringer might have gained access to the copyrighted works." *Benham Jewelery, supra* , 1997 U.S. Dist. LEXIS 15957, at *35; *Yurman. v. Chaindom ,supra*, 1999 WL 1075942, at *6. Given the vast public exposure of Plaintiffs products in the United States dating back to 2003, Defendants, as active participants in the children's toy industry are unquestionably aware of Plaintiffs' unique designs. See *Yurman. v. Chaindom, supra*, 1999 WL 1075942, at *6; *Benham Jewelry*, 1997 U.S. Dist. LEXIS 15957, at **37-38, 47. Plaintiffs widely advertise (nearly $1,000,000.00 per month in advertising during 2010) and have received very favorable press notoriety and awards and recognition. *Wright Dec., ¶¶ 4-14. Detective Comics, Inc. v. Bruns Publications, Inc.*, 28 F.Supp. 399, 400 (S.D.N.Y. 1939), modified on other grounds, 111 F.2d 432 (2d Cir. 1940). Plaintiffs also have sold tens of millions of Pillow Pets Products. (*Wright Dec., ¶ 12*).

#### ii. The Similarities Between Plaintiffs' and Defendants' Plush Toys are Probative of Copying

The side-by-side, visual comparison of Plaintiffs' plush toy designs with those sold by

Defendants indicates both probative similarity, *i.e.*, that copying has occurred, as well as substantial similarity, *i.e.*, that the copying constitutes infringement. *Yurman. v. Chaindom*, *supra*, 1999 WL 1075942 at *5; *Benham Jewelry*, 1997 LEXIS 15957, at **35-36. The probative similarity analysis requires consideration of the entire design and its overall look to the ordinary observer, while the substantial similarity analysis requires "comparison only of the protected features." *Benham Jewelry*, 1997 LEXIS 15957; see also *Yurman Design v. PAJ*, 1999 WL 1075942 at *6; *Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994).

Plaintiffs have demonstrated probative similarity. See *Wright Dec., ¶¶ 17-23, Exs. D-G.* Defendants' plush toy products (lady bug, bumble bee, panda, penguin, bear, duck, dolphin, cow, frog and monkey) are nearly identical to CJ's Copyrighted Works (lady bug, bumble bee, panda, penguin, bear, duck, dolphin, cow, frog and monkey) in appearance, shape, pose, feel and patterns. While the best way to compare the pairs of plush toys is through actual physical comparison of the two items, some of the extreme similarities can be described. *Wright Dec., ¶¶ 17-23, Exs. D-G. Fisher-Price Toys Div. of Quaker Oats Co. v. My-Toy Co., Inc.*, 385 F.Supp. 218, 220 (D.C.N.Y. 1974) ("while the following description of the dolls may be of some use, nothing short of visual inspection can convey the overall striking similarity between the dolls.")

As a starting point, each animal pair is comprised of the following attributes:

    a.  -a rectangular 18 inch pillow with a long pile fabric top, short pile fabric bottom and four triangular, short pile fabric corners;

    b.  -an animal head extending from the center of one of the long sides of the rectangular pillow;

    c.  -a plush rectangular hook attachment strap (with plush safety closure) extending from the center of one of the short sides of the rectangular pillow and corresponding loop attachment on the opposite short side of the rectangular pillow;

    d.  -when the hook and loops are connected they pull the center short sides of the pillow together so that the four corners of the body extend down and out forming four legs and feet supporting an animal body in a standing position.

*Wright Dec., ¶ 20.*

As for the specific designs, except for the substitution of black for brown in the yellow/brown body, head, mouth, arms and legs of the Bee, all patterned fabric colorings and designs for each paired animal are near identical. *Wright Dec., ¶ 21, Ex. F.* In addition, each animal face configuration (head, mouth, ears and nose), tails and in the case of the bee (wings) are near exact duplicates of coloring, appearance, shape, size, pose, feel and pattern. Only the bead eyes used by Plaintiffs have been changed to sewn eyes by Defendants. *Wright Dec., ¶ 22.* Without identifying tags, an ordinary observer would have great difficulty telling the two products apart. *Wright Dec., ¶ 23, Ex. G.*

