Daniel C. Marotta (DM-2581)
GABOR & MAROTTA LLC
Attorney(s) for Defendants
1878 Victory Boulevard
Staten Island, New York 10165
Tel: (718) 390-0555
Fax: (718) 390-9886

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------X

CJ Products LLC and Ontel Products
Corporation,

                                        Plaintiffs,

                                                            Civ. Action
                                                            No. 11-0715 (RRM)

        v.

Snuggly Plushez LLC and Berkant Keiskbas,

                                        Defendants.

-------------------------------------------------------------------X

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S**
**MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT...................................................................1

SUMMARY OF FACTS.......................................................................5

ARGUMENT.................................................................................12

   A. Standard on a Motion for Preliminary Injunction......................................12

   B. Copyright Claims.......................................................................15

      1. Plaintiff Cannot Establish Likelihood of Success on Copyright Claims......15

         a. Plaintiff Cannot Establish Copying of Protected Elements................18

         b. Preliminary Injunction May Not Issue Based on Simple
           Designs with Notable Differences.......................................22

      2. Irreparable Injury Not Shown Where Evidence of Laches......................23

      3. Balancing of the Public Interest Weighs In Favor of Defendant...............25

   C. Plaintiffs' State No Claim for Trademark Infringement or Common Law
      Trademark Infringement Because the Alleged Trademark Is Generic...............25

      1. Plaintiffs Do Not Have a Registration for the Generic Mark "Pillow
         Pets".................................................................................26

      2. Secondary Meaning of "Pillow Pets" Cannot Be Shown.......................28

      3. The Second Circuit Will Not Permit Exclusive Rights In A Word
         Necessary to Describe a Characteristic or a Product...........................29

   D. Plaintiff's Adoption of a Generic Mark Precludes Its Other Lanham Act
      Claims .................................................................................30

      1. Plaintiff Does Not State a Claim for False Designation of Origin
         Under the Lanham Act.........................................................30

      2. Remaining Common Law Claims for Unfair Competition Are Also Fatally
         Defective..........................................................................31

         a. Plaintiffs Cannot Demonstrate a Likelihood of Confusion............33

         b. Plaintiffs Cannot Show Bad Faith or "False" Advertising............37

      3. Harm to Defendant and the Public Interest From A Restraint of Advertising
      Outweighs Any Alleged Harm to Plaintiff .......................................41

      4. Laches, Waiver and Estoppel Preclude Equitable Relief......................42

## TABLE OF AUTHORITIES

<u>CASES</u>                                                                    <u>PAGE</u>

<u>Abercrombie & Fitch Co. v. Hunting World, Inc.</u>,
537 F.2d 4 (2d Cir. 1974)……………………………………………………....31

<u>Andre Strishak & Associates, P.C. v. Hewlett Packard Co.</u> ,
752 N.Y.S.2d 400 (2002)……………………………………………………....37

<u>AFA Dispensing Group B.V. v. Anheuser-Busch, Inc.</u>,
740 F. Supp.2d 465 (S.D.N.Y. 2010)………………………………………………13

<u>Abernathy & Closther Ltd v. E & M Advertising Inc.</u>,
553 F.Supp. 834 (E.D.N.Y. 1982)………………………………………....…39

<u>In re Ampco Foods, Inc.</u>,
227 U.S.P.Q. 331 (T.T.A.B. 1985)………………………………………....…28

<u>Arrow Fastener Co. v. Stanley Works</u>,
59 F.3d 384 (2d Cir. 1995)………………………………………………………31

<u>Beneficial Corp. v. Beneficial Capital Corp.</u>,
529 F.Supp. 445 (S.D.N.Y.1982)……………………………………………..36

<u>Bernard v. Commerce Drug</u>,
964 F.2d 1338 (2d. Cir. 1992)………………………………………....………28

<u>Bill Diodato Photography, LLC v. Kate Spade, LLC</u>,
388 F. Supp.2d 382 (S.D.N.Y. 2005)…………….……………………..……..19

<u>Boisson v. Banian, Ltd.</u>,
273 F.3d 262 (2d Cir. 2001)……………………………………………..……………16

<u>Boone v. Jackson</u>,
2006 WL 3327058 (2d Cir. 2006)…………………………………..…………19

<u>Brandwynne v. Combe Intern., Ltd.</u>,
74 F.Supp.2d 364 (S.D.N.Y. 1999)……………………………...…………………27

<u>Century Time Ltd v. Interchron Ltd</u>,
729 F.Supp. 366 (S.D.N.Y. 1990)……………………………………………..23

<u>County of Suffolk v. First Am. Real Estate Solutions</u>,
261 F.3d 179 (2d Cir. 2001)……………………………………..……………..19

i

Citibank NA and Citicorp v. CITYTRUST and Citytrust Bancorp.,
756 F.2d 273 (2d Cir. 1985)…………………………………………………...……………43

Citigroup Global Markets, Inc. v. VCG Special opportunities Master Fund Limited,
598 F.3d 30 (2d Cir. 2010)……………………………………………………………………13

Clonus Assocs. v. Dreamworks LLC,
417 F.Supp. 2d 248 (S.D.N.Y. 2005)…………………………...……………………………24

In re DNI Holdings Ltd.,
77 U.S.P.Q.2d 1435, 2005 WL 3492365 (T.T.A.B. 2005)……...………………………..28

Dollcraft Industries, Ltd. v. Well-Made Toy Mfg. Co.,
479 F.Supp. 1105 (E.D.N.Y. 1978)……………………………………..……………………16

Doninger v. Niehoff,
527 F.3d 41 (2d Cir. 2008)……………………………………...……………………………13

Doran v. Salem Inn, Inc.,
 422 U.S. 922 (1975)……………………………………………………………………………13

Eden Toys, Inc. v. Marshall Field & Company,
675 F.2d 498 (2d Cir. 1982)………………………………………………...……………18

Energy Intelligence Group, Inc. v. UBS Financial Services, Inc.,
2009 WL 1490603 (S.D.N.Y. May 22, 2009)……………………………………...…………27

Feist Pubs Inc., Inc. V. Rural Tel. Serv. Co.,
499 U.S. 340 (1991)……………………………………………………………..……………15

 Forschner Group, Inc. v. Arrow Trading Co.,
904 F.Supp. 1409 (S.D.N.Y. 1995)…………………………………………...……………36

Galerie Furstenberg v. Coffaro,
697 F.Supp. 1282 (1988)……………………………………………………………………38

Gen. Elec. Capital Corp. v. Armadora, S.A.,
37 F.3d 41 (2d Cir. 1994)…………………………………………………….…………..42

Genesee Brewing Co. v. Stroh Brewing Co.,
124 F.2d 137 (2d Cir. 1997)………………………………………………………………..28

Gund, Inc. v. Smile International, Inc.,
691 F. Supp. 642 (E.D.N.Y.1988)………………………………………………………20

Hasbro, Inc. v. Lanard Toys, Ltd.,
 858 F.2d 70 (2d Cir. 1988)……………………………………………..……………..35

Imperial Toy Corporation v. Goffa International Corporation,
988 F.Supp. 617 (E.D.N.Y.1997)……………………………………………..……………20

J. Kohnstam, Ltd. v. Louis Marx and Company,
280 F.2d 437 (1960)…………………………………………………………..……………31

Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,
58 F.3d 27 (2d Cir.1995)……………………………………………………………………37

Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.,
960 F.2d 294 (2d Cir.1992)…………………………………………………………………38

JSG Trading Corp. v. Tray-Wrap, Inc.,
917 F.2d 75 (2d Cir. 1990)…………………………………………………………...……..12

Kellogg Co. v. National Biscuit Co. ,
305 U.S. 111 (1938)…………………………………………………..……………………36

Knitwaves, Inc. v. Lollytogs. Ltd.,
71 F.3d 996 (2d Cir. 1995)…………………………………………………………………20

Lang v. Retirement Living Pub. Co.,
949 F.2d 576 (2d Cir.1991)…………………………………………………………………36

Lapine v. Seinfeld,
2010 WL 1688713 (2d Cir. April 28, 2010)…………………………………………………20

Loveridge v. Pendleton Woolen Mills, Inc.,
788 F.2d 914 (2d Cir. 1986)…………………………………………………………………13

Markowitz Jewelry Co. Inc v. Chapal/Zenray, Inc.,
988 F.Supp. 404 (S.D.N.Y. 1997)…………………………………………….……………23

Mattel, Inc. v. Azrak-Hamway Int'l, Inc.,
724 F.2d 357 (2d Cir.1983)………………………………………………….…………… 19

Mattel Inc. v. S. Rosenberg Co., Inc,
 296 F.Supp. 1024 (S.D.N.Y. 1968)……………………………………..……………………22

Mazer v. Stein,
347 U.S. 201 (1954)…………………………………………………………..……………21

McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.,
938 F.2d 1544 (2d Cir.1991)..................................................................38

Midway Mfg. Co. v. Bandai-America, Inc.,
546 F.Supp. 125 (D.C.N.J. 1982).............................................................16

Modern Pub., a Div. of Unisystems, Inc. v. Landoll, Inc.,
849 F.Supp. 22 (S.D.N.Y.1994)..............................................................16

Paddington Corp. v. Atiki Importers & Distribs, Inc.,
996 F.2d 577 (2d Cir. 1993)...................................................................35

Park 'n Fly, Inc. v. Dollar Park & Fly, Inc.,
469 U.S. 189 (1985)............................................................................27

Plus Prods. v. Plus Discount Foods, Inc.,
722 F.2d 999 (2d Cir.1983)...................................................................33

Prestige Fabrics Inc. v. Universal Manufacturing Corp.,
304 F.Supp.903 (S.D.N.Y. 1969).............................................................22

Procter & Gamble Co. v. Ultreo,
574 F.Supp.2d 339 (S.D.N.Y. 2008)..........................................................40

Polaroid Corp. v. Polarad Elecs. Corp.,
287 F.2d 492 (2d Cir. 1961)...................................................................33

Power Test Petroleum Distributers v. Calcu Gas,
754 F.2d 91 (2d Cir. 1985)....................................................................13

Reese Publishing Co. v. Hampton Int'l Comm., Inc.,
620 F.2d 7 (2d Cir. 1980).....................................................................27

Religious Technology Center v. Netcom On-Line Communication Services, Inc.,
923 F.Supp. 1231 (N.D.Cal. 1995)...........................................................16

Salinger v. Colting,
607 F.3d 68 (2d Cir. 2010)....................................................................13

Seijas v. Republic of Argentina,
352 Fed.Appx. 519 (2d Cir. 2009).............................................................14

Stewart v. United States Immigration and Naturalization Service,
762 F.2d 193 (2d Cir. 1985)...................................................................13

