Daniel C. Marotta (DM-2581)
GABOR & MAROTTA LLC
*Attorney(s) for Defendants*
1878 Victory Boulevard
Staten Island, New York 10165
TEL: (718) 390-0555
FAX: (718) 390-9886

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

CJ Products LLC and Ontel Products
Corporation,

                         Plaintiffs,

                                      **DECLARATION**
                                      **IN OPPOSITION**

                                      Civ. Action
                                      No. 11-0715

     v.

Snuggly Plushez LLC and Berkant Keiskbas,

                         Defendants.

------------------------------------------------------------------------X

I, Berkant Keiskbas, hereby declare as follows:

1.    I am an employee of the Defendant, Snuggly Plushez LLC ("Plushez"), in this action and make and submit this declaration in opposition to the Plaintiff's motion for a preliminary injunction.

2.    Pillow pets are stuffed plush toys made in various animal designs for children. The phrase "pillow pets" is a common advertising term to describe a category of product of soft plush toys which can be used as a bed pillow cushion. The phrase has been used by several toy manufacturers over the past some thirty (30) years, beginning well before Plaintiff began its new marketing campaign and litigation crusade, and well before CJ

Products LLC ("CJ") was in existence. Plaintiff was not the first to use this phrase in commerce.

3. Most pillow pets, including Plaintiff's products, are made in China. As stated herein, the designs for many of these brands, including the Plaintiffs,' were likely created by the same manufacturer in China.

4. As detailed hereinafter, Defendant Plushez does not sell counterfeits as Plaintiff implies. Defendant produces a high-end line of plush toys that are made pursuant to original, copyrighted designs commissioned by Plushez and which meet state, federal and international safety standards. Plushez did not copy CJ's designs, and instead engaged a creative team to develop their own unique designs.

5. Defendant began producing pillow pets and made its preliminary designs sometime in May 2010. The domain for the website plushez.com was purchased on August 3, 2010 and launched a few days thereafter. The company placed its first orders in August 2010 when Plushez was formally organized. The first product shipments arrived in late October 2010. Plushez brand pillow pets are sold on Amazon.com, as well as numerous other internet sites and retail outlets.

6. There are numerous legitimate competitors in the marketplace which sell and market pillow pets. Historically, pillow pets have been sold since 1974, decades before Plaintiff's company was formed.

7. "Pillow pets" were first manufactured by the R. Dakin & Company. Dakin registered a Pillow Pet trademark in 1974, with a date of first use in commerce of 1964. See **Exh. A** (certificate of registration). Since then, many companies have sold "pillow pets" or "pet pillows" of one variety or another as a category of toys for children.

2

8. Our attorney declaration details the widespread use of "pillow pets" in commerce, advertising and search engines. There are also legitimate competitors using the phrase "pet pillows" in commerce including Bestever - Hugga Pet Pillows, Comfy Pet Pillows, and Peculiar Pet Pillows.

9. While R. Dakin & Company is no longer in existence, Dakin Pillow Pets are still sold as collector items and can be purchased online through websites, such as E-Bay and Amazon. See **Exh. B** (E-bay snapshot of numerous Dakin Pillow Pet products for sale).

10. The R. Dakin & Company had used the term "pillow pets" as a trademark for their plush toy products, but did not actually manufacture pillow pets. Dakin's products are simply stuffed toys that are called "pillow pets." Plaintiff, however, uses the term "pillow pets" to describe the function and purpose of their products, i.e., a stuffed animal toy that converts into a bed pillow for children.

## PLAINTIFFS' MY PILLOW PETS AND "PILLOW PETS$^{TM}$" BRANDS

11. Plaintiff expressly disclaimed the generic term "pillow pets" when it registered its first trademark, "My Pillow Pets" in 2008. I am aware that Plaintiff initially refused to make such a disclaimer, but did so in order to obtain a U.S. trademark registration. Upon information and belief, sometime in late 2009, CJ began to use the phrase "pillow pets" as a second "trademark," in addition to its registered My Pillow Pets trademark.