### c) There is a Substantial Similarity Between Defendants' Designs and Plaintiffs' Designs

As discussed directly above, Plaintiffs easily satisfy the third element of this copyright infringement claim by demonstrating the existence of a substantial similarity of the products in issue to an ordinary observer.  A substantial similarity inquiry analyzes only "the protectible elements of the two works.'" *Yurman. v. Chaindom, supra,* 1999 WL 1075942, at *6; *Benham Jewelry Corp.*, 1997 U.S. Dist. LEXIS 15957, at *48. When a work contains both "protected and unprotected elements," the Second Circuit applies the "'discerning ordinary observer test" which analyzes the similarity between the protectable elements of Plaintiffs' work and a copy. *Id.; Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 123 (2d Cir. 1994); see also *Yurman. v. Chaindom, supra*, 1999 WL 1075942 at *6 ("In determining whether protectible elements are substantially similar, the Court must consider whether an ordinary lay person would overlook the dissimilarities between the protectible aspects of the two works to conclude that one was copied from the other."). In applying the "discerning ordinary observer test," the courts compare "the works' total concept and feel". *Benham Jewelry Corp.*, 1997 U.S. Dist. LEXIS

15957, at *48. Moreover, the "question of substantial similarity is largely answered by the comparison conducted in the probative similarity analysis." *Id.*

Nearly every aspect of Plaintiffs' designs are protectable element other than the pillow itself.  There is no disputing that there are hundreds, if not, thousands of ways to design an animal plush toy, by changing coloring, appearance, shape, size, pose, feel and pattern. Plaintiff's designs are highly unique and copyrightable subject matter given their combination pillow and plush animal toy design.  There are hundreds of ways to combine a pillow and a plush animal toy using different coloring, appearance, shape, size, pose, feel and pattern (as others have done) to create separable copyrightable plush toy designs and to avoid infringing Plaintiff's intellectual property rights.  Defendants have not used the idea of a plush toy pillow by creating an independent form of expression for its toys. Defendants have instead appropriated Plaintiffs' own unique (and extremely successful) form of expression, infringing Plaintiff's copyrights in its designs.  As set forth above and in the *Wright Declaration*, a comparison of Defendants' products and Plaintiffs' designs reveals an identical resemblance in the protected features as well as the "total concept and feel" of Plaintiffs' designs. Plaintiffs' copyrighted designs and Defendants' near exact knock-offs have the same arrangement, proportion, size and shape.  See *Yurman. v. Chaindom, supra*, 1999 WL 1075942, at *6-7 (finding the entire bracelet design is protectible "as the original combination of the elements present in the bracelet"); *Benham Jewelry Corp.*, 1997 U.S. Dist. LEXIS 15957, at *51 (finding the arrangement of "ornamentation with French enamel and diamonds ... the setting of diamonds ... the use of contrasting colors" and certain patterns, to be protectible); *Knitwaves, Inc. v. Lollytoqs, Ltd.*, 71 F.3d 996, 1004 (2d Cir. 1995) (finding selection of "leaves and squirrels" as "dominant design elements ... fall palette of colors," and arrangement of elements into pattern to be protectible); *Tienshan Inc. v.*

26

*C.C.A. Int'l (N.J.), In*c., 895 F. Supp. 651, 658-59 (S.D.N.Y. 1995) (finding placement of text, trademark, logo and photographs of actual plates and bowls on box containing products to be protectible).  Without identifying tags, an ordinary observer would have great difficulty telling the two products apart.  Unless one set out to detect the disparities it is clear the aesthetic appeal of the Copyrighted designs and Defendant's plush toy designs are the same: therefore, Defendant's plus toy designs are clearly infringing Plaintiff's Copyrights.

Because Plaintiffs has established a prima facie case of copyright infringement, this Court must presume irreparable harm and shift the burden to Defendants to rebut the presumption. *Benham Jewelry Corp.*, 1997 U.S. Dist. LEXIS 15957, at *49.