Sussman v. Crawford,
488 F.3d 136 (2d Cir. 2007).................................................................12

TCPIP Holding Co.. Inc. v. Haar Communications, Inc.,
244 F.3d 88 (2d Cir.2001)..................................................................27

Telecom Int'l Am., Ltd. v. AT & T Corp.,
280 F.3d 175 (2d Cir.2001)................................................................38

The Comic Strip v. Fox Television Stations, Inc.,
710 F.Supp. 976 (S.D.N.Y.1989)........................................................18

Torah Soft Ltd v. Drosnin, Simon & Schuster,
136 F.Supp.2d 276 (S.D.N.Y. 2001)....................................................16

Tonawanda St. Corp. v. Fay's Drug Co.,
842 F.2d 643 (2d Cir.1988)................................................................37

Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.,
964 F. Supp. 733 (S.D.N.Y. 1997).......................................................35

Two Kids From Queens. Inc. v. J & S Kidswear, Inc.,
2009 WL 5214497 (E.D.N.Y. 2009).....................................................43

Uneeda Doll Co. v. P&M doll Co Inc,
241 F.Supp. 675 (S.D.N.Y. 1965)........................................................21

Waldman Publishing Corp. v. Landoll, Inc.,
43 F.3d 775 (2d Cir.1994)..................................................................30

Williams v. Crichton,
84 F.3d 581 (2d Cir. 1996).................................................................16

Weight Watchers Int'l, Inc. v. Stouffer Corp.,
744 F.Supp. 1259 (S.D.N.Y. 1990)......................................................37

WWW Pharmaceutical v. Gillette Company,
808 F. Supp. 1013 (S.D.N.Y. 1992).....................................................34

Zitz v. Pereira,
965 F.Supp. 350 (E.D.N.Y. 1997)........................................................23

OTHER SOURCES                                                    PAGE

J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition § 23:15 (4th

ed. 2011)..........................................................................................................26

J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:13 (4th ed.
2011). .............................................................................................................27

Restatement (Third) of Unfair Competition § 20 (1995)...................................36

This memorandum of law is submitted in opposition to the Plaintiffs' motion for a preliminary injunction on behalf of the Defendants herein Snuggly Plushez LLC ("Snuggly") and Berkant Kieskbas.  Plaintiffs and Defendant are producers of plush toy animals for children. This action involves various intellectual property claims for alleged trademark infringement and unfair competition based on the use of the internet search terms "pillow pet," as well as copyright and trade dress infringement claims for alleged copying of simple designs of toy stuffed animals that turn into bed pillows for children.

Defendants deny all claims, and assert that they manufacture their own high quality, safety tested pillow pets for children pursuant to their own copyrighted designs under the brand PLUSHEZ Pillow Pets, and that Plaintiffs cannot be granted a monopoly over generic terms, as same would constitute an unlawful restraint of trade and grant Plaintiffs an unfair competitive advantage they have never had.   Defendants also affirmatively assert that Plaintiff was not the first to manufacture pillow pets, and that Plaintiff did not create the idea of a stuffed plush toy that can be used as a pillow.

## PRELIMINARY STATEMENT

The R. Dakin Company, not Plaintiff, was the first company to make "pillow pets," and there have been many other companies manufacturing "pillow pets" before Plaintiff.  Plaintiffs now seek a preliminary injunction enjoining Snuggly from using "pillow pets" in any internet or other advertising and search engines.  However, Plaintiffs fail to mention the key fact in this dispute, which is that Plaintiff CJ Products Inc. ("CJ") actually disclaimed the exclusive right to use the phrase "pillow pets" in connection with their February 2008 trademark registration application for "My Pillow Pets."[1]   See

---

[1] CJ filed for the mark "My Pillow Pets" on February 4, 2008; however, the mark was not registered until March 23, 2010.

accompanying Declaration in Opposition of Daniel C. Marotta ("Marotta Decrl.") at Exh.

A. Plaintiffs have two similar, albeit generic, alleged marks they use in commerce.

Plaintiffs have a registration certificate for the word mark, "*My* Pillow Pets" which they

continue to use (with the disclaimer), but not "Pillow Pets.™"   Despite Plaintiffs'

suggestions, Snuggly does not use "*My* Pillow Pets" in search engines or otherwise, only

the generic phrase "pillow pet."

As detailed herein, the motion must be denied in its entirety, as Plaintiffs cannot

establish irreparable harm or a likelihood of success on any of their claims.

It is clear that all of Plaintiffs' copyrighted designs are merely recycled common

designs based either on well known pre-existing designs, such as TY Inc.'s products

(manufacturer of the famous "Beanie Babies" and "Pillow Pals") (see Marotta Decrl. at

Exh. L), or simply the same common designs used by many toy and other well known

manufacturers across multiple industries.   Plaintiff has not added any original

contribution.   More importantly, Defendant has not copied any of Plaintiff's designs.

Snuggly produces its own, original, high quality products, which are in no way

"counterfeit" as Plaintiffs suggest.

There is no longer any presumption of irreparable harm in copyright infringement

cases as Plaintiffs suggest.  Moreover, Plaintiffs' delay in filing copyright registrations,

seeking enforcement against others and the delaying in bringing this action and instant

motion for emergency equitable relief mitigate against any finding of irreparable harm,

particularly where Plaintiff has not shown any actual losses or damages.

Despite Plaintiffs' allegations or implications to the contrary, Defendants'

products are all safety tested with certifications and proper labeling, made with the

highest quality materials pursuant to Defendant's quality control standards and registered copyright designs, and there is no bona fide issue with respect thereto.

Plaintiffs also cannot establish irreparable harm or a likelihood of success on any of their sundry claims for false advertising and unfair competition. All of these claims are based on the false premise that Plaintiffs own the exclusive rights to the generic industry phrase, "pillow pets." "Pillow pets" and "pillow pet," as well as "pet pillow(s)," are generic phrases which have been used extensively in the plush toy industry by manufacturers, retailers, wholesalers and consumers alike for over thirty (30) years to describe a stuffed plush animal toy, including ones that can be converted into a bed pillow for children.

While Plaintiffs claim "great success since their introduction in 2003" (see Plaintiff's Memorandum of Law at p.3), in actuality, Plaintiffs had been selling their pillow pet products under the "My Pillow Pets" trademark. Not content with their trademark disclaiming "pillow pets," Plaintiffs now attempt to bootstrap the notoriety of its "My Pillow Pets" brand to its new "pillow pets" alleged mark, and preclude all others from using these generic words. It is no surprise that Plaintiffs now seek to corner the market on "pillow pets" which would give them a tremendous unfair advantage over competitors.

It is also no surprise that the Plaintiff Wright Declr. In Support has no attachments regarding its 2009 toy awards (See Wright Declr at ¶8). CJ's press release regarding its celebrated 2009 awards clearly identifies "*My* Pillow Pets" as the exclusive brand for Plaintiffs' products. See Keiskbas Declr at Exh. C. (June 18, 2009 CJ press release).

Plaintiffs also presented their brand as "*My* Pillow Pets" in earlier television appearances. See Keiskbas Declr at ¶. 12.

Plaintiffs' adoption of a generic industry phrase precludes its Lanham Act claims for false designation of origin, unfair competition and false advertising. Plaintiffs also cannot establish a likelihood of confusion for its common law claims – "pillow pets" is an unenforceable generic mark, incapable of achieving secondary meaning or serving as an indication of sole source of origin. Alleging that Snuggly has used "pillow pets" in its advertising and labeling, Plaintiffs then go on to say that Defendant is making misrepresentations that it is the "authentic" or "official" source of pillow pets. Snuggly is indeed the official source of PLUSHEZ pillow pets, and Defendant does not engage in conduct to the contrary. Snuggly does not purport to be the official source of CJ's "My Pillow Pets" brand. Despite Plaintiff's claims, there are no instances of actual confusion shown where consumers purchased a PLUSHEZ product believing it was CJ.

Pillow pets is a generic category of product and has been regarded as such by the toy industry since the R. Dakin company (the original manufacturer of pillow pets) abandoned its trademark in 1993, resulting in widespread use of "pillow pets" by other manufacturers. Although Plaintiffs refer to a "collectible market created by Plaintiff," the true collectibles are the Dakin brand pillow pets from the 1970's. See Kieskbas Declr. at Exh. B (E-bay snapshot of numerous Dakin Pillow Pets for sale).

Plaintiff cannot establish a likelihood of success, and the harm to the Defendant and the public interest outweighs any harm to Plaintiff from a denial of equitable relief at this preliminary stage. There has been no discovery in this action beyond initial Rule 26 disclosures.

4

**SUMMARY OF FACTS**

R. Dakin & Company was the original manufacturer of pillow pets and maintained a U.S. registration under serial no. 0994415 from 1973-1993, in the same class for "stuffed animal toys," class 028. The date of first use therein was alleged to be 1964. After some twenty years of use after registration, the mark was not renewed and the registration expired in 1993. Since 1993, there has been widespread general use of the mark in the stuffed toy industry by various competitors and the public. See Marotta Declr. at ¶ 17. Whatever distinctiveness the mark may have carried before, it has now become a generic term, often used as noun. See Marotta Declr. at Exh. K (internet snapshots that show the public's repeated and common usage of the generic phrase "pillow pets" by search engines, manufacturers, retailers, and consumers).

The individual words themselves, pillow and pet, can be found in any English dictionary. They are often used interchangeably in advertisements and search engines; sometimes advertisements appear showing the product as a "pet pillow," and other times, as a "pillow pet." Other advertisements and listings show the same phrases indicating a plural noun, "pillow pets," or "pet pillows." See Marotta Declr. at Exh. K.

Prior to Plaintiffs' attempt to register "pillow pets" as a word mark, there were numerous manufacturers using the same term, or variation thereof, to describe similar products in the industry. See Marotta Declr. at Exh. H (copies of trademark registrations for the marks, "pillow pets" and "pet pillows"). It is obvious given the extensive use in commerce by numerous third parties, the phrases "pillow pets" and "pet pillows" are generic or at best highly descriptive of a type of toy, i.e., bed pillows in the form of pets.

CJ first filed for the marks "My Pillow Pets" and "My Pillow Pets Its Your Pillow

And A Pet, It's A Pillow Pet," on February 4, 2008. When Plaintiff CJ sought to register the mark, "My Pillow Pets," the United States Patent and Trademark Office ("USPTO") initially refused to register the mark due to the potential for confusion with another mark, "Pet Pillows." See Marotta Declr. at Exh.A (Nov.13, 2008 USPTO Office Action Letter). The USPTO examiner pointed out that Plaintiff's mark was for use as a "pillow," which was similar to "Pet Pillow" products. CJ argued in its Response that while both marks contain both "pillow" and "pet," consumers would not confuse the two marks since the *visual impressions* of the two marks were distinct. Additionally, CJ claimed that its product was not sold as bedding of any kind and is promoted primarily as a toy - "Applicant's goods are neither identical nor directly competitive. Applicant's goods consist of stuffed animal toys which are constructed in such a way to allow them to be used as a pillow. However, Applicant does not sell the goods as bedding or a bedding accessory of any kind. The primary use is as a toy." However, Plaintiff CJ indeed currently advertises its pillow pets as a pillow used at bedtime. See Marotta Decl. at Exh. L (internet printout of CJ advertisement showing child sleeping with a pillow pet; CJ's Response to Office Action Letter).