12. On a television segment hosted by Fox Business, on November 9, 2010, CJ's principal, Jennifer Telfer, claims she invented the "pillow pet" idea of combining a pillow with a stuffed animal. Telfer claims she developed the concept after witnessing her son constantly sleeping with a teddy bear. Telfer repeatedly stated in that segment

3

that consumers should look for the "*'My'* Pillow Pet" label. Specifically, Telfer states "Look for the 'My Pillow Pet' label and make sure you get an authentic pillow pet." The segment clearly portrays "My Pillow Pets" as the brand. Also, Telfer herself is using the generic phrase "pillow pet" as a common noun, just like other competitors, manufacturers, and the public. See **Exh. C** (press release regarding CJ's celebrated 2009 awards, which clearly identifies "*My* Pillow Pets" as the exclusive brand for Plaintiffs' products).

13. Thereafter, Telfer appeared on a television segment on CNBC "How I Made My Millions" on March 3, 2011, wherein it seemed that Plaintiffs have changed their marketing campaign and are trying to reinvent themselves as "Pillow Pets." Apparently Plaintiffs are now manufacturing pillow pets under both labels, but under different quality standards and pricings. Plaintiffs charge $19.95 for their products with the mark "Pillow Pets," and $24.95 for those products with the mark "My Pillow Pets." Plaintiff uses the same font, color, logo, and label for its two brands of pillow pets, but simply omits the word, "my," as seen below:

 

4

14. Plaintiffs' blurring of their two alleged (and generic) labels is likely to mislead and confuse consumers.

15. There is evidence of actual confusion resulting from Plaintiff blurring the two marks shown above. Tim James, an Amazon purchaser, wrote a customer review for "My Pillow Pets Comfy Panda," where he explained such confusion. See page 1 of **Exh. D.** James explained the difference between Plaintiff's "My Pillow Pets," which he claims is the "true original toy," and Plaintiff's "Pillow Pets," which he claims is the "knock-off version." "Except for the word 'MY,' the two names and logos are identical." (See images above). James further explains that the Panda he purchased, which was marked "Pillow Pets," was "noticeably lumpy and small clumps of its fur came off when I ran my hand along the toy." Apparently not only is Plaintiff blurring their two marks, but Plaintiff is also producing inferior, lower-quality products under the mark, "Pillow Pets."

16. In fact, many purchasers of Plaintiffs' product are unhappy with the quality of the products. See **Exh. D.** (Complaints of Plaintiff's "My Pillow Pets" and "Pillow Pets" products).

17. As seen from page 2 of **Exh. D**, the purchaser was unhappy with the quality of a "MY Pillow Pets Tardy Turtle," where she noticed "stuffing coming out on its back along one of the shell's seams."

18. Additionally, on page 3 of **Exh. D**, a purchaser of a "My Pillow Pets Dinosaur" experienced loose stitching and poor quality. This purchaser "already had to sew up the head on the ["My Pillow Pet"] he has had for 2.5 months because it split completely open."

19. Furthermore, as seen from page 4 of **Exh. D**, a purchaser of "My Pillow Pet Silly Monkey" noticed a big hole in the seam when opening it. The purchaser returned the ripped CJ Product and re-ordered the same product from Amazon. "The new product has a hole in the seam in almost the exact same place."

20. Clearly Plaintiff's products are not as high quality as they lead the public to believe.

### THE PLUSHEZ BRAND PILLOW PET

21. Notwithstanding, PLUSHEZ, not "pillow pets," is the brand name and trademark of the Defendant Snuggly Plushez LLC. The PLUSHEZ name prominently appears on all labels for all Plushez products, including the Plushez brand pillow pets line called PLUSHEZ Pillow Pets.

22. The PLUSHEZ Pillow Pet product is superior in quality to most competing products in the market, and as a result, the company has enjoyed a remarkable period of success and good will associated with its brand since its introduction in October 2010.

23. The company initially designed and created some products with two brands, "Napies" and "Plushez." However, it was quickly decided that PLUSHEZ would be the sole brand. Some products were initially manufactured with the "Napies" brand name embroidered on the leg of the toy. All "Napies" embroidered pillow pets had the PLUSHEZ brand paper hang tags affixed to the product. Shortly after the start of production, but before sale of Defendant's products, Plushez discontinued producing pillow pets with the "Napies" embroidered emblem. All products produced thereafter had both the PLUSHEZ embroidered label on the leg, and the PLUSHEZ hang tags.

Plushez now only produces and sells PLUSHEZ embroidered pillow pets with PLUSHEZ embroidered labels.