## IV.   PLAINTIFFS HAVE SHOWN SUFFICIENTLY SERIOUS QUESTIONS GOING TO THE MERITS OF ITS CLAIMS TO MAKE THEM A FAIR GROUND FOR LITIGATION AND THE BALANCE OF HARDSHIPS TIPS DECIDEDLY IN PLAINTIFF'S FAVOR

Even if this Court is unable to determine that Plaintiff is likely to succeed on the merits, the undisputed facts as alleged in the Complaint and Declaration of Brian Wright and Jason M. Drangel, bring Defendants claims squarely within the purview of the Copyright Act, Lanham Act and the New York statutes and common law and raise serious issues which this Court must resolve.  *Polyglycoat Corp. v. Envtl. Chems.*, 509 F. Supp. 36, 39 (S.D.N.Y. 1980) Likewise, when only one party's reputation is a stake, the balance of hardships tips decidedly in that party's favor.  *See, Otokoyama Co. v. Wine of Japan Import,* 985 F. Supp. 372, 379 (S.D.N.Y. 1997). Here, Plaintiffs have built its reputation over nearly a decade and should not suffer the harm of association with Defendants sale of its sole, inferior, untested and possibly unsanitary products. Defendants are profiting through the manufacture and sale of goods based on designs it did not create or invest time and effort in promoting.  No undue harm will result if this Court preliminarily enjoins Defendants' unauthorized conduct.  Defendants' business will not be

unreasonably harmed since it sells other products and has the Plushez.com website to do so. *Drangel Dec., ¶¶ 3-4, Exs. A-B.*

Additionally, if this Court were to assess the public interest in granting preliminary relief, the result is the same. Public interest requires support for legitimate business behavior, which rewards creative efforts and hard work of individuals and decries the renegade who would take without right or authority the fruits of such labor. Public interest also requires that consumers be protected against the flow of potential harmful products into the marketplace until such time as they can be properly investigated. Defendants cannot be harmed if they are ordered to cease misappropriating the property rights of Plaintiffs because they would only be enjoined from unlawful activities. Otherwise, "a knowing infringer would be permitted to construct its business around its infringement, a result we cannot condone." *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir. 1983), *cert. dismissed*, 464 U.S. 1033 (1984).

The threat of irreparable injury to Plaintiffs, Plaintiff's rights in the Copyrighted Plush Toys and Plaintiff's Pillow Pets Marks causes the "balance of hardships" to tip decidedly in favor of Plaintiffs. Potential monetary loss and other inconveniences to Defendants do not weigh heavily against a potential threat to Plaintiff's intangible assets, such as reputation and goodwill. See, e.g., *Polyglycoat Corp. v. Environmental Chemicals, Inc.*, 509 F.Supp. 36, 39 (S.D.N.Y. 1980). The only hardship that Defendants face if this Court grants the relief sought, and Defendant ultimately prove that its conduct is innocent, is lost profits. Any such monetary loss can be remedied in damages. For all these reasons, equity warrants a preliminary injunction against Defendants.

## V.    CONCLUSION

The indisputable evidence establishes Defendants' willful, persistent and illegal copyright infringement, false advertising and false association and unfair competition.    Plaintiffs respectfully submit that their motion for Preliminary Injunction be granted.

Dated:  5/3/11

EPSTEIN DRANGEL LLP

By: _____
Jason M. Drangel (JMD 7204)
Attorneys for Plaintiff
60 East 42nd Street
Suite 820
New York, NY 10165
Tel: 212-292-5390
Fax: 212-292-5391

Jason M. Drangel (JMD 7204)

EPSTEIN DRANGEL LLP

Attorneys for Plaintiffs

60 East 42nd Street, Suite 2410

New York, NY 10165

Tel: 212-292-5390

Fax: 212-292-5391

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------X

CJ Products LLC and Ontel Products    :
Corporation
    :
    :
Plaintiffs    :
      v.    :    Civ Action No.  11- 0715 (RRM)
    :
Snuggly Plushez LLC and Berkant Keiskbas :
Defendants    :

---------------------------------------------------X

## CERTIFICATE OF SERVICE

       I hereby certify that a true and complete copy of the following:

1. Proposed Order to Show Cause
2. Memorandum of Law In Support of Plaintiffs' Motion for Order to Show Cause for Preliminary Injunction
3. Declaration of Brian Wright
4. Declaration of Jason M. Drangel

was served by email and Federal Express on this 3rd day of April, 2011, upon Defendant's counsel at:

Daniel C. Marotta, Esq.

G A B O R   &   M A R O T T A  LLC
1878 VICTORY BOULEVARD
STATEN ISLAND, NY 10314

New York, New York        By: _____

                              Jason M. Drangel