Notwithstanding, the USPTO required a disclaimer of the exclusive right to use "pillow pets." Although CJ initially resisted, CJ eventually agreed to the disclaimer, and the USPTO published "My Pillow Pets" for opposition and a certificate was issued on March 23, 2010 with the disclaimer on its face. See Marotta Declr. at Exh.A.

On August 15, 2010, Defendants then filed a trademark registration for "PLUSHEZ Pillow Pets," *after* Plaintiffs publicly disclaimed use of the term "pillow pets." As did CJ, Defendants also disclaimed the exclusive right to use "pillow pets"

6

apart from the mark as shown. See Marotta Declr. at Exh. F. The USPTO *approved*
Defendant's application for the mark, "PLUSHEZ Pillow Pets." CJ filed objections
thereto on February 9, 2011.

Although CJ now alleges use since 2003, CJ filed no actual application for the
alleged mark "Pillow Pets$^{TM}$" until February 19, 2010. The date of first use stated therein
is September 11, 2009. Ultimately, the USPTO approved the mark for publication.
Snuggly filed objections Feb. 9, 2011. See Marotta Declr. at Exh. E. Plaintiffs then
commenced this action on February 14, 2011.

In addition to the aforementioned trademark filings, there are numerous other
competitors that use "pillow pets", including MultiPet International, which currently sells
plush toy products called "Pillow Pets$^{TM}$." See Marotta Declr. at ¶ 18 and Exh. I.
MultiPet also manufactures designs nearly identical to Plaintiffs' alleged copyrighted
designs, as do many others as discussed below. Such third party use of the mark and the
designs is evidence of the genericness of the mark, and the commonality of the designs.
There are also manufacturers, such as Aroma Home, that produce other products with the
same designs. It is likely that the owner of these common designs is a China based
company, Color Rich LTD, which is also the manufacturer of the Aroma Home's
products, as well as other companies such as American Mills and Squishables. See
Kciskbas Declr. at Exh. L (images of animal slippers likely manufactured by Color Rich
and which bear close similarity to the Plaintiffs' "My Pillow Pets").

**Defendants Do Not Infringe Plaintiff's Invalid Copyrights**

Defendant has developed some twenty seven (27) of its own original animal
designs for its PLUSHEZ brand pillow pets. Snuggly has filed a copyright registration for

7

each of its PLUSHEZ designs. The work for hire author of the PLUSHEZ designs, JSF International, is listed on the PLUSHEZ copyright certificates. See Keiskbas Declr. at Exh. E.   Snuggly adds expressive elements to the designs created by JSF. See Keiskbas Declr. at ¶ 25.

Plaintiffs allege copyright infringement of ten (10) copyright designs: a ladybug, bumblebee, panda, penguin, bear, duck, dolphin, cow, frog, and monkey.   Plaintiffs' purportedly original copyright designs are merely borrowed from designs that predate Plaintiffs' designs, or common designs from the public domain that are used by at least ten (10) companies in the plush toy industry, including: American Mills, Mulitpet International, Kellytoy, CuddleBudz, Aroma Home, TY Inc., Fiesta, Bestever Hugga Pet, Intelex, and Squishables.   See Marotta Declr. at ¶ 30 and Exh. N.   Additionally, one of these, Multipet International Pillow Pets uses Pillow Pets[TM] as a trademark. See Marotta Declr. at ¶ 18 and Exh. I.   Plaintiff lists no work for hire or contributing author on their copyright certificates.

While Plaintiffs do not make a trade dress claim in connection with this motion, it is important to note that the Velcro strap described by Plaintiffs is not an exclusive feature of Plaintiffs' product and is not trade dress as Plaintiffs claim.   The velcro strap is a common functional feature used by many manufacturers, including: pediatrician recommended "Slumber Friends" by Cloud B; Fiesta; Kellytoy; Best Ever Hugga Pets; and Mary Meyer Animal Pillows.   As explained below, the idea of a velcro strap is not a protectable element under existing copyright law.

Plaintiffs present <u>no</u> proof of use of the mark "*My* Pillow Pets" by Defendants. Snuggly does not use "my pillow pets."  Snuggly uses "pillow pets" for its internet advertising and Google Adword program.  <u>See</u> Keiskbas Declr. at Exh. I (list of key words that Snuggly has purchased from Google Adwords).  Moreover, Snuggly's PLUSHEZ trademark appears prominently on all its pillow pet products.  The PLUSHEZ trademark is not only clearly displayed on all hangtags, but is also permanently stitched on the leg of every product.  PLUSHEZ appears in capital letters in highly stylized font with a penquin logo.  <u>See</u> Keiskbas at ¶ 47.

While Plaintiffs purport to allege instances of actual confusion by consumers, there is in fact <u>no</u> such evidence submitted with Plaintiff's motion.  The actions by state agencies in Missouri, Delaware and New Jersey did not involve PLUSHEZ pillow pets. The remaining allegation of confusion pertains to the use of a coupon found on a third party website, advertising coupons for Defendant's products.  Plaintiffs allege that a consumer attempted to use the coupon to purchase a My Pillow Pets pillow pet. Plaintiffs merely allege confusion as to the use of a coupon code found on pillowpetscoupon.com, and not as to actual products themselves.  <u>See</u> Plaintiff Drangel Declr. at Exh. M.  The consumer did not buy a PLUSHEZ product thinking it was Plaintiffs', but merely inquired whether a coupon was redeemable by CJ.  This instance involves nothing more than the fact that a consumer attempted to purchase a pillow pet using a coupon, but could not do so on the CJ pillow pet website.

Nonetheless, any alleged confusion among Plaintiffs' and Defendants' products is not due in any part to Defendants' actions, but rather a result of the Plaintiff's adoption of a generic phrase as its new trademark, and their own blurring of its two generic brands.

Defendant's websites, Plushez.com, pillowpetswholesale.com and pillowpets.co are all legitimate and official internet sites that sell *only* legitimate and official brands of pillow pets, like PLUSHEZ. See Keiskbas Declr. at ¶¶ 32, 34, and 36.  Pillowpets.co is indeed one of the official websites of Snuggly, but pillowpetscoupon.com is not.   See Keiskbas Declr. at ¶ 34.  None of Defendant's websites possess a "My Pillow Pets" coupon link that directs the consumer to Defendant's legitimate websites. See Keiskbas Declr. at ¶ 38.

Plaintiffs themselves generate confusion in the marketplace by promoting "Pillow Pets" as a brand, when the Plaintiffs' established brand is actually "My Pillow Pets." Both of Plaintiffs' labels for "My Pillow Pets" and "Pillow Pets" are nearly identical - Plaintiffs use the same font, color, logo, and label, but simply omit the word, "My." See Keiskbas Declr. at ¶ 13.   In fact, there is evidence of actual consumer confusion among Plaintiff's own products resulting from Plaintiff blurring the two marks. See Keiskbas Declr. at ¶ 15 and Exhibit D.  Plaintiffs also use and maintain multiple websites with "pillow pets" in the domain name, which also contribute to any confusion, such as pillowpetstv.com, pillowpetsontv.com, ilovepillowpets.com, getpillowpets.com, etc.

**PLUSHEZ Safety Testing and Certifications**

Each and every product manufactured by Snuggly is safety tested, with certifications and proper labeling.  Plaintiffs' averments suggesting that Defendants do not comply with safety standards and that Defendant's products have been the subject of seizure or complaints by various states are incorrect.   Defendant's products are not unsanitary and do not contain harmful materials as Plaintiffs falsely suggest. PLUSHEZ products bear all required labeling information and certification standards.   Defendant's

10

PLUSHEZ brand pillow pets meet mandatory and voluntary safety requirements, have met testing standards and certifications, and are made only from the highest quality materials pursuant to original copyrighted designs approved by Defendants pursuant to an established quality control process.   See Kieskbas Declr. at Exh. F (copies of License Certificates and Test Reports).

Specifically, Defendant's products were not seized at malls in New Jersey and Delaware as Plaintiff absurdly suggests.  Any product seized by the Delaware Attorney General's Office was not a PLUSHEZ pillow pet.  See Keiskbas Declr. at ¶ 49.  There is absolutely no evidence pointing to the contrary, and there is no indication that the products were the PLUSHEZ brand.  Furthermore, the product complained of by the Missouri Attorney's General Office as alleged by Plaintiff is not a PLUSHEZ product. Nowhere in the customer's complaint attached to Plaintiff's moving papers does it say that the product was a PLUSHEZ product.  See Plaintiff Wright Declr. at Exh. I.  In fact, the letter from the consumer states that there was no embroidered emblem on the leg of the pillow pet.  Each and every PLUSHEZ pillow pet has an embroidered patch on the bottom of the leg, indicating the product to be an authentic PLUSHEZ.  Obviously, the product was not a PLUSHEZ pillow pet.  See Keiskbas Declr. at 47.

**There is Considerable Evidence of Laches, Waiver and Estoppel**

Plaintiff likely waited to file suit until after Snuggly filed objections to CJ's trademark registration, and then waited until May 3, 2011 to seek injunctive relief, 9 months after Snuggly filed its trademark registration alleging use in commerce, and over 7 months after Snuggly's products were in retail stores.

Plaintiffs disclaimed exclusive rights to use of the generic phrase, "pillow pets," thereby admitting the marks descriptiveness, and should therefore be estopped from now asserting such rights. In adopting its Plushez Pillow Pets brand, Snuggly relied on CJ's disclaimer as stated in CJ's March 23, 2010 registration certificate.

The term "pillow pet" is a common keyword search for all adult users pricing and purchasing different brands of pillow pets online. If Plaintiff were granted a monopoly, nearly all competitors would be eliminated from the pillow pets market. Consumers would have less choice, and Plaintiff would be free to dictate pricing and quality standards.

## ARGUMENT

Plaintiffs' motion is based on the likelihood of success of their claims for alleged copyright infringement and Lanham Act and state law claims for unfair competition. Plaintiffs do not seek preliminary relief on their trademark infringement claim, dilution or trade dress claims.