24. At no time has Defendant represented themselves to be the Plaintiff, nor has Defendant publicly represented to sell Plaintiff's products. All labels affixed to Plushez pillow pets prominently display the following Plushez trademark and penguin logo:



Thus, there can be no confusion resulting therefrom.

## QUALITY CONTROL AND EXTENSIVE SAFETY TESTING BY PLUSHEZ PILLOW PETS

25. All Plushez products are made from original designs by JSF International Limited with instructions and feedback of Plushez, which are registered with the U.S. Copyright Office. Plushez has 27 copyright design registrations. See **Exh. E.**

26. Plushez pillow pets are made from only the highest quality fabrics and soft, dense pile plush fabric.

7

27. Plushez pillow pet products have met all necessary safety testing requirements, including those required by the state of Pennsylvania[1] and ASTM international standards. Attached as **Exh. F** are the manufacturer certificates/test reports Exh.ing Defendant's compliance with the aforementioned safety test requirements. Plushez has a full line of pillow pet products, all designed and manufactured in strict accordance with Plushez design specifications, and safety and quality standards with the highest quality materials.

28. While some of Defendant's early labels did not bear the full certification, these products were not actually sold until after such certification was granted. The labels were already made before receiving the test report certificates.

29. I note that while Plaintiff alleges that safety is an important issue, the ASTM safety certifications they submit for their own products are dated August 2010, years after Plaintiff began its sales of My Pillow Pets. It is not clear whether Plaintiff even complied with Pennsylvania safety standards prior to 2010, although they were clearly selling products in the states that require PA registration numbers.

## PLUSHEZ' AUTHENTIC COPYRIGHT DESIGNS

30. Defendants use an agency, JSF International Limited, which, unlike Plaintiffs, is clearly credited on its copyright registration, with an in-house team of designers that creates its own designs of the various animal toys. See **Exh. E** (Defendants' copyright registrations). Plushez has a time consuming creative process and quality control procedure. Plushez presents its ideas to JSF International and provides the requested specifications. Plushez provided details for expressive elements such as the PLUSHEZ

---

[1] **PA, CT, and MA require and accept PA Registration for stuffed toys and bedding items. New York does not require this certification.**

8

unique fabric eyes, and the quality for the fabrics. Initial designs are created by JSF's team of designers. JSF then provides a strike sample for approval by Plushez. Any defects are corrected, and the toy is manufactured and shipped.

### PILLOW PET IS USED AS A GENERIC PHRASE BY PLAINTIFF AND OTHERS IN THE INDUSTRY

31. As clearly Exh.ed by the public's repeated usage of the phrase "pillow pets," it is clear that such a phrase is generic. See **Exh. G**, which includes product reviews of Aroma Home Pillow Friendz brand pillow pets, and clearly depicts the usage of pillow pets as a common noun. For example, on page 2 of Exh. F, a consumer states, "This is not the size of most PillowPets… other than that it is basically a Pillowpet."

### PILLOWPETS.CO

32. Defendant maintains the following websites: Plushez.com, Pillowpets.co, and Pillowpetswholesale.com.

33. There is a 90 day return policy clearly displayed on the pillowpets.co website, in which Plushez provides a full refund to any dissatisfied customer. If requested, Plushez provides return labels to make return shipping free.

34. Pillowpets.co is not a counterfeit website, or any successor website to the counterfeit website Plaintiff claims has been "reborn." (See Plaintiff Wright Declr. at page 11, Para. 35). Pillowpets.co is a website that sells a variety of brands of pillow pets, including Plushez, and other legitimate manufacturers, including Bestever Hugga Pet Pillows, American Mills, Fiesta and Russ Berrie pillow pets.

9

35. Plaintiff is being clever when it claims we are using their "Marks" – Plushez only uses "pillow pets" as a category of product or search engine keyword, and does not use "My Pillow Pets." Each brand of pillow pet is clearly displayed in the "vendor" description on the pillowpets.co website. Attached as **Exh. H** are snapshots of Pillowpets.co, which show the vendor's name next to each of the pillow pets which are offered for sale. For example, on page 1 of Exh. H, next to "Loli Lady Bug Pillow Pets," it can clearly be seen that PLUSHEZ is the *Vendor,* and pillow pets is the *Type* of product. Additionally, on page 2 of Exh. H, it is clearly stated next to "Spice Puppy Pillow Pets," that PLUSHEZ is the *Vendor,* and pillow pets is the *Type* of product. This is further noted for other vendors, including Bestever Hugga Pet Pillows, as seen on page 5 of Exh. H.