### A. Standard on a Motion for a Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." Sussman v. Crawford, 488 F.3d 136 (2d Cir. 2007)(emphasis in original). A preliminary injunction should not be granted as a routine matter. JSG Trading Corp. v. Tray-Wrap, Inc., 917 F.2d 75, 80 (2d Cir. 1990). A preliminary injunction may issue only where the moving party demonstrates a likelihood of success on the merits, or sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in the

movant's favor. <u>Power Test Peteroleum Distributers v. Calcu Gas</u>, 754 F.2d 91, 95 (2d Cir. 1985). <u>See also</u> <u>Doninger v. Niehoff</u>, 527 F.3d 41 (2d Cir. 2008).   Plaintiff must also demonstrate that he is likely to suffer irreparable injury in the absence of the injunction. <u>Salinger v. Colting</u>, 607 F.3d 68 (2d Cir. 2010).

Irreparable injury means injury for which a monetary award will not be sufficient. <u>Loveridge v. Pendleton Woolen Mills, Inc.</u>, 788 F.2d 914 (2d Cir. 1986).  Mere damages to reputation ordinarily do not merit preliminary injunctive relief.   <u>Stewart v. United States Immigration and Naturalization Service</u>, 762 F.2d 193, 200 (2d Cir. 1985). Irreparable harm is a fundamental and traditional requirement of all preliminary injunctive relief. <u>Doran v. Salem Inn, Inc.</u>, 422 U.S. 922, 931 (1975).  If a showing of irreparable harm is required where a movant must also establish probable success on the merits, then *a fortiori* where the movant establishes something less than probable success as to the merits, the need for proof of the threat of irreparable damage is even more pronounced.  <u>Id</u>.  In order to demonstrate irreparable harm, the moving party must demonstrate that, absent preliminary injunction, it will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be redressed through a monetary award. <u>AFA Dispensing Group B.V. v. Anheuser-Busch, Inc.</u>, 740 F. Supp.2d 465 (S.D.N.Y. 2010).   If the movant elects to show likelihood of success, it must show that it is more likely than not to succeed on its underlying claims, or in other words, that the movant must show a greater than fifty percent probability of success on the merits. <u>Citigroup Global Markets, Inc.</u>, 598 F.3d 30 (2d Cir. 2010).

In copyright cases, the Second Circuit has specifically stated that there is no presumption of irreparable harm for purposes of a preliminary injunction.  Salinger, 607 F.3d 68.  (citing eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, (2006)).[2]  Thus, even when the plaintiff seeking a preliminary injunction establishes a likelihood of success on the merits, the court must not presume that the plaintiff will suffer irreparable harm.  Id. "A preliminary injunction is an extraordinary remedy never awarded as of right." Salinger, 607 F.3d at 79.  (noting that the Second Circuit previously had "nearly always issued injunctions in copyright cases as a matter of course upon a finding of likelihood of success on the merits.").

The "serious questions" standard permits the court to grant a preliminary injunction in situations where it cannot determine with certainty that the movant is more likely than not to prevail on the merits of the underlying claims, but it is established that the costs outweigh the benefits of not granting the injunction.  598 F.3d at 35.  Because the movant must not only show that there are "serious questions" going to the merits, but must "additionally establish that the balance of hardships tips *decidedly* in its favor, its overall burden is no lighter than the one it bears under the 'likelihood of success' standard."  Id.  A court deciding a preliminary injunction motion must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the relief.  Seijas v. Republic of Argentina, 352 Fed.Appx. 519, 520 (2d

---

[2] While the Second Circuit in Salinger ruled that the Supreme Court ruling in eBay specifically applied to copyright cases, the Court also found that all preliminary injunction cases generally are subject to the new standard required by eBay; accordingly, courts may not take categorical approaches to injunctive relief and must employ the traditional requirements for equitable relief, particularly the impact on the public interest when analyzing the balance of harms.  Salinger, 607 F.3d 68.

Cir. 2009).   Salinger, 607 F.3d 68.   Additionally, the court must ensure that the "public interest would not be disserved" by the issuance of a preliminary injunction.   Id.   See also Citigroup Global Markets, Inc. v. VCG Special opportunities Master Fund Limited, 598 F.3d 30, 34 (2d Cir. 2010).

## B.   Copyright Claims

### 1.   Plaintiffs Cannot Establish Likelihood of Success on Copyright Claims

Each of the alleged works are wholly lacking in any originality, and, in any event, are not the independent creation of the Plaintiff.  Consequently, Plaintiff cannot establish a likelihood of success on the merits of any of its purported copyright claims.

Plaintiffs' copyrights are thin at best.  Each of the Plaintiffs' alleged designs is merely a common design in general use by multiple manufacturers, nearly all of which, including Plaintiffs,' are made in China.  See Kieskbas Decl. at Exhs. L and M. Plaintiff's designs are lacking in any specific features, qualities or personality traits. There are little to no apparent aesthetic features other than the shape and fabric.  Unlike a "Curious George" or Mickey Mouse toy, Plaintiffs' characters do not possess identifiable personality traits or any originality of design protected by intellectual property law. Plaintiff makes no original contribution to the common designs.  There are no protected elements that have been copied by Defendant.

Copyright infringement is established by proving ownership of a valid copyright, and copying of the constituent elements of the work that are original.  Feist Pubs Inc.,

Inc. V. Rural Tel. Serv. Co., 499 U.S. 340 (1991).[3]  See also Boisson v. Banian, Ltd., 273 F.3d 262, 267 (2d Cir. 2001) (copyright infringement where "sameness" of two quilts); Williams v. Crichton, 84 F.3d 581, 587 (2d Cir. 1996).  To prevail on an infringement claim, the owner also must show actual copying and "improper appropriation" of constituent elements of the work that are original. Feist, 499 U.S. at 348.

Copyright registration is prima facie evidence of ownership, and confers a presumption of validity, including originality, but an accused infringer may rebut that presumption. Modern Pub., a Div. of Unisystems, Inc. v. Landoll, Inc., 849 F.Supp. 22 (S.D.N.Y. 1994).  Where evidence in the record casts doubt on the issue, there is no presumption of validity. Midway Mfg. Co. v. Bandai-America, Inc., 546 F.Supp. 125 (D.C.N.J. 1982).  Nonetheless, there is no statutory presumption of copyright validity to works published more than five years before registration. Religious Technology Center v. Netcom On-Line Communication Services, Inc., 923 F.Supp. 1231 (N.D.Cal. 1995). According to 17 U.S.C.A. § 410, the evidentiary weight to be accorded the certificate of a registration made after the five (5) years following publication shall be within the discretion of the court.  The plaintiff carries the burden of proving the originality of a copyright for a toy when such copyright is registered five years after publication. Dollcraft Industries, Ltd. v. Well-Made Toy Mfg. Co., 479 F.Supp. 1105 (E.D.N.Y. 1978).

---

[3] In Feist, the Supreme Court found that there was no viable copyright infringement claim for the copying of a directory of information. 499 U.S. 340.  Although not much is required to establish originality, Feist requires that there be at least some modicum of creativity involved. Torah Soft Ltd v. Drosnin, Simon & Schuster, 136 F.Supp.2d 276 (S.D.N.Y. 2001) (motion to dismiss copyright granted).  The Plaintiff's copyright cannot extend to functional elements or "scenes a faire." Id.  "The mere fact that a work is copyrighted does not mean that every element of the work may be protected."  499 U.S. 340, 344-345.  "Originality remains the sine qua non of copyright; accordingly copyright protection may extend only to those components of a work that are original to the author."  Id. at 340, 348.

The Plaintiff's copyright registration certificates appear to be defective.  Plaintiffs allege copyright infringement of ten (10) designs: a ladybug, bumblebee, panda, penguin, bear, duck, dolphin, cow, frog, and monkey. The earliest date of publication on any of CJ's copyright certificates is 2004.  However, CJ continuously states that their products have been on the market since 2003, thereby casting doubt on the validity of each of Plaintiff's copyright registrations, precluding a statutory presumption of validity.  See Modern Pub, 849 F.Supp. 22.   Moreover, some thirty-five (35) of all of the Plaintiff's registration certificates were issued within five years of the first publication.  The other five (5) works are not entitled to the statutory presumption of validity. See Religious Technology Center, 923 F.Supp. 1231. These five (5) works include two (2) designs at issue which Plaintiffs allege Defendants infringed, namely the duck, which was published on 11/01/2004, and registered on 04/22/2010, and the cow, which was published on 11/01/2004 and registered on 04/29/2010.

Irregardless, Plaintiffs' copyright designs are not original and are borrowed from preexisting designs owned by third parties.  For example, the copyright designs of Plaintiff's duck and dolphin pillow pets, both of which Plaintiff claims Defendants infringed, are clearly based on the pre-existing design of "HuggyDucky" the duck and "Glide," the dolphin, both manufactured by TY Inc.   See Marotta Decl. at Exh. M. Defendant maintains that the Plaintiffs designs are common designs in the public domain and were likely created by the same source for multiple manufacturers.  See Kiesksbas Declr. at ¶ 55-57, and Exh. L.

Also, Plaintiff does not have an actual copyright registration for its alleged ladybug pillow pet. Plaintiff holds only a copyright registration for a "Ladybug Pillow Pet Blanket," which alleges a first publication date of 2009.

Furthermore, the copyright registration for the CJ bear design is not actually for the bear that Plaintiff's alleged Defendants have infringed. In fact, the first bear design that Plaintiffs do own a copyright over has been discontinued, and Plaintiffs do not own any other registration for the new bear design which Plaintiff alleges Snuggly infringed. Defendant's bear likely predates Plaintiff's second, non-copyrighted, bear design.

Thus, Plaintiff cannot establish ownership of the above five (5) designs.

Furthermore, Defendant offers evidence of independent creation which also rebuts Plaintiffs' prima facie case. See Eden Toys, Inc. v. Marshall Field & Company, 675 F.2d 498, 500-501 (2d Cir. 1982). See also, The Comic Strip v. Fox Television Stations, Inc., 710 F.Supp. 976, 981 (S.D.N.Y.1989). Defendants' own twenty-seven (27) copyrighted designs are original and independently created by Snuggly's team of designers at JSF International. See Keiskbas Declr. at Exh. E (Defendant's copyright registrations). See also Keiskbas Declr. at ¶ 30, which details Snuggly's creation process.

### a.   Plaintiff Cannot Establish Copying of Protected Elements

To meet its burden to establish copying, Plaintiff must also prove access and substantial similarity of the protectable material in the two works. Williams v. Crichton, 84 F.3d 581 (2d Cir. 1996). Whatever copyright protection Plaintiffs may have extends only to the protectable elements, if any. Id. Where a work contains both protectable and unprotectable elements, the court must take care to inquire only whether protectable elements, standing alone, are substantially similar. Moreover, copyright law does not

protect an idea, only the expression of an idea. Id. *citing* Mattel, Inc. v. Azrak-Hamway Int'l, Inc., 724 F.2d 357 (2d Cir.1983). (5 1/2 inch "Warlord" doll did not infringe upon a 5 1/2 inch "Masters of the Universe" doll because, though the dolls looked remarkably similar, the similarities all were attributable to the unprotectable idea of "a superhuman muscleman crouching in what since Neanderthal times has been a traditional fighting pose.").