36. "Pillowpets.co" is a trade name used by defendant to identify its web services. The pillowpets.co website states at the top that it is the official website of "pillowpets.co™." It does not state that it is the official website of "Pillow Pets™" as Plaintiff claims at p.12 of its memorandum of law.

37. Plushez does not use Plaintiff's trademark in domain names as Plaintiff suggests. Plushez only uses the generic phrase "pillow pets," which is also used by numerous competitors in the industry, retailers and search engines. Undoubtedly, nearly all consumers would type "pillow pets" when searching and making price comparisons.

38. Plaintiffs claim that the Defendant utilizes a linked internet-based advertisement/ "activate coupon" link using Plaintiff's trademark, "My Pillow Pets." This is a false accusation. There is no such link on any website owned or controlled by Defendant. Upon information and belief, said advertisement is owned by a commission based third

party marketing program, and is not any activity controlled by Defendants. In fact, at the current time, the link redirects the consumer to happynappers.com, which is wholly unrelated to Plushez, rather than to pillowpets.co.

39. Plaintiff also falsely claims that "[d]efendants also have established a wholesale website (PILLOWPETSWHOLESALE.COM) offering discounts on Defendant's Products using **Plaintiffs Marks**." *Nowhere* on pillowpetswholesale.com is Plaintiffs' trademark, "My Pillow Pets," used. Defendant uses pillow pet, pillow pets and pet pillows, as do many other legitimate competitors, retailers, websites and search engines. Defendant does not use "*My* Pillow Pets" in any of its advertising. In fact, there is extensive use of the distinctive PLUSHEZ logo and slogans on the site.

40. Additionally, despite Plaintiff's claim that "in order to draw consumers to the PILLOWPETS.CO website, Defendants purchase Google Adwords for "pillow pets," "my pillow pets," and variations thereof…" Defendant does not use "My Pillow Pets" in Google Adwords. Plushez purchased and uses "pillow pets" as a keyword in Google Adwords for search engine results. Attached as **Exh. I** is the list of key words that Plushez has purchased from Google Adwords.

41. Defendant's pillow pets are "authentic" Plushez pillow pets, and are free of all forgery and counterfeiting. Plushez is the "official" source of PLUSHEZ products.

42. Plaintiff is indeed the only source of "My Pillow Pets," but not of pillow pets. There are numerous brands in the plush toy industry that sell pillow pets, however, the My Pillow Pets brand is manufactured exclusively by Plaintiffs, and Defendant does not advertise anything to the contrary.

43. Plaintiff alleges that Defendant advertised on third party websites using "similar images" used to promote Plaintiff's product. However, Defendant's image of a child sleeping with a toy used as a pillow (the frog) is a common image, but substantially different from Plaintiff's advertisement. Nonetheless, Defendant does not have control over the third party websites which are advertising the product, and therefore, Defendant cannot control whether the "PLUSHEZ" brand name accompanied the image with every use.

44. Pillowpetscoupon.com offers coupons for different brands of pillow pets. The consumer identified by plaintiff attempted to use a coupon to purchase a pillow pet from CJ. The consumer did not purchase a Plushez product. Any confusion pertaining to use of the coupon is simply a mistake on behalf of a consumer who could not find a valid coupon for Plaintiff's website, so the customer attempted to use any available coupon for pillow pets that he/she could find. In any event, Pillowpetscoupon.com is a third party website which is not owned by Defendant.

**PLUSHEZ LABELS**

45. Some of Defendant's early hang tags did contain the phrase "As Seen On TV" as Plaintiffs assert.[2] Defendant started producing such labels because they had every intention in producing a televised advertisement to promote Plushez pillow pets. We spoke with a representative from Time Warner Cable regarding our proposed TV ads in September 2010. However, production was delayed, the televised advertisement was not produced, and Defendants discontinued producing its early labels containing "As Seen On TV," since we were not able to broadcast a TV ad prior to the 2010 holiday season.