Where it appears that the works are indeed substantially similar, the court must then determine whether the similarities are due to the protected aspects of the plaintiff's work. Boone v. Jackson, 2006 WL 3327058 (2d Cir. 2006)(Substantial similarity required to establish copyright infringement did not exist between copyright holder's "Holla Back" song and allegedly infringing song "Young N," since the phrase "holla back" was common and unprotectable); County of Suffolk v. First Am. Real Estate Solutions, 261 F.3d 179, 187 (2d Cir. 2001) (Proof of the third element requires a further showing that "(1) the defendant has actually copied the plaintiffs work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiffs"). The copyright owner must demonstrate that "'substantial similarities' as to the protected elements of the work would cause an average lay observer to 'recognize the alleged copy as having been appropriated from the copyrighted work.'" See Bill Diodato Photography, LLC v. Kate Spade, LLC, 388 F. Supp.2d 382, 390 (S.D.N.Y. 2005) (photographs not original where stock photos similar to ones at issue were readily available, and were found in films and other media).

Where, as here, the works contain both protectable and unprotectable elements, the court's "inspection must be more discerning; [it] must attempt to extract the

unprotectable elements from [its] consideration and ask whether the *protectable elements, standing alone*, are substantially similar." id. at 390 (*citing* Knitwaves, Inc. v. Lollytogs, Ltd., 71 F.3d 996, 1002 (2d Cir. 1995)) (emphasis in original); Boisson v. Banian, Ltd., 273 F.3d 262 (2d Cir. 2001)(Where there are protectable elements, not taken from the "public domain," the court must apply the "more discerning observer test"); Lapine v. Seinfeld, 2010 WL 1688713 (2d Cir. April 28, 2010).

Where the similarities between a copyrighted work and an allegedly infringing work express a general idea, such similarity in expression is not infringing unless the feature being expressed is unnecessary to express the idea conveyed. See Gund, Inc. v. Smile International, Inc., 691 F. Supp. 642, 645 (E.D.N.Y.1988). (Court denied motion for preliminary injunction and held that Plaintiff's copyrighted "floppy" dog stuffed animal was not infringed by Defendant's "floppy" dog, since Defendant had only copied features necessary to express the idea of a "floppy" stuffed dog). Where, as here, the features in common between a plaintiff's and defendant's stuffed animal are generic characteristics that would be common to any toy recognizable as such animal, the defendant will not be found to have infringed on plaintiff's copyright for such stuffed animal. See Imperial Toy Corporation v. Goffa International Corporation, 988 F.Supp. 617, 621 (E.D.N.Y.1997) (Court denied motion for preliminary injunction, in part, holding that Plaintiff's copyrighted stuffed turtle was not infringed by Defendant's stuffed toy turtle since the features in common between the two turtles were generic characteristics that would be common to any toy recognizable as a turtle even where there was evidence of copying of numerous other animal designs). See also Diodato, 388 F. Supp. 2d at 390 ("When similar works resemble each other only in unprotected aspects –

for example, when similarities inhere in … expression that is not proprietary to plaintiff – defendant prevails") (citing 4 Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> §13.03[B][2]).

Here, as in <u>Williams v. Crichton</u>, 84 F.3d 581, 588 (2d Cir. 1996), "nearly all the similarities between the works arise from non-copyrightable elements." Plaintiffs cannot succeed on its copyright claims, because the alleged designs lack any particularized features or original contribution protected under copyright law. It is clear that the ideas expressed by Snuggly/CJ in their animal designs are all general ideas. The idea of a frog; the idea of a ladybug; the idea of a bumblebee; the idea of a cow; and the ideas of the other common animals are general, and all the features used by Defendant in their products are those necessary to express such general ideas in the public domain.

Copyright protection does not extend to "any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." 17 U.S.C.A. § 102 (b). The idea of a square pillow with an animal head and triangle legs is not protected, nor is use of the color green for a frog, or red for a ladybug. <u>Gund, Inc. v. Smile International, Inc.</u>, 691 F. Supp. 642; <u>Imperial Toy Corporation v. Goffa International Corporation</u>, 988 F.Supp. 617. Also, in accordance with §102(b) and the rule in <u>Feist Pubs Inc., Inc. V. Rural Tel. Serv. Co.</u>, 499 U.S. 340 (1991), the Plaintiff's velcro strap design is a functional aspect and does not constitute a protectable element under copyright. <u>See</u> <u>Mazer v. Stein</u>, 347 U.S. 201 (1954). At best, the strap is akin to packaging, which is not entitled to copyright protection. <u>See</u> <u>Uneeda Doll Co. v. P&M doll Co Inc</u>, 241 F.Supp. 675 (S.D.N.Y. 1965) (motion for preliminary injunction denied).

21

Further, the Plaintiffs' designs are quite minimal and lack any "personality" traits or unique details.    The features noted above used in Defendant's animal designs are clearly generic characteristics that would be common to any toy recognizable as such animal.    Therefore, Defendant has not copied any expression which is protected by Plaintiff's copyrights. Gund, 691 F. Supp. at 645.  See also Diodato, F.Supp. 2d at 392 ("elements of an image that flow naturally and necessarily from the choice of a given concept cannot be claimed as original."); Imperial Toy Corporation, 988 F.Supp. 617. Any characteristic in common between Snuggly designs and CJ's designs are unprotectable material that is in the public domain.  See Boisson, 273 F.3d 262 at 268. (Material in the public domain, which "is free for the taking and cannot be appropriated by a single author even though it is included in a copyrighted work" is unprotectable.)

### b.    Preliminary Injunction May Not Issue Based on Simple Designs with  Notable Differences

Nonetheless, the Defendant's designs have numerous differences in key aspects. See Marotta Declr. at pp. 10-12.    Under these circumstances, an injunction may not issue.  See Eden Toys, Inc. v. Marshall Field & Company, 675 F.2d 498, 500-501 (2d Cir. 1982)   (preliminary injunction denied); Mattel Inc. v. S. Rosenberg Co., Inc, 296 F.Supp. 1024 (S.D.N.Y. 1968) (preliminary injunction denied in case involving perfume bottle dolls where differences in size, shape and stand and differences between dolls); Prestige Fabrics Inc. v. Universal Manufacturing Corp., 304 F.Supp.903 (S.D.N.Y. 1969)(preliminary injunction denied where differences in flower designs and aesthetic appeal).  Regardless of whether the court employs the "discerning observer" test, there is no substantial similarity here with any protected portions of Plaintiffs' animal designs or

the combination of elements as to the work as a whole, since there are identifiable differences in the allegedly distinct elements themselves. See Boone, 2006 WL 3327058.

## 2.      Irreparable Injury Not Shown Where Evidence of Laches

Even prior to <u>Salinger</u>, there is no presumption of irreparable injury in a copyright infringement action where, as here, there is evidence of delay on the part of the Plaintiff. PLUSHEZ began selling its pillow pet products in late October 2010.  Plaintiffs waited over six (6) months to move for preliminary injunctive relief.

Snuggly filed its trademark registration on August 15, 2010 and began promoting its products in August 2010.  Presumably, Plaintiffs were aware of and actively policing their copyrights at that time.  Plaintiffs issued a cease and desist letter dated November 11, 2011.  See Marotta Declr. at Exh. G   Even under relevant case law prior to the Second Circuit's ruling in <u>Salinger</u>, Plaintiffs cannot claim irreparable harm, since Plaintiffs delayed in bringing suit and then waited nearly three additional months after filing before seeking equitable relief on its copyright claims.  <u>Markowitz Jewelry Co. Inc</u> <u>v. Chapal/Zenray, Inc.</u>, 988 F.Supp. 404 (S.D.N.Y. 1997) (preliminary injunction denied in copyright action where Plaintiff waited two months after filing complaint to seek preliminary relief and was aware of alleged infringement for thirteen months); <u>Century</u> <u>Time Ltd v. Interchron Ltd</u>, 729 F.Supp. 366 (S.D.N.Y. 1990).  A preliminary injunction should not issue where there is a delay in seeking equitable relief or other evidence of laches.  <u>Zitz v. Pereira</u>, 965 F.Supp. 350 (E.D.N.Y. 1997)(preliminary injunction on copyright infringement claim denied).  <u>See also</u> <u>Century Time Ltd</u>, 729 F.Supp. 366 at 369 (six month delay in requesting preliminary injunction in infringement and trade dress

case barred relief); The Comic Strip Inc. v. Fox Television Stations, 710 F.Supp. 976 (S.D.N.Y. 1989) (seven month delay barred preliminary injunctive relief).

The presumption of irreparable harm may be rebutted with opposing evidence such as where there is evidence of laches, where the plaintiff's damages appear to be trivial, or where there is evidence of independent creation by Defendant. See Clonus Assocs. v. Dreamworks LLC, 417 F.Supp. 2d 248 (S.D.N.Y. 2005) (copyright injunction denied where damages nominal). See also, The Comic Strip Inc. v. Fox Television Stations, 710 F.Supp. 976 (S.D.N.Y. 1989)(no irreparable harm in trademark infringement action where Plaintiff waited seven months to prosecute, including three months since last communication with defendant, and plaintiff provided no evidence of lost revenues)(preliminary injunction denied notwithstanding likelihood of confusion).

Here, Plaintiff delayed not only in bringing suit against Snuggly, but failed to bring suit against numerous other third parties clearly manufacturing products with the same or similar designs which mitigates against Plaintiffs' claim that any of Defendant's designs may cause irreparable harm. See Marotta Declr. at pp. 4-6.

The Court must actually consider the injury Plaintiff will suffer in the absence of preliminary relief and whether money damages would suffice. Salinger v. Colting, 607 F.3d 68 (2d Cir. 2010). To show irreparable harm, Plaintiff must show more than mere minimal harm. Clonus, 417 F.Supp. 2d 248. Plaintiff fails to offer any evidence of lost revenues or lost licensing deals due to Defendants' alleged activities. As Plaintiff offers no other evidence of damages, there is no basis for preliminary relief. See The Comic Strip Inc., 710 F.Supp. 976 (owners of nightclubs did not demonstrate irreparable harm, as they conceded that they had not lost revenues as result of television network's alleged

infringement).  Even if copying is found, preliminary relief at this stage is not appropriate because it would be the functional equivalent of a final judgment. Id.