---

[2] However, the initial "Napies" products did not have "As Seen OnTV" on the hang tag.

12

Irregardless, these early labels, as with all Plushez labels on all of its products, prominently display the PLUSHEZ trademark and penguin logo. See Plaintiff's Exh. N, attached to Plaintiff's moving papers. Attached hereto as **Exh. J** are the new labels that have been affixed to all Plushez pillow pets and no longer state "As Seen On TV," nor any other mention to any televised advertisement.

46. Nonetheless, the Defendant's websites do not state "As seen on TV," nor make any mention to any televised advertisement. It is also noted however, that Hugga Pets, which are sold on www.pillowpets.co, are advertised on television.

47. In addition to the PLUSHEZ hang tags, the PLUSHEZ ™ trademark and logo is clearly printed on an embroidered patch on each and every PLUSHEZ Pillow Pet so that it cannot be removed, and therefore, all consumers will be aware that Plushez (in stylized font) is the brand of the pillow pet they are purchasing. See below:

  

**FALSE CLAIMS MADE BY PLAINTIFF REGARDING PLUSHEZ PRODUCTS**

48. There is no evidence to support the Plaintiff's claim that the Missouri Attorney General received a complaint about a PLUSHEZ pillow pet purchased from pillowpets.tv. See Wright Declaration at paragraphs 34-37. The website pillowpets.tv

was not a website owned or controlled by Plushez, and upon information and belief, sold many brands of pillow pets. In fact, the consumer complaint states that there is no embroidered emblem sewn on the leg, and all authentic PLUSHEZ pillow pets have an embroidered emblem sewn on the leg, including even the early "Napies" products. It is thus clear that the product in fact was <u>not</u> made by Plushez.

49. Similarly, no Plushez products were seized in Delaware as reported in the October 1, 2010 article attached to Exh. K of Plaintiff Wright Declr. In fact, the seized items could not be Plushez products because Plushez products were not even on the market until later in October 2010. Our first shipment arrived the week of October 27, 2010. See **Exh. K.**

50. Furthermore, the charity drive for cancer patients, discussed in the Plaintiff's Wright Declaration, was initiated by a consumer and was not a charity drive for Plaintiffs goods, as the Wright Declaration unashamedly suggests. (See page 14, Para. 40). This was, after all, a charity event and donations were made and accepted regardless of the manufacturer or brand of pillow pet. Plushez made a donation and upon information and belief, other manufacturers also made donations.

51. The Plaintiffs claim that Defendant is taking reviews from their website and placing them on Defendant's website. These product reviews did not come from the Plaintiff's website; the quotes are from other sources, including amazon.com. See Drangel Exh. C and D. The quotes describe pillow pets generally and do not refer to "My Pillow Pets," but have been removed from pillowpets.co. Plushez.com never had these quotations placed on any of its pages.

## PLUSHEZ AUTHENTIC COPYRIGHT DESIGNS

52.     Defendant does not sell counterfeits as Plaintiff implies. Plushez products are "authentic" and are indeed the "official" product manufactured and approved by Snuggly Plushez LLC. Plushez did not copy Plaintiffs' designs. The term "authentic" is always used in conjunction with the PLUSHEZ brand name.

53.     Plushez uses an agency, JSF International, with an in-house team of designers which creates the various animal toy designs, all of which are original and owned by Plushez. Each animal design passes through a rigorous testing and screening process.

54.     Plushez has over 27 original designs, including a variety of animal designs that Plaintiff does not have, including a black sheep, a husky, gorilla, and a camel.

55.     I believe the Plaintiffs use already existing designs which are owned by a company in China, called **Color Rich Ltd,** to make and manufacture its products in China.

56.     Color Rich is also likely the manufacturer of the products made by American Mills, Squishables and Aroma Home use Color Rich to manufacture its products.

57.     Color Rich also likely manufactures animal slippers which bear close similarity to the Plaintiff's. See **Exh. L.**

58.     Floor cushions by American Mills are made of the same materials and constructed more or less in the same manner as CJ's My Pillow Pets. See **Exh. M.** There is no aesthetic difference in the two designs. The only difference is that American Mills products are much larger in size, measuring 32", as opposed to Plaintiffs' products, which measure 18".