### 3.    Balancing of the Public Interest Weighs In Favor of Defendant

Under the new standard for preliminary injunctions in the Second Circuit, the Court must not only balance the potential irreparable harm to the Plaintiff with the injury to the Defendant, but must also now take into account any harm to the public and "ensure that the pubic interest would not be disserved." Salinger 607 F.3d at 80. Defendant has a property interest in its own copyrighted works and a First Amendment right of free expression.  The public also has an interest in free expression, and the "court must pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Salinger, 607 F.3d 68.  Many competitors use and adopt these common animal designs.  If Plaintiff were granted a monopoly over the subject designs and the internet search terms, it would likely force all competitors out of business.  The public interest would be "disserved" if the Plaintiff were allowed to assert a monopoly over the idea of a square pillow toy with an animal head.

Plaintiff does not present evidence of confusion arising from similarity of copyright design.  There is no evidence of any market confusion arising out of the appearance of copyright designs, as opposed to the use of a generic phrase.  Snuggly products are safety tested, and there is no public health risk as Plaintiffs suggest.

### C.    Plaintiff's State No Claim for Trademark Infringement or Common Law Trademark Infringement Because the Alleged Trademark is Generic

Although Plaintiffs do not move for injunctive relief on their first cause of action for trademark infringement, the fact that the alleged mark is generic defeats any such

claim and is also dispositive of all asserted unfair competition claims, except Plaintiff's claims for common law unfair competition. Even with respect thereto, Plaintiffs face an even more difficult hurdle given the generic or descriptive nature of the alleged mark, and cannot establish a likelihood of confusion, or any injury causally related to Defendant's conduct.

As discussed further hereinafter, generic terms are given less weight in analyzing the likelihood of confusion between marks "on the rationale that the public will look to other portions of the marks and will not be confused." J. Thomas McCarthy, 4 McCarthy on Trademarks and Unfair Competition § 23:15 (4th ed. 2011).

### 1.   Plaintiffs Do Not Have a Registration for the Generic Mark "Pillow Pets"

Plaintiffs state a first cause of action for "infringement of registered trademarks" in their complaint, but do not assert such claim as a basis for preliminary injunctive relief in the instant motion. Indeed, while Plaintiffs have registered "My Pillow Pets," a trademark they have used for years with a disclaimer, they do not have a trademark registration for the generic term itself, "pillow pet."

Plaintiff's claim for unfair competition is limited to Defendants' use of the words "pillow pet." Plaintiffs' allegations are really that defendant uses the alleged unregistered mark "pillow pets" to describe its products in internet advertising and search engines. The phrase "pillow pet" is merely a composite of two generic terms: pet, which is a genus of inanimate objects that people refer to metaphorically; and pillow, which is a common item in a household. A pillow pet is thus both a type of pet and a type of pillow, i.e. a plush stuffed animal that converts into a bed pillow. Therefore, a "pillow pet" is but a

subset of each genus and is totally lacking in distinctiveness. It is clear that such a phrase is not entitled to protection under federal trademark law.

Marks that "constitute a common descriptive name are referred to as generic." They refer merely to the "genus of which the particular product is a species." Park 'n Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985). Generic marks are "those consisting of words that identify the type or species of good or services to which they apply, and are totally lacking in distinctive quality." TCPIP Holding Co., Inc. v. Haar Communications, Inc., 244 F.3d 88, 93 (2d Cir.2001). Plaintiffs have no right in a generic mark. See Reese Publishing Co. v. Hampton Int'l Comm., Inc., 620 F.2d 7 (2d Cir. 1980).

In determining whether a particular mark is generic, courts in the Second Circuit look to several factors, including evidence of: (1) generic use of the term by competitors which plaintiff has not challenged or generic use by plaintiff himself; (2) dictionary definitions, which may be relevant while not dispositive; (3) generic usage in trade journals or newspapers; (4) testimony of persons in the trade; and (5) consumer surveys. See Brandwynne v. Combe Intern., Ltd., 74 F.Supp.2d 364, 381 (S.D.N.Y. 1999); J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:13 (4th ed. 2011). The burden is on plaintiff to show that an unregistered mark is not generic. A mark that is generic is not entitled to protection under federal trademark law. Energy Intelligence Group, Inc. v. UBS Financial Services, Inc., 2009 WL 1490603, at 6 (S.D.N.Y. May 22, 2009).

It is notable that R. Dakin Inc had used the term "pillow pets" as a trademark, but did not actually make pillow pets. Dakin's products are simply stuffed toys that are called

"pillow pets." The USPTO granted the trademark because the phrase "pillow pets" was not descriptive as to Dakin's products. The type and functionality of CJ's products are for a category of stuffed animal toys commonly referred to as pillow pets.

### 2.   Secondary Meaning of "Pillow Pets" Cannot Be Shown

If the Plaintiffs' purported mark is found not to be generic, at best, it is highly descriptive. In <u>Bernard v. Commerce Drug</u>, 964 F.2d 1338 (2d. Cir. 1992), the Second Circuit defined "descriptive" for trademark classification purposes. The Court recognized that, "[a] term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." <u>Id</u>. at 1341. The Court also recognized that if the term also described the specific ingredients or characteristics of the product, the term would be considered generic. <u>Id</u>. A prior user of a descriptive mark must demonstrate that the words have acquired secondary meaning before its competitor commenced use of the mark. <u>Genesee Brewing Co. v. Stroh Brewing Co.</u>, 124 F.2d 137 (2d Cir. 1997).

By including the disclaimer in their intial trademark registrations, Plaintiffs conceded that "pillow pets" is descriptive. <u>See In re Ampco Foods, Inc.</u>, 227 U.S.P.Q. 331 (T.T.A.B. 1985); <u>In re DNI Holdings Ltd.</u>, 77 U.S.P.Q.2d 1435, 2005 WL 3492365 (T.T.A.B. 2005) ("[I]t has long been held that the disclaimer of a term constitutes an admission of the merely descriptive nature of that term, as applied to the goods or services in connection with which it is registered, and an acknowledgement of the lack of an exclusive right therein at the time of the disclaimer").

Moreover, where the court finds a mark generic, it should exclude evidence of secondary meaning altogether. <u>Reese Publishing Company, Inc. v. Hampton International Communications, Inc.</u>, 620 F.2d 7, 12 (2d Cir. 1980). Generic terms cannot be "rescued

as trademarks" by proof of secondary meaning. Id. In Reese, the Second Circuit noted that a word may be generic in a number of different senses, for example, "safari" has come to have a generic meaning in the clothing industry, "consumer electronics" in the electronics industry and the word "video" in context of a "Video Buyer's Guide;" the court found that persons in those industries who are stopped from using those words would find it difficult to flourish and identify themselves to the relevant market. Id.

### 3.    The Second Circuit Will Not Permit Exclusive Rights in a Word Necessary to Describe a Characteristic of a Product

In Genesee Brewing Co. v. Stroh Brewing Co., the Second Circuit stated:

> In resolving the appeal, we explicitly endorse the rule that, when a producer creates a new product that differs from an established product class in a particular characteristic, the law of trademark will not grant the producer the exclusive right to label its product with words that are necessary to describe that new characteristic.

124 F.3d 137, 140 (2d Cir. 1997) ("Honey Brown" is generic as applied to ales; preliminary relief is inappropriate given the generic nature of the words "Honey Brown"). The Plaintiff has the burden to demonstrate that the primary significance of the alleged mark is not the product but the producer. Id.

In Genesee, 124 F.3d 137, plaintiff had invented the product and spent millions of dollars marketing its "Honey Brown Ale" and submitted consumer surveys showing that 81% of consumers identified "Honey Brown" with plaintiff. The Second Circuit noted, however, that "Honey" and "Brown" were functional characteristics of the product and other beer makers did not have simple alternatives for describing the same product.

The Court in <u>Genesee</u>, found that secondary meaning evidence submitted by plaintiff could not be considered, until it was determined that "Honey Brown" was not a generic category of beer.[4] The Court reviewed the market evidence and determined that competitors, who had the right to copy successful features of plaintiff's product, could not effectively describe their products without using the words "Honey Brown Ale" unless they used awkward words or descriptions. Similarly, here Snuggly uses generic terms "pillow pets" in internet search engines and advertising. Snuggly faces the same insurmountable hurdle to describe its products without use of the generic phrase. To search on the internet for other brands of pillow pets, consumers would have to search for plush toys, and then scroll through voluminous search engine results to narrow the search to find the species of plush toys that turn into bed pillows for children.

Similarly, the court in <u>Bernard</u>, 964 F.2d 1338, held that the subject mark was descriptive, citing the concern that, "exclusive use of the term might unfairly monopolize common speech." 964 F.2d at 1342.

D.     **Plaintiff's Adoption of A Generic Mark Precludes Its Other Lanham Act Claims**

Section 43(a) prohibits misrepresentations as to the source of a product in primarily two types of activities: (1) false designation, or "passing off" in which "A" sells its product under "B's" name; and (2) false representation, or "false advertising." <u>See</u> <u>Waldman Publishing Corp. v. Landoll, Inc.</u>, 43 F.3d 775, 780 (2d Cir.1994).

---

[4] The subject mark in Genesee was unregistered, as is CJ's purported mark "pillow pets." It is noted that in the Genesee case the USPTO had approved the Plaintiff's mark without a disclaimer.

1.    **Plaintiff Does Not State a Claim for False Designation of Origin Under the Lanham Act**

As with trademark infringement, to prevail on a claim for false designation of origin under the Lanham Act, a plaintiff must demonstrate consumers are likely to be confused as to source because of the entrance in the marketplace of the defendant's mark. See Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 390 (2d Cir. 1995).   To prove unfair competition, Plaintiff must show: 1) secondary meaning, "an association of origin by the consumer between the mark and the first user"; and, 2) likelihood of confusion when the mark is applied to the second user's goods.

However, since the alleged mark "pillow pet" is generic, Plaintiffs have no claim for unfair competition for false designation of origin or passing off under the Lanham Act.  See Energy Intelligence Group, Inc. v. UBS Financial Services, Inc., 2009 WL 1490603 (S.D.N.Y. May 22, 2009).   While a descriptive mark could be the subject of an unfair competition claim under the Lanham Act, a generic mark cannot.   "[E]ven proof of secondary meaning, by virtue of which some "merely descriptive" marks may be registered, cannot transform a generic term into a subject for trademark.  As explained in J. Kohnstam, Ltd. v. Louis Marx and Company, 280 F.2d 437, 440 (1960), no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4 (2d Cir. 1974).