15

59. I believe Color Rich Ltd created the common designs which are used by these various manufacturers, including CJ. I also believe CJ merely purchased pre-existing designs because Jennifer Telfer stated in a CNBC television segment "How I Made My Millions" that the first purchase order for six (6) separate designs together with the manufacturing of some 7,000 pieces. It is not possible that CJ obtained original designs with such a small order.

60. Certain designs of pillow pets, including the duck, ladybug, and bumblebee are common animal designs for children and can be seen on various products made by numerous competitors and toy animal manufacturers. I have provided samples to our attorneys. The same is true for most of the designs that Plaintiff asserts exclusive copyright over. Whether they are owned by Color Rich, the Plaintiff's concept, designs, and even the velcro strap are simply common and/or preexisting designs used by many others, including, but not limited to, TY, American Mills, Kellytoy, Fiesta, Cloud B, and Bestever Hugga Pet Pillows.

61. Notwithstanding, Plushez pillow pets have several distinct features that set our products apart from other competitors, and which are different than Plaintiff's products as detailed in my attorney's Declaration.

62. In fact, consumer reviews prove that customers can clearly tell the differences between Plushez products and Plaintiffs' products. Some purchasers have exclaimed that Plushez pillow pets are the cutest brand of pillow pets. See **Exh. N.** (Customer reviews taken from Amazon.com).

## ADDITIONAL EVIDENCE OF PLAINTIFF'S UNCLEAN HANDS

63. Plaintiff includes a link on its website, entitled "BEWARE: Counterfeit Websites," which includes Defendant's website. Plaintiff asserts that "[t]he following websites do NOT sell authentic products and sell counterfeit merchandise," and then proceeds to list pillowpets.co as one of the counterfeit sites. Plaintiff is falsely accusing Defendant of producing counterfeit products and is causing irreparable damage to Defendant's reputation.

64. Plushez is a legitimate company that produces only legitimate products and advertises them on legitimate websites, including Plushez.com, pillowpetswholesale.com and pillowpets.co.

65. Additionally, Plushez' products are sold on Amazon.com, which sells other legitimate pillow pets. Attached as **Exh. O** is a snapshot of Amazon.com selling legitimate and authentic PLUSHEZ pillow pets.

66. Pillowpetssale.com, which is neither owned, controlled, nor related to Plushez, is an illegitimate website, as correctly indicated by Plaintiffs. Plushez should not be categorized as illegitimate [websites] like pillowpetssale.com, since Defendant's products are legitimate and "authentic" Plushez products.

## PREJUDICE WILL RESULT TO DEFENDANT FROM ANY RESTRAINT OF ADVERTISING

67. If Defendant is prohibited from using the phrase "pillow pet" in advertising to describe its pillow pet products, Defendant will be unable to conduct any significant sales or have any cogent and successful marketing strategy, particularly for online sales.

68. There is no easy replacement phrase or simple internet key word to identify this specific category of product, i.e. a soft plush stuffed animal toy that can be converted into a bed pillow for children.

69. The phrase "pillow pet" and "pillow pets" is now also a common keyword in most internet searches, and customers use the phrases to shop for various pillow pets brands and prices.

70. Plaintiff no doubt intends to eliminate all uses in search engines of pillow pet and pillow pets except in connection with the sale of their products.

71. Even a temporary injunction would have a devastating effect not only on Defendant's business and brand, but also on competitors and the public at large, as same would effectively eliminate all real competition.

72. It is crucial that Defendant and other competitors continue to use "pillow pets" in Google Adwords. Google Adwords is a program created by Google that allows advertisers to select the words that trigger their ads. When a user searches on Google, ads containing the user's search words are located on the internet and displayed on the screen. Thus, when a user types "pillow pets" in the search field, advertisements for those companies that have purchased "pillow pets" as an Adword will be located on the internet and displayed.

73. Online consumers would be directed only to retailers selling CJ products, and consumers would be forced to purchase CJ products regardless of quality or price, if CJ were given exclusive rights over these keywords. In an anti-competitive environment, CJ would be able to charge any price, regardless of quality, and the consumer would be deprived of all legitimate choices.

I declare under the penalty of perjury that to the best of my knowledge, the foregoing is true and correct.

Dated:    Staten Island, New York
May 27, 2011

By: _____
Berkant Keiskbas