**2.    Remaining Common Law Claims for Unfair Competition Are Also Fatally Defective**

However, a finding of genericness does not necessarily dispose of Plaintiff's claim for common law unfair competition. See Energy Intelligence Group, Inc.,2009 WL 1490603 at 6 ("to prevail on such a claim, a plaintiff "must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief. Additionally, there must be some showing of bad faith."). Nonetheless, the Court in Energy Intelligence dismissed the common law unfair competition claims therein, holding that where marks are "so dissimilar as to overwhelm any likelihood of confusion between the marks," the plaintiff's common law unfair competition claim fails as a matter of law. Id. ("The likelihood that consumers will be confused…will be dispelled by…the commercial presentation of the parties' respective marks…in starkly different typefaces and styles.").

Here, as in Energy Intelligence, the competing marks are "so dissimilar as to "create[ ] distinct marketplace impressions, and thus, as a matter of law … no likelihood of confusion." Id. ("The marks are "at best marginally similar because of the common use of" the same, generic words "oil" and "daily,"). Because defendant prominently displays its stylized PLUSHEZ brand word mark and logo on all labels and advertising, there can be no confusion. Id. See also, Genesee Brewing Co. v. Stroh Brewing Co., 124 F.2d 137(denial of preliminary injunction affirmed on unfair competition claim).

Regardless of whether the mark is generic, Plaintiff cannot prevail on any of its Lanham Act claims, or common law claims, because it cannot demonstrate a likelihood of confusion, and there is no actual confusion shown. Plaintiffs also cannot demonstrate any harm or injury from any action attributable to Defendant. Any confusion that Plaintiff alleges is not the result of Defendant's action, but rather the result of Plaintiff's

adoption of a generic phrase and previously existing trademark of the Dakin company to market its products, and the blurring of Plaintiffs' alleged marks "*My* Pillow Pets" with the alleged "Pillow Pets" brand.

### a.    Plaintiffs Cannot Demonstrate A Likelihood of Confusion

The three alleged instances of consumer confusion do not involve Plushez products. See Kieskbas at ¶¶ 48-49. The products seized in New Jersey and Delaware were not PLUSHEZ brand pillow pets. See Keiskbas Declr. at ¶ 49. In fact, the only evidence of actual confusion is confusion amongst Plaintiffs' own two brands of pillow pets, "My Pillow Pets" and "Pillow Pets." See Keiskbas Declr. at Exh. C.

Since there is no evidence of actual confusion, Plaintiffs must show a likelihood of confusion between their generic/highly descriptive marks, and the PLUSHEZ brand. As noted by Plaintiff in its memorandum in support at p.18, the standard for finding a likelihood of confusion under an unfair competition claim is the same as the standard in trademark infringement cases.

The Second Circuit examines the eight factors elaborated in Polaroid Corp. v. Polarad Elecs. Corp. in determining whether a plaintiff has established likelihood of confusion. 287 F.2d 492, 495 (2d Cir. 1961), cert. denied 368 U.S. 820 (1961).  The factors are: (1) the strength of the mark; (2) the degree of similarity between the two marks; (3) the proximity of the products; (4) the likelihood that the prior owner will "bridge the gap"; (5) actual confusion; (6) the defendant's good faith in adopting its mark; (7) the quality of the defendant's product; and (8) the sophistication of the buyers. Id. "[N]o single Polaroid factor is determinative." Plus Prods. v. Plus Discount Foods, Inc., 722 F.2d 999, 1004 (2d Cir.1983) ("each [factor] must be considered in the context

of all of the other factors, and from a balance of these determinations, one is able to reach the ultimate conclusion, whether there is likelihood of confusion").

The strength of a mark may be gauged by categorizing the mark as generic, descriptive, suggestive, or arbitrary/fanciful.  Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4 (2d Cir. 1976); WWW Pharmaceutical v. Gillette Company, 808 F. Supp. 1013, 1022 (S.D.N.Y. 1992).  Since the Plaintiffs' mark is generic, or at best highly descriptive, the alleged mark is weak.  This factor heavily favors Defendants.

Whereas Plaintiff uses pillow pets in its mark to identify its products, Defendant operates under the mark "PLUSHEZ" and only uses "pillow pets" as a descriptive generic term on the internet to describe the nature of the product.  The fonts and stylized logos, are different and give different impressions which negate any confusion. See Lapine v. Seinfeld, 2010 WL 1688713.  Plaintiffs made this very argument when responding to USPTO objections that Pet Pillows was a similar mark.  See Marotta Declr. at Exh. L.  As such, the second factor also favors Defendant.

Plaintiffs cannot show that any confusion is due to Defendants' conduct rather than Plaintiff's use of a generic mark.  Apparently the Plaintiff promotes two brands but uses nearly identical labels and tags, thereby blurring their own alleged marks.  Defendants believe that Ontel now sells products with the "My Pillow Pets" label, while CJ sells lower quality products with the "pillow pets" label.  See Keiskbas Declr. at ¶ 15.  Plaintiffs also allow third parties to use "pillow pets" in their domain names to sell "My Pillow Pets" products, including ScottsPillowPets.com and Anita'sPillowPets.com. See Marotta Declr. at Exh. S.

With respect to the good faith prong, Defendants are entitled to a presumption of good faith, since the selected mark reflects the product's characteristics. See Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 397 (2d Cir. 1995). Prior knowledge of a senior user's trade mark may be consistent with good faith, particularly where there is no registration. Id. At the very least, since Plaintiff disclaimed exclusive use of "pillow pets" in its trademark registrations, it cannot say that Snuggly acted in bad faith in filing a registration for PLUSHEZ Pillow Pets with the same disclaimer. Indeed, the USPTO approved "PLUSHEZ Pillow Pets" for publication. See Marotta Declr. at Exh. F.

The seventh factor "is primarily concerned with whether the senior user's reputation could be jeopardized" by the inferior quality of defendant's product. Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp., 964 F. Supp. 733, 747 (S.D.N.Y. 1997). All PLUSHEZ Pillow Pets are made pursuant to Snuggly's approved copyrighted designs in accordance with all applicable safety standards. Snuggly maintains that its products are of higher quality than most competitors including Plaintiffs, and the fact that Plaintiffs now produce an inferior line of their own, weigh in favor of Defendants.

The last factor is premised on "the belief that unsophisticated consumers aggravate the likelihood of confusion," Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 78 (2d Cir. 1988) (likelihood of confusion found because the mark was suggestive, as opposed to descriptive). Likelihood of confusion is diminished when potential purchasers are sophisticated. Paddington Corp. v. Atiki Importers & Distribs, Inc., 996 F.2d 577 (2d Cir. 1993) (no likelihood of confusion between plaintiff's trademark "No. 12 Ouzo" and defendant's mark "#1 Ouzo"). Here, these pillow pet products are made for small children, but purchased by adults and also sold as collector items, as Plaintiffs

themselves claim. Moreover the primary point of purchase is online through retailers such as amazon.com or the Plaintiffs and defendants' websites, which purchases and selections are made by adults on behalf of their children. The sophistication of the buyers in this case is bolstered by the fact that Plaintiff has not lost any revenue or licensing deals. Accordingly, this factor weighs in favor of Defendants.

Moreover, Defendant prominently displays its PLUSHEZ brand on all labels – including all hang tags and an embroidered patch on the leg of each toy animal - which negates Plaintiff's allegations of "passing off." There can be no confusion between the PLUSHEZ pillow pets brand and "My Pillow Pets." Defendants have a right to use "pillow pet" in marketing as do other competitors. See Genesee Brewing Co. v. Stroh Brewing Co., 124 F.2d 137 (2d. Cir. 1997); Bernard v. Commerce Drug, 964 F.2d 1338 (2d. Cir. 1992). See also Kellogg Co. v. National Biscuit Co. 305 U.S. 111 (1938).

Furthermore, the Second Circuit, as well as the Restatement (Third) of Unfair Competition § 20 (1995), has maintained that the Lanham Act protects only against confusion regarding purchasing decisions, and not against confusion in general. See Lang v. Retirement Living Pub. Co., 949 F.2d 576 (2d Cir.1991). Thus, where Plaintiff fails to produce evidence linking the alleged confusion with the actual effect on purchasing decisions, no likelihood of confusion can be found. Id. at 583. See also Beneficial Corp. v. Beneficial Capital Corp., 529 F.Supp. 445, 450 (S.D.N.Y.1982). Since no such evidence exists here, Plaintiffs cannot show a likelihood of confusion between Plaintiffs' and Defendants' products.

Moreover, where a generic mark is involved, "[t]he relief granted should go only so far as to alleviate the source confusion caused by the Defendant and no further."

Forschner Group, Inc. v. Arrow Trading Co., 904 F.Supp. 1409, 1428 (S.D.N.Y. 1995).
While a court may therefore "require the newcomer to distinguish its product or to notify
consumers explicitly that its product does not come from the original manufacturer,"
Forschner Group, Inc. v. Arrow Trading Co., 30 F.3d 348, 359 (emphasis altered, internal
quotation marks omitted), or otherwise "to use every reasonable means to prevent
confusion," Kellog, 305 U.S. 111 (1938), it may not prevent the defendant from using the
plaintiff's mark altogether, see id.

### b.    Plaintiffs Cannot Show Bad Faith or "False" Advertising

"The common law unfair competition claims (in New York) closely parallel
Lanham Act unfair competition claims; to the extent that they may be different, the state
law claim may require an additional element of bad faith or intent." Weight Watchers
Int'l, Inc. v. Stouffer Corp., 744 F.Supp. 1259, 1283 (S.D.N.Y. 1990) (citing 815
Tonawanda St. Corp. v. Fay's Drug Co., 842 F.2d 643 (2d Cir.1988)).   In Genesee, the
Court found that a state law claim for unfair competition could not stand without a
showing of bad faith.   124 F.2d 137 (2d Cir. 1997).   Thus, to prevail on an unfair
competition claim under New York law, a "plaintiff must show either actual confusion in
an action for damages or a likelihood of confusion for equitable relief," as well as make a
showing of "bad faith." Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc., 58 F.3d 27,
35 (2d Cir.1995).   As stated above, Plaintiffs cannot show bad faith, as Defendants relied
on Plaintiffs' March 2010 trademark disclaimers in adopting its PLUSHEZ brand.
Plaintiff therefore cannot state a claim for unfair competition under the New York statute.

Under the New York statute prohibiting false advertising, The Plaintiff must
demonstrate that the advertisement: (1) had an impact on consumers at large; (2) was

37

deceptive or misleading in a material way; and (3) resulted in injury. Andre Strishak & Associates, P.C. v. Hewlett Packard Co. 752 N.Y.S.2d 400 (2002).  See also, Galerie Furstenberg v. Coffaro, 697 F.Supp. 1282 (1988) (art merchant, which purportedly held exclusive rights to artist's drawings and etchings, could not recover for injury caused by sales of counterfeit artworks).  In determining whether an advertisement is "false" within meaning of statute prohibiting false advertising, the test is whether the advertisement is likely to mislead a reasonable consumer acting reasonably under the circumstances. Andre Strishak, 752 N.Y.S.2d 400.

Plaintiff cannot establish any causal connection to Defendant's conduct. To have standing for a false advertising claim generally, "a plaintiff must be a competitor of the defendant and allege a competitive injury." Telecom Int'l Am., Ltd. v. AT & T Corp., 280 F.3d 175, 197 (2d Cir.2001).  To obtain relief against a false or misleading advertisement, "a plaintiff must demonstrate by a preponderance of the evidence that an advertisement is literally false, or that the advertisement, though literally true, is likely to mislead or confuse consumers." McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1548-49 (2d Cir.1991).  When "a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers." Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp., 960 F.2d 294, 297 (2d Cir.1992). The success of an implied claim usually requires proof in the form of a consumer survey. Id.

Plaintiff incorrectly claims that Snuggly engages in advertising that is "literally false" because Snuggly purports to sell products that are "authentic" or "official."

Defendants sell authentic PLUSHEZ brand pillow pets and are the official source of PLUSHEZ pillow pets.   Snuggly does not use the "My Pillow Pets" brand in any advertising medium.   See Kieskbas Declr. at ¶ 39.   Snuggly maintains the websites plushez.com, pillowpets.com and pillowpetswholesale.com, for the sale of its genuine PLUSHEZ brand pillow pets. Snuggly also maintains a website pillowpetswholesale.com where it sells PLUSHEZ brand and other leading brands of pillow pets; each brand is identified with each product photo. See Kieskbas Declr. at ¶ 35.   PLUSHEZ has the right to market its own website as the "official site" for PLUSHEZ brand pillow pets, and has the right to market the sale of "authentic" PLUSHEZ brand pillow pets.   There is no falsehood in connection therewith.   Defendant does not own the pillowpetscoupon.com website. See Kieskbas Declr. at ¶44.

As alleged by Plaintiff, Defendant's early labels for PLUSHEZ pillow pets contained the phrase "As Seen On TV" but only because Defendant had every intention in producing a commercial advertisement to promote PLUSHEZ pillow pets for the fall 2010 holiday season, and made arrangements to produce and air a commercial.  However, the commercial was not produced due to a delay in production.  Defendants have taken all necessary measures, and have discontinued producing its early labels containing the phrase "As Seen On TV." See Keiskbas Declr. at ¶ 18 and Exh. J (new labels that have been affixed to all PLUSHEZ pillow pets that no longer state "As Seen On TV").  Additionally, Defendant does not advertise that the PLUSHEZ brand pillow pets are those "As Seen On TV" on any of its websites.

Irregardless, the statement "As Seen On TV" while incorrect, does not make a statement as to the quality of the products, and as such, cannot form the basis of a false

advertising claim.  Abernathy & Closther Ltd v. E & M Advertising Inc., 553 F.Supp. 834 (E.D.N.Y. 1982) (preliminary injunction denied where claims based on Defendants statements that offer was "exclusive T.V. offer").  Such statement lacks the materiality element required in false advertising under the Lanham Act, and cannot be said to have caused any harm to Plaintiff.  See also Procter & Gamble Co. v. Ultreo, 574 F.Supp.2d 339 (S.D.N.Y. 2008) (preliminary injunction denied).  There is no evidence that Plaintiffs suffered any harm from Defendants using "As Seen On TV" to describe their products.

Defendant asserts that Plaintiff itself engages in false advertising since it is not the original, "authentic," or "official" Pillow Pets, given that the 1970's Dakin products are the "official" collector items.    Plaintiffs generate confusion in the marketplace by promoting "Pillow Pets" as a brand, when the Plaintiffs' established brand is actually "My Pillow Pets."   By promoting both generic marks, Plaintiffs are likely generating much confusion amongst their own customers.  See Keiskbas at ¶ 13 and Exh. D. (copies of complaints).  Marketing the same product, with different marked labels, for different prices, is sure to confuse the public and lead the public to believe that the two products are distinct from one another.

Plaintiff's also claim that "Defendants have unfairly piggy-backed onto a market created by Plaintiffs through substantial sales, advertising and promotion of its Pillow Pets Products for nearly eight (8) years."  See Memorandum in Support at p.12.  This statement itself is untrue and misleading.  Plaintiffs did not create the pillow pets market. Pillow pets have been sold since 1964 by others.  See Kieskbas Declr. at ¶ 7.  While it is not clear when Plaintiffs first adopted the "My Pillow Pets" brand or "pillow pets," they were clearly not marketing "pillow pets" as their exclusive brand in 2003.

### 3.    Harm to Defendant and the Public Interest From A Restraint of Advertising Outweighs Any Alleged Harm to Plaintiff

The balance of hardships weighs against movant. "Pillow pet" is a common internet keyword search for all adult users pricing and purchasing different brands of pillow pets online. See Kieskbas Declr. at ¶ 69. Snuggly would suffer prejudice and extreme hardship if it were restrained from using "pillow pets" in all commercial speech. See Keiskbas Declr. at ¶ 73. Since Defendants' advertisements are truthful and not misleading, Defendants have a constitutional right under the First Amendment in commercial speech and use of search engine terms. See Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy, 512 U.S. 136 (1994) (attorney's use of CPA and CFP designations in her advertising and other communication with the public was protected "commercial speech" for purposes of the First Amendment since such advertisement was truthful and not misleading). Granting Plaintiffs exclusive use of the term "pillow pets" to describe their plush toy products would "unfairly monopolize common speech." Bernard, 964 F.2d 1338. Competitors and Defendant would be relegated to awkward descriptions to sell their plush toys that convert into bed pillows for children. If Plaintiff were granted a monopoly over common internet search terms, nearly all competitors would be eliminated from the pillow pets market. Ultimately, consumers would have less choice, and Plaintiff would dictate pricing and quality standards. See Kieskbas Declr. at ¶73.

Armed with any preliminary injunction in this case, Plaintiffs will undoubtedly proceed to exclude all others from using "pillow pets" in internet search engines and all forms of advertising and shipping. The clear danger here is that Plaintiff would be able to assert complete control over the market for this species of plush toy products and push all

competitors out.  Worse yet, internet search engines would be prohibited from using or allowing others to use "pillow pet" in commercial speech. The end result would clearly be that a consumer would not be able to locate Dakin Pillow Pets on the internet, or any other brand, except Plaintiffs'.

On balance, there is no hardship to Plaintiffs from a denial of relief at this early stage, because Plaintiffs can continue marketing "My Pillow Pets."  After all, CJ chose to affirmatively disclaim exclusive rights to "pillow pets" when it first registered its trademark.  The constitutional harm to the Defendant and the public far outweighs any speculative harm alleged by plaintiff.

E.  **Laches, Waiver and Estoppel Preclude Equitable Relief**

Plaintiffs' claims for preliminary relief should be denied based on the equitable defenses of waiver and estoppel. <u>See</u> 15 U.S.C. § 1115(b)(9).   To establish the defense of estoppel, a defendant must show: (1) material misrepresentation; (2) reliance; and (3) damage. <u>Gen. Elec. Capital Corp. v. Armadora, S.A.</u>, 37 F.3d 41 (2d Cir. 1994).

When Plaintiff CJ registered its "My Pillow Pets" mark, CJ was clearly aware of the widespread general use of the phrase "pillow pet" as a generic and/or descriptive term or phrase in commerce, as evidenced by the fact, *inter alia,* that Plaintiff filed two applications disclaiming the exclusive right to use the words "pillow pets" as part of its mark. <u>See</u> Marotta Declr. at Exhs. A and B.   At the time, Plaintiff had the opportunity to offer proof of secondary meaning to obtain registration without such a disclaimer, but instead chose to make the disclaimers, which are an admission that the mark is generic and/or descriptive.

Plaintiffs are now estopped from objecting to the marketing and sale of "PLUSHEZ Pillow Pets" because CJ represented that such action was permissible. By making such a disclaimer, Plaintiff represented that it had no objection to other companies using the words "pillow" and "pet" in its brand names. Snuggly relied upon Plaintiffs' disclaimers. If enjoined, Snuggly will be significantly harmed by the expense of completely changing all embroidered labels, hangtags, website designs, and advertising. Additionally, Snuggly will be forced to recover the inventory that is currently in the possession of website and store retailers, and re-label each and every product in inventory.

Furthermore, it cannot be said that only one party's reputation is at stake, as Plaintiffs have directly assaulted Defendants' reputation. Believing that CJ enjoys exclusive rights, Plaintiffs' website accuses Snuggly of being "counterfeit." Such an accusation will lead consumers to stray away from purchasing Snuggly's legitimate products and damage Defendant's reputation. See Keiskbas at ¶ 63.

In addition, evidence of laches and the failure of the Plaintiff to act promptly justify the denial of a preliminary injunction. See Two Kids From Queens, Inc. v. J & S Kidswear, Inc., 2009 WL 5214497 (E.D.N.Y. 2009) (Children's clothing line's delay in seeking a preliminary injunction for trademark and trade dress infringement justified a denial of the preliminary injunction where said delay was not explainable by either "ignorance of [Defendants'] competing product or [Plaintiffs'] good faith efforts to investigate the alleged infringement"). Plaintiff's delay in seeking equitable relief indicates a lack of irreparable harm, or at least a reduced need for drastic, speedy action pending trial. Citibank NA and Citicorp v. CITYTRUST and Citytrust Bancorp., 756

F.2d 273 (2d Cir. 1985)(grant of injunctive relief of use of the name "Citytrust" reversed).

Here, Plaintiff not only waited to seek a preliminary injunction against Snuggly, but also has not sought or obtained immediate relief against others using the name. Indeed, CJ did not file any trademark registration until 2008, and did not file any of its alleged copy designs until 2009 or 2010. The failure to promptly assert its allegedly exclusive rights indicates that Plaintiff was merely acting in reaction to competition in the market, and that irreparable harm cannot be shown. See Bourne v. Walt Disney Co., 2003 WL 721405 (S.D.N.Y.) at p. 4 ("Delay has been held to defeat the presumption of irreparable harm in cases where the owner of intellectual property appears first to have concluded that the challenged activity did not constitute infringement, but subsequently sued in response to commercial competition").

Moreover, much of the preliminary relief sought is moot, as Snuggly does not advertise "As Seen On TV," and Defendant has taken steps to ensure that highlights of favorable consumer reviews online pertain to Snuggly or "pillow pets" generally and are not taken from any review of an actual CJ product. Id.


CONCLUSION

Plaintiffs' motion for preliminary relief should be denied in its entirety.


Dated:  Staten Island, New York
        May 31, 2011

                                        GABOR & MAROTTA LLC

                                        Daniel C Marotta, Esq. (DM-2581)

44