Jason M. Drangel (JMD 7204)
Robert L. Epstein (RE8941)
William C. Wright (WCW 2213)
EPSTEIN DRANGEL LLP
Attorneys for Plaintiffs
60 East 42nd Street, Suite 2410
New York, NY 10165
Tel: 212-292-5390
Fax: 212-292-5391

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

```
--------------------------------------------------X
                                        :
CJ Products LLC and Ontel Products      :
Corporation                             :
                                        :
        Plaintiffs                      :
              v.                        :        Civ Action No.  11- 0715 (RRM)
                                        :
Snuggly Plushez LLC and Berkant Keiskbas:
                                        :
        Defendants                      :
                                        :
--------------------------------------------------X
```

## PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  PLAINTIFFS ARE LIKELY TO SUCCEED ........................................................... 2

   A.  Plaintiffs are Likely to Succeed on Their False Advertising Claims .................... 2

      1.  As Seen on TV Claims ...................................................................................... 2

      2.  Favorable Product Review Claims .................................................................... 3

      3.  Original and Authentic Claims .......................................................................... 3

   B.  Plaintiffs are Likely to Succeed on Their Lanham Act, Common Law and New York State
   Unfair Competition Claims .......................................................................................... 4

      1.  Third Party Registrations Cited by Defendants Support Fact that PILLOW PETS is not
      Generic ................................................................................................................. 5

      2.  CJ's Trademark Registrations Are Presumed To Be Valid ............................... 6

         a.  The USPTO Confirmed that PILLOW PETS is not Generic in CJ's Pending PILLOW
         PETS Application ............................................................................................... 7

         b.  Disclaimers Do Not Establish Genericness ..................................................... 7

      3.  Additional Factors That Establish PILLOW PETS is Not Generic ................... 9

         a.  Competitors Do Not Use Pillow Pets Generically ........................................... 9

            (i).   Use of PILLOW PETS by Multipet International ............................... 11

            (ii).  Ebay, Google, IOffer and Nextag Evidence ...................................... 11

               i.    EBay .............................................................................................. 11

               ii.   Google ........................................................................................... 12

               iii.  IOffer and Nextag ......................................................................... 12

         b.  Plaintiffs' Do Not Use the "Pillow Pets" Generically ..................................... 13

         c.  Dictionary Definitions Confirm PILLOW PETS is Not Generic ...................... 14

         d.  Generic Usage In Trade Journals Or Newspapers ........................................ 15

         e.  Understanding of Terms by Persons In The Trade ......................................... 15

         f.  Consumer Surveys ........................................................................................ 16

      4.  Given That PILLOW PETS is not Generic Defendants' Use of Pillow Pets Must be
      Enjoined ............................................................................................................... 17

   C.  Plaintiffs Are Likely To Succeed On Their Copyright Claims ............................. 18

      1.  Plaintiff Owns Valid Copyrights .................................................................... 18

         a.  All of Plaintiff's Copyrighted Designs Are Entitled to Statutory Presumptions ........ 19

       b.   Plaintiff's Copyright Registrations Are Not Defective ............................................... 20

       c.   Plaintiff Has a Valid Copyright in its Ladybug Design............................................... 20

       d.   Plaintiff Has a Valid Copyright in its Current Bear Design ......................................... 20

       e.   Plaintiff's Copyrighted Designs are Original and From One China Source .............. 21

    2.   Defendants Copied Plaintiff's Valid Copyrighted Designs ........................................... 22

       a.   Defendants Had Access to Plaintiff's Designs ........................................................... 22

       b.   Defendants Copied Plaintiff's Original Animal Plush Designs ................................. 23

       c.   Plush Toy Animals Can Be Protected by Copyright ................................................... 24

       d.   Plaintiff's Stuffed Animal Faces are Original and Protectable ................................... 25

       e.   Plaintiff's Stuffed Animal Bodies are Original and Protectable ............................... 25

       f.   Defendants Fail to Prove the Respective Designs Are Not Substantially Similar ..... 27

III.  IRREPARABLE HARM ............................................................................................................ 28

  A.  Defendants' Claims of Laches and Estoppel Fail ........................................................... 28

    1.   Laches................................................................................................................................ 28

    2.   Estoppel ............................................................................................................................ 30

IV.  CONCLUSION ........................................................................................................................... 30

## TABLE OF AUTHORITIES

**Cases**

*Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946).......................................................... 23

*Brandwynne v. Combe Int'l, Ltd.*, 74 F. Supp. 2d 364 (S.D.N.Y. 1999) .......................... 9

*CJ Products et al., v. Concord Toys Int'l, Inc. et al, 2011 U.S. Dist. LEXIS 4983 (E.D.N.Y. 2011)* ................................................................................................................ 20, 28

*Clifford Ross Co. v. Nelvana, Ltd.*, 710 F. Supp. 517 (S.D.N.Y. 1989), aff'd, 883 F.2d 1022 (2d Cir. 1989 ................................................................................................................ 29

*Coquico, Inc. v. Rodriguez-Miranda* 2010 U.S. Dist. LEXIS 76386 (D.P.R. 2010).................... 25

*CPC International, Inc. v. Balzola Foods Corp.*, 224 U.S.P.Q. 85 (S.D. Fla. 1984) ................. 14

*Filipino Yellow Pages, Inc.* v. *Asian Journal Publ'ns.,Inc.*, 198 F.3d 1143 (9th Cir. 1999) ........ 15

*Gund Inc. v. Fortunoff Inc.*, 3 U.S.P.Q.2d 1556 (S.D.N.Y. 1556)........................................... 25

*Imperial Toy Corp. v. Goffa Int'l Corp.*, 988 F.Supp. 617 (E.D.N.Y. 1997) ....................... 23, 25

*In re Genemedicine, Inc.*, 1998 TTAB LEXIS 221, 6-7 (TTAB 1998).......................................... 9

*Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340 (E.D.N.Y. 2007) ................................................................................................................ 6, 31

*King v. Innovation Books*, 976 F.2d 824 (2d Cir. 1992)............................................................ 29

*Omega Importing Corp. v. Petri--Kine Camera Co.*, 451 F.2d 1190, (2d Cir. 1971) ................. 28

*Reese Publ'g Co. v. Hampton Int'l Commc'ns, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980) ...................... 6

*Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566 (2d Cir. 1971) .................. 7

*Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 2757, (1992).................. 5

*Yurman. v. Chaindom* 1999 WL 1075942, at *6 (2d Cir, 2001).................................................. 23

**Texts**

*J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition*, §12:27, Pg. 12-90 (4th Ed. 2010) ................................................................................................................ 12

## I.   PRELIMINARY STATEMENT

Defendants spend forty-five pages citing well-known intellectual property and preliminary injunction standards and cases without any legitimate factual support for their contentions that: (1) "pillow pets" is generic terminology for "stuffed plush animal toys"; and (2) "all of Plaintiffs copyrighted designs are merely recycled common designs based on either well-known pre-existing designs . . . or simply the same common designs used by many toy and other well-known manufacturers across multiple industries." *Defendant's Memorandum of Law in Opposition to Plaintiff's Motion for Preliminary Injunction ("Opposition"), Pg.2.*

What the facts do show is that Plaintiff's MY PILLOW PETS and PILLOW PETS trademarks are strong, valid and enforceable and only associated with Plaintiff CJ Products and its valid, original, copyrighted plush foldable animal designs.

Defendants also contend that their use of "official" and "authentic" to identify their Pillowpets.co website, which launched recently in 2011, and Plushez foldable stuffed toys - toys that are substantially similar to Plaintiff's copyrighted designs and developed in mid-2010 - is justified. Defendants' intentions are obvious, *i.e.*, by using unscrupulous on-line marketing techniques that Defendants have recently instituted to misdirect consumers from legitimate "PILLOW PETS" websites to Defendants' new website Pillowpets.co™, Defendants wish to intentionally confuse consumers into believing that they are purchasing Plaintiff's "authentic" and "official" PILLOW PETS plush stuffed animal toys, not Defendants' Plushez brand - a brand which is not marketed or promoted by Defendants at all. At the Pillowpets.co™ website, Defendants sell substantially similar plush animal pillow designs to Plaintiff's copyrighted designs.

In response to Plaintiffs' Preliminary Injunction Motion, Defendants have removed the "As Seen on TV" reference and positive reviews for Plaintiffs' PILLOW PETS products from their Pillowpets.co website. Plaintiffs request that Defendants now be preliminarily enjoined from their remaining false advertising activities and making the *remaining* false associations with Plaintiffs (including use of the Pillowpets.co website), and Plaintiff's "official" and "authentic" protectable and unique PILLOW PETS copyrighted plush animal toys, and from selling Plushez products that violate Plaintiff's copyrighted plush animal toy designs.

## II.   PLAINTIFFS ARE LIKELY TO SUCCEED

### A.   Plaintiffs are Likely to Succeed on Their False Advertising Claims

Where an advertisement is literally false, it may be enjoined without reference to its impact on the consumer. *See, McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991). Here, Defendants make a number of literally false claims in connection with advertising and promoting Plushez plush toys. To the extent any of the following claims are determined to be only implicitly false, the facts of this case show that Defendants instituted an intentional course of action to deceive consumers and retailers for their own benefit. *Drangel Dec., ¶¶ 3-16; Wright Dec., ¶¶ 17-23, 34-40 Wright II Dec., ¶ 45-49, Ex. 23.* Plaintiffs claim that Defendants are engaging in three forms of false advertising. Each of the following literally false advertising claims should be enjoined.

### 1.   As Seen on TV Claims

Defendants were identifying their products as "As Seen On TV" products when the products were not promoted on television. Although Defendants have removed the reference to "As Seen on TV" from their website and indicate that the phrase only appeared on old product hang tags, an injunction should issue against future use to avoid confusion going forward. *See, Declaration of Berkant Kieskbas ("Keiskbas Dec."), ¶¶ 45-46.*

2

2.     **Favorable Product Review Claims**

Defendants also engaged in false advertising by using favorable product reviews of Plaintiff's PILLOW PETS products on its Pillowpets.co website. Defendants have removed the reviews but an injunction should issue against future use to avoid confusion going forward. *Kieskbas Dec., ¶ 51.*

3.     **Original and Authentic Claims**

Defendants contend that their use of "official" and "authentic" to identify their Pillowpets.co website and Plushez foldable stuffed toys that are substantially similar to Plaintiffs' copyrighted designs is justified. "[Defendants] have the right to market its own website as the 'official site' for Plushez brand pillow pets and has the right to market the sale of 'authentic' PLUSHEZ brand pillow pets." *Opposition, Pg. 39.* Defendants claim that their product line is all about the "Plushez" brand, yet "Plushez" barely appears on Defendants' Pillowpets.co website and does not appear anywhere at all in Defendants' Google Adword advertising. Defendants advertisements on Google search results pages simply indicate "Official PillowPets.co" and their website: "the Official Site of PillowPets.co." *Drangel Dec., Exs. B & E.*

Furthermore, Defendants foldable plush toys bear labels that designate the product as "Authentic Pillow Pets." *Drangel Dec., ¶ 16, Ex. O.* Each label clearly indicates that "Authentic refers to "Pillow Pets" by using the same font (in the case of Napies product) and use of "authentic" directly above "Pillow Pets" (in the case of Plushez product). *Drangel Dec., ¶ 16, Ex. O.* Defendants' intentions are obvious, *i.e.,* to confuse consumers to believe they are purchasing Plaintiff's "authentic" and official" PILLOW PETS plush stuffed animal toys – not "official" and "authentic" Plushez, a brand not marketed or promoted by Defendants at all.

If Defendants' actions were all about the Plushez brand as they indicate (*Keiskbas Dec., ¶ 21*) then they would focus on leading consumers to their Plushez.com website where the Plushez

3

brand is used, not to Pillowpets.co™ where Plushez barely appears. Plushez.com simply has no

traffic to its website. *Wright II Dec., ¶ 45-49, Ex. 23.*

**B.    Plaintiffs are Likely to Succeed on Their Lanham Act, Common Law and New York State Unfair Competition Claims**

Where a defendant adopted the plaintiff's mark with the intent of obtaining benefit from

the plaintiff's business reputation, this fact alone may be sufficient to justify the inference that

there is a likelihood of confusion. *Resource Dev., Inc. v. Statue of Liberty-Ellis Island Found.,*

*Inc.*, 926 F.2d 134 (2d Cir. 1991)  Defendants could not sell their knock off "Plushez" plush toys

through Pluzhez.com.  Accordingly, they establish the PillowPets.co website. *Drangel Dec., ¶¶*

*3-4, Exs. A-B.*    Defendants also began to conduct on-line marketing attempting to confuse

consumers. *Drangel Dec.,  ¶¶ 8-14.* Website visitor tracking information shows that Defendants

are reaping the benefits of their aggressive use of "pillow pets" Adwords that misdirect

consumers to the Pillowpets.co website, since Defendants' site (Pillowpets.co) is ranked nearly

as high as Plaintiffs' websites. *Wright II Dec., ¶ 45-49, Ex. 23.*   There is very little evidence or

argument in Defendants' Opposition papers to dispute this course of conduct.

The only ground that Defendants rely upon to challenge Plaintiffs' rights to an injunction

for its Lanham Act, Common Law and State Law Unfair Competition Claims is that Plaintiff's

trademark "PILLOW PETS" is generic and therefore they are entitled to use the terms for any

and all purposes.  Defendants argue that:

> All these claims are based on the false premise that Plaintiffs own the exclusive
> rights to the generic industry phrase "pillow pets", "Pillow pets", and "pillow
> pets", as well as "pet pillow(s)", are generic phrases which have been used
> extensively in the plush toy industry by manufacturers, retailers, wholesalers, and
> consumers alike, for over thirty years to describe a stuffed plush animal toy,
> including ones that can be converted into a bed pillow for children. *Opposition,*
> *Pg. 3*

Defendants further allege that:

4

Pillow pets is a generic category of product and has been regarded as such by the toy industry since the R. Dakin company (the original manufacturer of pillow pets) abandoned its trademark in 1993, resulting in widespread use of 'pillow pets' by other manufacturers. *Opposition, Pg. 4*

"Marks are generally classified as (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." "[G]eneric marks--those that refer to the genus of which the particular product is a species--are not registrable as trademarks." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 2757, (1992) (internal quotation and citation omitted).

"Pillow Pets" is not the genus of the products. Instead, the genus of the products are, unequivocally, plush stuffed toys. "PILLOW PETS" is comprised of irreconcilable terms that when combined create a composite mark which is incongruous, catches one's attention, and requires some imagination and mental pause to reach a conclusion as to the nature of the goods. The relevant public thus understand that the designation PILLOW PETS primarily refers to Plaintiff and Plaintiff's goods, not the genus of the products. As such, the phrase PILLOW PETS is neither descriptive nor generic.

1.   **Third Party Registrations Cited by Defendants Support Fact that PILLOW PETS is not Generic**

In support of Defendants' claim to widespread generic use of "pillow pets" in the toy industry, Defendants attach to the *Declaration of Daniel C. Marotta ("Marotta Dec."), Exh. H*, what it calls "twelve (12) trademark registrations filed by some nine (9) separate third parties for the marks 'Pillow Pets' and 'Pet Pillows' . . ." *Marotta Dec., ¶13, Ex. H.* What Defendants fail to mention is that *none* of the "registrations" are currently "live." *See, "Live/Dead Indicator" on each TARR Printout in Exhibit H which indicates "dead"* [1]. Moreover, from 1974 to 1994 there was only a single third party U.S. trademark registration of PILLOW PETS for stuffed toys

---

[1] The registration of Cuddly Pillow & Pets, Reg. No. 3866164, in the name of SVG Global Inc. was voluntarily surrendered after SVG settled a lawsuit with Plaintiffs and agreed to phase out its use of said mark. *Wright II, Dec., ¶ 8, Ex. 4.*

– that were not even foldable pillow stuffed toys. The other supposed "registrations" were actually trademark applications that were filed and abaondoned after the R. Dakin registration expired and registrations of the mark PET PILLOW, a mark which is not probative on the question of genericness since it is a different mark for different goods. *Marotta Dec., ¶13, Ex. H.*

### 2. CJ's Trademark Registrations Are Presumed To Be Valid

When a trademark has been registered, it is presumed not to be generic. *Reese Publ'g Co. v. Hampton Int'l Commc'ns, Inc.*, 620 F.2d 7, 11 (2d Cir. 1980) ("If a mark has been registered with the United States Patent and Trademark Office, the defendants in an infringement action do bear the burden of overcoming the presumption that the mark is not generic."). Thus, the party challenging the validity of a registered trademark must present evidence sufficient to overcome the presumption that the trademark is valid. *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 360 (E.D.N.Y. 2007)   (citations omitted).

Among others, CJ owns the following U.S. trademark registrations/applications for its Pillow Pets Marks:

| | |
|---|---|
| **MY PILLOW PETS®** | U.S. Reg. No. 3,762,061 |
| **IT'S A PILLOW, IT'S A PET** | |
| **. . . IT'S A PILLOW PET!®** | U.S. Reg. No. 3,944,372 |
|  ® | U.S. Reg. No. 3,762,062 |
| **PILLOW PETS™2** | U.S. Ser. No. 77,940,244 |

*Wright Dec., ¶ 15.*

It is no surprise that Defendants completely ignore CJ's trademark registrations, as all of the marks are presumed to be protectable. In fact, Defendants have not submitted a scintilla of

---

2 Defendant Snuggly Plushez opposed this application on the grounds that the mark is generic/highly descriptive. *Wright II, Dec., ¶ 5.*

evidence that would indicate any of aforementioned registered composite marks are generic or otherwise not protectable. Instead, Defendants focus on CJ's PILLOW PETS trademark application for a plush stuffed toy.

**a.** **The USPTO Confirmed that PILLOW PETS is not Generic in CJ's Pending PILLOW PETS Application**

On January 11, 2011, the USPTO confirmed that the mark PILLOW PETS for, among other items, "stuffed and plush toys; stuffed dolls and animals; stuffed toy animals; stuffed toys", is not generic or even merely descriptive, as it published for opposition the trademark application for PILLOW PETS, Ser. No. 77/940,244.[3] *Wright II, Dec., ¶ 4, Ex. 1. See Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 569 (2d Cir. 1971) (the decisions of the USPTO are to be accorded great weight). Defendants, however, simply gloss over this fact, and instead would like this Court to believe that CJ entering disclaimers of PILLOW PETS apart from its

marks **MY PILLOW PETS®** and , respectively, Reg. Nos. 3,762,061 and 3,762,062, somehow establishes that PILLOW PETS is a generic term. Such a suggestion is both legally inaccurate and misleading.

**b.** Disclaimers Do Not Establish Genericness

The Examining Attorney at the United States Patent and Trademark Office who reviewed Plaintiff's applications to register the marks MY PILLOW PETS and MY PILLOW PETS and Design, both of which subsequently issued to registration, respectively, under Reg. Nos. 3762061 and 3762062, issued office actions indicating that the wording "PILLOW PETS" was descriptive, *not generic*[4]. CJ did not agree that the composite PILLOW PETS was descriptive

---

[3] The term PILLOW is disclaimed apart from the mark as shown. Moreover, the application was published without the need for CJ to evidence secondary meaning. *Wright II, Dec., ¶ 4, Ex. 1.*

[4] It is well settled that even a descriptive mark is protectable once it acquires secondary meaning. *Park 'N Fly, Inc.*

7

and subject to such a disclaimer, and argued that only a limited disclaimer of the individual terms

"PILLOW" and "PETS" should be entered in the records:

> Applicant agrees to enter disclaimers for the words "Pillow," "Pet" and
> Pets." *Applicant declines to enter a disclaimer for the combined words "Pillow
> Pet" and the "design of a stuffed animal shown." The words Pillow Pet in
> combination are not descriptive.*

In response to CJ's submission, the Examiner advised CJ that:

> Applicant has chosen the wrong format for the disclaimer since there are no
> intervening words, the proper disclaimer should have been: Applicant disclaims
> the wording, "PILLOW PETS" apart from the mark as shown. *This is not a
> matter of why the terms are merely descriptive, it is a question of whether
> applicant followed proper office procedure in crafting the disclaimer.*

*Wright II, Dec., ¶ 4, Ex. 1.*

Given the Office position that the disclaimer was not an acknowledgement of

descriptiveness, CJ disclaimed the composite PILLOW PETS *only* to comply with office

procedure and to facilitate registration of CJ's applied for marks. *Wright II, Dec., ¶ 4, Ex. 1.* As

a result, the disclaimers of record in respect of CJ's registrations of the MY PILLOW PET and

MY PILLOW PETS and Design marks, simply cannot serve as a concession that, when

combined, PILLOW PETS is merely generic or even descriptive as applied to CJ's goods. In a

case on point, the Trademark Trial and Appeal Board acknowledged that by Applicant

voluntarily offering to disclaim the term "GENEMEDICINE," it did not concede the mere

descriptiveness of such term as used in connection with its goods.   *See, e.g., In re

Genemedicine, Inc.,* 1998 TTAB LEXIS 221, 6-7 (TTAB 1998)

The USPTO recently confirmed that this position was accurate when it considered the

same issue during the course of prosecuting CJ's pending PILLOW PETS application (Ser. No.

---

*v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S. Ct. 658, 83 L. Ed. 2d 582 (1985); *Two Pesos, Inc. v. Taco
Cabana, Inc.,* 505 U.S. 763, 769, 112 S. Ct. 2753, 120 L. Ed. 2d 615 (1992). Given Plaintiffs' prolific sales and
advertising, even assuming *arguendo* that PILLOW PETS is not inherently distinctive, it has certainly acquired
secondary meaning. *Wright Dec., ¶ 4, Ex. 1.*

77,940,244), and approved and published said application for opposition on January 11, 2011, with only a disclaimer of "pillow." *Wright II, Dec., ¶ 4, Ex. 1.*

### 3.   Additional Factors That Establish PILLOW PETS is Not Generic

The Trademark Office history of its handling of the combined terms "pillow pets" is alone conclusive evidence that "Pillow Pets" is not generic or even descriptive. However, for belt and suspender purposes, we discuss below the following factors, which courts in the Second Circuit look to in determining genericness: (1) generic use of the term by competitors which plaintiff has not challenged; (2) plaintiff's own generic use which may have an estoppel effect; (3)  dictionary definitions which, while not determinative, may be relevant if not persuasive; (4) generic usage in trade journals or newspapers; (5) testimony of persons in the trade; and (6) consumer surveys. *Brandwynne v. Combe Int'l, Ltd.*, 74 F. Supp. 2d 364, 381 (S.D.N.Y. 1999).

### a.   Competitors Do Not Use Pillow Pets Generically

Defendants claim there is widespread third party generic use of PILLOW PETS. As evidenced above, the "PILLOW PETS" applications and registrations cited by Defendants do not support evidence of widespread use of "Pillow Pets." *Marotta Dec., ¶13, Ex. H.* In fact, the US Trademark Office records show just the opposite, *i.e.*, that R. Dakin had exclusive rights in the combined terms PILLOW PETS up until Plaintiff acquired its rights nearly ten years after R. Dakin's last use. As indicated by Defendants, "Dakin's products are simply stuffed toys that are called 'pillowpets'" *Keiskbas Dec., ¶ 10.* Defendants acknowledge that R. Dakin's nearly twenty (20) years of use did not result in the term becoming generic for animal shaped foldable plush toys.

None of the companies that Defendants allege as selling the same or similar plush pillow toys (Aroma Home ("Pillow Friendz")), Fiesta ("Transformable Pillows") , Kelly Toys ("Pillow Chums"), Intelex ("Pillowheads cushions"), American Mills ("Floor Cushions")) use the terms

"pillow pets" to identify or promote their goods as trademarks or generically. *Wright II, Dec., ¶ 7, Ex. 3.*

Competitors have many alternatives to describe their foldable plush animal designs such as animal pillows, plush animal pillows, stuffed animal pillows, pillow animals and animal pet pillows (the same terms that Defendants use as Adwords). *Kieskbas Dec., ¶ 40, Ex. I; Wright II, Dec., ¶ 6, Ex. 2.* Only Defendants have attempted to genericize Plaintiff's "PILLOW PETS" trademark for its own benefit. When CJ's U.S. trademark application for PILLOW PETS was recently published for opposition, only Defendant Snuggly Plushez opposed. None of Plaintiff's previous applications were opposed by any third party. *Wright II, Dec., ¶ 5.*

Plaintiffs have worked through counsel to actively police the marketplace and educate consumers and competitors as to Plaintiff's intellectual property rights. Plaintiffs have sent hundreds of warning letters. *Wright II, Dec., ¶ 9.* Plaintiffs have filed eleven (11) lawsuits. Plaintiffs have settled all but three lawsuits (including this lawsuit), with each party agreeing not to use "Pillow Pets" as trademarks, trade names, Adwords or otherwise. *Wright II, Dec., ¶ 10.* Plaintiffs have also challenged "pillow pet" variant filings in the USPTO, resulting in abandonment and cancellation of trademark filings. *Wright II, Dec., ¶ 15.* Plaintiffs have engaged investigators to issue cease and desist letters to kiosk owners, mall owners and flea market retailers throughout the United States. Plaintiffs have also actively monitored the Internet and worked with Google, Amazon, Alibaba among others to make certain that Plaintiffs' intellectual property rights are understood and enforced. *Wright II, Dec., ¶ 11.* Plaintiffs registered copyrights and trademarks with U.S. Customs and have cooperated with them to seize infringing products. *Wright II, Dec., ¶ 12.* Plaintiffs even require their own retail customers to agree not to advertise their website using or purchasing the trademarks PILLOW PETS and MY

PILLOW PETS from any search engine or registering any URL that includes the terms "Pillow" or "Pet(s)". *Wright II, Dec., ¶ 16, Ex. 6.*

The results of Plaintiff's policing activities is clear. A search of Google today reveals very little unauthorized use of "Pillow Pets". *Wright II, Dec., ¶ 14, Ex. 5.* Defendants rely upon a single webpage allegedly showing use of "Pillow Pets" by a company called Multipet International (*Marotta Dec., ¶ 18, Ex. I*), and print-outs from Ebay, Google, IOffer and Nextag, showing alleged third party use of "Pillow Pets" as a generic term. *Marotta Dec., ¶ 21, Ex. K.*

### (i). Use of PILLOW PETS by Multipet International

Defendants assert that MultiPet International sells plush toy products called "Pillow Pets™". *Opposition, Pg. 7; Marotta Dec., ¶ 18, Ex. I.* What Defendants fail to indicate is that MultiPet products are plush toys for domesticated animals, not a plush stuffed toy for children. Moreover, MultiPet uses a "tm" to indicate it claims trademark rights and it did not begin to use the trademark until late 2008. In any event, MultiPet agreed to phase out its use and assign its rights in and to the PILLOW PETS trademark to Plaintiff CJ. *Wright II, Dec., ¶ 13.*

### (ii).Ebay, Google, IOffer and Nextag Evidence

### i.    EBay

Defendants' search on eBay revealed use of the term PILLOW PETS in connection with the sale of two Animallow turtle foldable plush toys. The listings appear along with three references to Plaintiff's trademark MY PILLOW PETS. *Marotta Dec., ¶ 21, Ex. K.* This reference does not reveal generic usage of "Pillow Pets." Ebay postings are typically entered by individuals with limited trademark knowledge.

> [T]he fact that buyers or users often call for or order a product by a term does not necessarily prove that the term is a "generic name." The person who orders for lunch a "BIG MAC and a COKE" undoubtedly has brand knowledge and brand loyalty. The generic names "hamburger" and "cola" are understood by all precisely because BIG MAC and COKE are such strong trademarks identifying

source. Since everyone knows the generic names, they are dropped in ordinary usage. *J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition*, §12:27, Pg. 12-90 (4th Ed. 2010).

In any event, UJ Trading, the source of Animallow foldable plush toys was sued by Plaintiff for violating Plaintiff's copyrighted designs. UJ Trading did not refer to their product generically as "pillow pets."  In April, 2011, UJ Trading agreed to a permanent injunction against further sales of Animallow products that were alleged to infringe Plaintiff's copyrighted designs. *Wright II, Dec., ¶ 17.*

### ii.  Google

Defendant searched Google using the search terms "different brands of pillow pets". *Marotta Dec., ¶ 21, Ex. K.*  Such a search would hardly yield anything relevant with respect to the issue of genericness, as "brands" cannot be generic.  To the extent, however, that the Google findings are relevant, it is worth noting that the majority of the references refer to Plaintiff's PILLOW PETS products. Specifically, the reference to Pillow Pets Official site, Target, My Pillow Pets, Toys and Co./Brands/My Pillow Pets, and Amazon.com all refer to Plaintiff's PILLOW PETS products. *Marotta Dec., ¶ 21, Ex. K.*

A proper search of Google using only "pillow pets" reveals an overwhelming majority of references to Plaintiffs and their PILLOW PETS branded products.  The obvious violator is Defendant, who pays for the search term "pillow pets" at great cost to Plaintiffs and with harsh results to consumers seeking "official" and "authentic" PILLOW PETS plush toys.  *Marotta Dec., ¶ 21, Ex. K.*

### iii.  IOffer and Nextag

Plaintiffs do not know what these two websites are but they appear to be pay for placement websites so anyone can use the terms "pillow pets" for the right price to obtain top placement.  Many products on the website do not even show foldable plush toys. This evidence

12

is insignificant in light of the overall scope of proper use of "PILLOW PETS on the internet, and simply irrelevant to the question of genericness of PILLOW PETS. Nearly every reference to "Pillow Pet" is to Plaintiff or Defendants product or a third party that has been challenged by Plaintiff for violating one or more of its intellectual property rights. However, none of this evidence goes to the question as to whether PILLOW PETS is a generic phrase.

### b.  Plaintiffs' Do Not Use the "Pillow Pets" Generically

CJ uses PILLOW PETS as a trademark identifying source.  The Google search results and MyPillowPets.com website clearly identify the website as:

### My *Pillow Pets*® | The Official Home of *Pillow Pets*™

On its MYPILLOWPETS.COM website, CJ advertises:

- "Since 2003, Pillow Pets™ plush folding stuffed animals have been bringing smiles to the faces of all ages. Pillow Pets plush folding stuffed animals add true function to that warm and wonderful feeling by combining the security of a stuffed animal with the functionality of a pillow. Made of high quality, super soft chenille, Pillow Pets plush folding stuffed animals make the most precious snuggle pal for you or your loved one."
- "All Pillow Pets™ products are recommended for ages 3 and up."
- "Washing Instructions: If your Pillow Pets™ plush animal gets dirty and needs a washing, here's how to do it. Place your Pillow Pets plush animal inside a white pillow case and tie off the open ends."
- "Pillow Pets™ Information: A super-soft chenille plush folding stuffed animal. So cuddly you'll never want to put it down! Starts out as your pal, then un-velcro its belly, and it quickly becomes your pillow."

*Wright II, Dec., ¶ 18, Ex. 7.*

CJ indicates on its hangtags:

- "All Pillow Pets™ plush toys have been inspected to meet or exceed U.S.A., U.K. & European safety requirements."
- "Pillow Pets are anything but just another <u>toy</u>!"
- "These attachments are not part of the <u>toy</u>."

*Wright Dec., ¶ 3, Ex. A.*

CJ's Fact Sheet reads:

13

- "Number of varieties of Pillow Pets <u>plush animals</u> - 36; farm critters, sea creatures, jungle pets and more"
- "Retail cost of Pillow Pets <u>plush animals</u> - Under $25; available at www.MyPillowPets.com and select retailers nationwide"
- "Products in the Pillow Pets line – Pillow Pets <u>plush animals</u>, books, slippers, blankets and games"

*Wright II, Dec.,  ¶ 19, Ex. 8.*

While CJ may have a few instances of uses of PILLOW PETS as a noun, such use is infrequent and hardly qualifies the mark PILLOW PETS as a generic term.

> It is not mandatory that a trademark owner engage in redundancy in its advertising or promotional literature following every use of its trademark with the generic words for the product. It is sufficient that the viewer is made aware that the word is a trademark by the association of the mark with the generic words in a context of normal literary style". *CPC International, Inc. v. Balzola Foods Corp.*, 224 U.S.P.Q. 85 (S.D. Fla. 1984) *See Maremont Corp. v. Air Lift Co.*, 463 F. 2d 1114, 174 U.S.P.Q. 395 (C.C.P.A. 1972).

It should be noted that not only does Plaintiff use "PILLOW PETS" as a trademark for its foldable plus toy, but also as a trademark for plush slippers, blankets and hats, *i.e.*, not products that could be used as pillows. *Wright II, Dec., ¶ 20.*

### c.  <u>Dictionary Definitions Confirm PILLOW PETS is Not Generic</u>

Defendants dissect the mark PILLOW PETS into component parts and reasons:

> [t]he phrase "pillow pets" is merely a composite of two generic terms: pet, which is a genus of inanimate objects that people refer to metaphorically; and pillow, which is a common item in a household. A pillow is thus both a type of pet and a type of pillow, i.e. a plush stuffed animal that converts into a bed pillow. *Opposition, Pg. 27*

This approach of dissecting a mark, which alters the meaning of the mark when viewed in its entirety, has been rejected. See, e.g., *Filipino Yellow Pages, Inc.* v. *Asian Journal Publ'ns.,Inc.*, 198 F.3d 1143, 1150 (9th Cir. 1999) (the genericism analysis should be conducted by looking at an entire mark rather than dissecting it into its smaller parts.)

14

Defendants acknowledge there is no dictionary definition of the composite mark PILLOW PETS. *Marotta Dec., ¶ 23.* However, there are individual definitions of the terms "pillows" and "pets". The term "pillow" is understood to denote an item used to "[] support [] the head of a reclining person". The word "pet" is understood to denote "a domesticated animal kept for pleasure rather than utility". Thus, a "pillow" by definition is lifeless while a "pet" is a living, breathing creature. Obviously, no reasonable consumer would or could use "domesticated animals" as a pillow. The combined terms PILLOW and PETS are incongruous, have no recognizable meaning, and are certainly not the genus of the goods at issue. Instead, the genus of said goods are undoubtedly "stuffed plush animal toys". *Wright II, Dec., ¶ 21, Ex. 9.*

### d.  Generic Usage In Trade Journals Or Newspapers

Defendants have come forward with no evidence of generic usage of "Pillow Pets" in trade journals or newspapers. Nearly all magazine, newspaper and internet-based articles that discuss "Pillow Pets" though, do so in connection with a reference to Plaintiffs and their line of PILLOW PETS products. *Wright II, Dec., ¶ 22.* There simply is no evidence otherwise as to widespread generic usage of the terms in such mediums.

### e.  Understanding of Terms by Persons In The Trade

Evidence from the trade clearly evidences that they understand "Pillow Pets" to be a trademark of Plaintiff. Nearly every major U.S. mass retailer sells Plaintiff's PILLOW PETS products. Evidence of how they use the trademark to identify Plaintiff as the source of its well-known "As Seen On TV" product is conclusive of their understanding that PILLOW PETS is a trademark. *Wright II, Dec., ¶ 23, Ex. 10.*

Defendants, alleged to be in the trade, even acknowledge that the genus of the goods at issue are indeed plush stuffed animals. Defendants, on their website Pillowpets.co, defines the genus of its business as a ". . [a] store [which] carries high-quality plush animals and ***super-soft***

***pillow toys*** from various brands". *Drangel Dec., Ex. C.*   On that same website, Defendants defines the genus of its PLUSHEZ product, explaining that "PLUSHEZ Pillow Pets, [are] a higher standard of plush toys", and even uses a trademark symbol after PILLOWPETS.CO. *Keiskbas Dec., Ex. H.*

As Defendants indicate on their Pillowpets.co website, they identify each product by vendor and type. For example, the vendor is "Plushez" and the "type" of product is a "pillow pet." *Keiskbas Dec., ¶ 35, Ex. H.* For the American Mills Floor product it identifies the vendor as "American Mills" and the type as a "floor cushions."   As for the "Hugga Pet Pillows" which are a competitive foldable stuffed toy line, the vendor is identified as "Hugga Pet Pillows by Bestever" (although on its label, the vendor refers to its product as only "Hugga Pet") and the type as "***plush toys***" – not "pillow pets." Defendants are simply playing games. Defendants and the other "vendors" that offer products on the Pillowpets.co website know that the "type" is simply a "plush toy".   Under each Plushez animal display, Defendants describe "Pillow Pets as super-soft chenille plush animals." *Keiskbas Dec., Ex. H.*   Additionally, Defendant, on its PLUSHEZ.COM website, uses PLUSHEZ as a trademark and as adjective modifying the generic noun "stuffed toys". *Drangel Dec., Exhibit A.* Defendants are trying to genericize "Pillow Pets" for their financial benefit.

### f.   Consumer Surveys

Until Defendants took this position that "Pillow Pets" is generic, no one else has ever challenged Plaintiff's rights to its trademarks. Accordingly, no survey has been performed, nor does it seem, given the evidence above, that one is necessary.

**4.      Given That PILLOW PETS is not Generic Defendants' Use of Pillow Pets
Must be Enjoined**

There is no question that Plaintiff's MY PILLOW PETS and PILLOW PETS are valid
and enforceable trademarks.  Given this, Defendant Keiskbas' attempts to explain its deceitful
and bad faith use of Pillowpets.co, "My Pillow Pets" in connection with coupon sites (*ex.,*
pillowpetscoupon.com -where links only exist to Pillowpets.co), and visually similar "Pillow
Pets" graphic ads, cannot be taken seriously.  *See Keiskbas Declaration.*  Defendants blame third
parties (pillowpetscoupon.com; promocodes2011.com), yet they almost certainly pay the third
party a referral fee.  *Keiskbas Dec., ¶¶  37-38, 44.*  Defendants pay to place graphic "Pillow
Pets" ads although they indicate that they cannot control whether or not a third party uses
"Plushez."  *Keiskbas Dec., ¶ 43.*  The deceptive use of "Official Pillowpets.co" in Google
Adword Advertisements is simply confusing consumers.  *Keiskbas Dec., ¶¶ 36-37.*  A review of
website visitor data clearly shows that Defendants' actions are reaping the benefits of consumer
confusion with consumers being misdirected to the Pillowpets.co website, since Defendants' site
Pillowpets.co is ranked nearly as high as Plaintiffs' websites.  *Wright II Dec., ¶¶ 45-49, Ex. 23.*
Finally, Defendants try to exculpate themselves by claiming that they do not use "My Pillow
Pets" as adwords, but use instead only "pillow pets."  *Keiskbas Dec., ¶ 40 , Ex. I.*  What is truly
telling with respect to Defendants' intent here is that Defendants do not even use their "plushez"
brand as a keyword. The reason is simple: "plushez"  has no brand recognition, as shown by the
lack of website visitors for Plushez.com website.   *Wright II Dec., ¶ 49, Ex. 2.* Accordingly,
Defendants have utilized Plaintiff's trademark in every way conceivable to exploit and trade off
of Plaintiff's PILLOW PETS brand and the goodwill engendered thereby.

Defendants argue that if prohibited "from using 'pillow pet' in advertising to describe its
pillow pet products, Defendants will be unable to conduct any significant sales or have any

17

cogent and successful marketing strategy, particularly for online sales." *Keiskbas Dec.,* ¶ *67.* Defendants then indicate that "there is no easy replacement phrase or simple internet key word to identify this specific category of product *i.e.*, soft plush stuffed animal toy that can be converted into a bed pillow for children." *Keiskbas Dec.,* ¶ *68.* Defendants' argument fails for this very reason. "Pillow Pets" is not a category of product. It is Plaintiff's trademark.  It is true that Defendants cannot build a business without the terms unless it does its own marketing and promotions for "Plushez" as opposed to riding on the coattails of Plaintiff's success and nearly $1 million per month in advertising. *Wright Dec.,* ¶ *5.* Defendants list nearly thirty (30) alternative generic terms it can use as Adwords as alternatives to "pillow pets." *Keiskbas Dec.,* ¶ *40, Ex. I.* It might even consider marketing "Plushez" and using it as a keyword, as competitors do.

Given the above, any use of "PILLOW PETS", Pillowpets.Co., MY PILLOW PETS®, IT'S A PILLOW, IT'S A PET, IT'S A PILLOW PET® or any confusingly similar mark, or any colorable imitations thereof by Defendants as a trademark, service mark, trade name, domain name and website (pillowpets.co, pillowpetswholesale.com, among others owned and controlled by Defendants), Google Adword or otherwise on tags, labels or packaging, in connection with the wholesale, retail and/or Internet sale of plush toys, or in any advertising, promotions, solicitations or Internet use (including, but not limited to, website, domain name, coupon, and/or social networks) is intentional, infringing, bad faith harmful conduct that should be preliminarily enjoined during the course of this Action.

**C.**    **Plaintiffs Are Likely To Succeed On Their Copyright Claims**

    **1.**    **Plaintiff Owns Valid Copyrights**

As indicated by Defendants, copyright registration is prima facie evidence of ownership, and confers a presumption of validity, including originality, but an accused infringer may rebut

18

that presumption.  Defendants challenge Plaintiffs presumptive rights but fail for the following reasons.

### a.  All of Plaintiff's Copyrighted Designs Are Entitled to Statutory Presumptions

Defendants are correct that "some thirty five (35) of all of Plaintiffs registration certificates were issued within five years of publication."  Defendants then argue that the other five (5) are not entitled to statutory presumption of validity.  Eight (8) of ten (10) of Plaintiff's copyrights involved in this Motion are entitled to statutory presumptions of ownership, validity and originality: Lady Bug, Panda, Bumble Bee, Penguin, Bear, Dolphin, Frog and Monkey as each were issued within five years of publication. *Opposition, Pg. 17.*

For the purposes of this Motion, only the Duck and the Cow are not automatically entitled to statutory presumptions.  However, Judge Vitaliano considered this same issue when he extended the statutory presumptions to Plaintiff's Duck in connection with a preliminary injunction motion earlier this year.  Judge Vitaliano held that:

> Given that the overwhelming majority of the designs within this product line are clearly entitled to the statutory presumption of validity, the Court finds that it is especially appropriate to exercise the discretion accorded it by statute and afford the same weight to the five certificates registered outside the protected harbor timeline. Plaintiffs currently market and sell 33 versions of the pillow pet product line that are all functionally the same—they are a combination of a stuffed animal and a pillow. That the "Buzzy Bumble Bee" design, for example, was registered within the five-year period and the "Puffy Duck" design was not, is substantively insignificant. Both products are made and marketed as part of the identical product line. All in all, the Court treats the certificates of registration for the five stale registration products as prima facie evidence of their validity, despite the fact that they were registered outside the five-year period. Since defendants have not submitted on the motion for preliminary injunction a scintilla of evidence to cast doubt on the validity of any of the subject copyrights, except for the invitation to eyeball other similar stuffed animal products, the presumption of validity has certainly not been rebutted. Stated another way, "absent any reason or basis to rebut the presumption of validity," all of CJ's certificates of registration, at this stage, will be deemed valid. *CJ Products et al., v. Concord Toys Int'l, Inc. et al, 2011 U.S. Dist. LEXIS 4983 (E.D.N.Y. 2011)*

This Court should extend the presumption to the Duck and Cow designs for the same reasons.

### b.  Plaintiff's Copyright Registrations Are Not Defective

Defendants argue that the registrations are defective because Plaintiffs indicate that their Pillow Pets have been on the market since 2003 yet the earliest registration certificates indicate a publication date of 2004. *Opposition, Pg. 17.*  No copyrighted designs that are the subject of this Motion were first published in the United States in 2003.  The 2004 publication dates in each copyright registration is accurate. *Wright II, Dec., ¶ 24.*

### c.  Plaintiff Has a Valid Copyright in its Ladybug Design

Contrary to Defendants argument otherwise, Plaintiff has a valid copyright registration (VA 1-665-418) for its Ladybug plush toy design. *Opposition, Pg. 18.* The application was simply mistitled as:

> Titles of Work: Untitled (Bumblebee Pillow Pet)
> Contents Title: Untitled (LadyBug Pillow Pet)

*Wright, Dec., Ex. C, Pg. 4.*  A correction has been filed with the U.S. Copyright Office. *Wright II, Dec., ¶ 25, Ex. 11, Wright Dec., Ex. C.* "Thus, the errors, committed without deceptive intent, are harmless and do not invalidate the copyright." *Gund Inc. v. Swank, Inc.,* 673 F. Supp. 1233 (S.D.N.Y. 1987)

### d.  Plaintiff Has a Valid Copyright in its Current Bear Design

Defendants argue that "the copyright registration for the CJ Bear design is not actually for the Bear that Plaintiff's alleged Defendants have infringed." *Opposition, Pg. 18.*   This is not correct.  The Bear deposit materials showed the exact same Bear design, only with different coloring. *Wright II, Dec., ¶ 26, Ex. 12.* The new Bear design is dark brown with light nose and skin.

Fortunoff argues that since Gund registered its copyright for the brown and white medium size SNUFFLES bear, the question of substantial similarity should be decided between this SNUFFLES bear and the Fortunoff's white bears and that Gund should have re-registered SNUFFLES in the different sizes and colors to obtain protection for each color and size. The argument is without merit. The size and color variations in the SNUFFLES design were not sufficiently significant or original to qualify for separate registration under the Copyright Act. *Gund Inc. v. Fortunoff Inc.*, 3 USPQ2d 1556 (S.D.N.Y. 1986).

### e.   Plaintiff's Copyrighted Designs are Original and From One China Source

Defendants argue that "Plaintiffs purportedly original copyright designs are merely borrowed from common designs that are used by at least ten (10) companies in the plush toy industry, including: American Mills, Multipet International, Kellytoy, CuddleBudz, Aroma Home, Ty, Fiesta, Bestever Hugga Pet, Interlex and Squishables." *Opposition, Pg. 8.* American Mills (selling to Squishables), Multipet, Aroma Home and Fiesta all have purchased goods from the same factory but it is Plaintiff's factory: Color Rich Limited ("CRL"). *Wright II, Dec., ¶ 27; Declaration of Jospeh Li ("Li Dec.") ¶¶ 1-11.* Plaintiff's agreement with CRL permits CRL to sell plush items incorporating facets of Plaintiff's plush foldable pillows into Rounds, 32 inch floor cushions, slippers, standard plush animals, and even, for limited sales to third parties as plush foldable pillows. *Wright II, Dec., ¶ 27; Li Dec., ¶ 11.* This does not affect Plaintiff's copyright rights in and to the designs as incorporated into the foldable plush toy designs.

The remaining companies identified as selling products incorporating the alleged "common designs" (Kellytoy, CuddleBuzz, Interlex, and Bestever) are doing so without authorization and only very recently. *Wright II, Dec., ¶ 29; Li Dec., ¶¶ 13-14* Kellytoy was sent a warning letter for its activities and no longer sells similar designs. Their "Pillow Chum" products now resemble more life-like animals and each design has extendable legs and feet. *Wright II, Dec., ¶ 30, Ex. 13.* The Interlex products were first discovered in connection with this Motion, but the products are not sold in the United States and only appear to be a recent product

release. *Wright II, Dec., ¶ 33; Li Dec., ¶ 13.*  Bestever sells foldable pillow products that do not

look like Plaintiff's design and have legs and feet. *Wright II, Dec., ¶ 32, Ex. 15.*  None of these

designs pre-date CJ's copyrighted designs. *Wright II, Dec., ¶ 34.*

> Notwithstanding defendants' assertions, the mere presence of other similar
> products does not undercut the legitimacy of plaintiffs' copyrights. It certainly
> does not rebut the presumption of validity. To rebut the presumption that
> plaintiffs' copyrights are indeed valid, defendants are required to make a showing
> that the certificates of registrations are somehow invalid or that CJ does not in fact
> own the copyrights. *See Hasbro, 780 F.2d at 192.* They have not come close to
> shouldering that burden. *CJ Prods, at *9*

Defendants then argue that the Duck and Dolphin are similar to Ty Inc.'s products.

Defendants do not indicate when the Ty products were created and distributed.  Further, the

overall Ty designs are distinguishable from Plaintiff's unique-shaped and designed Duck and

Dolphin. *See Section C.2.b., infra.*   Defendants' arguments are mere speculation supported by

no evidence.

> First Goffa speculates that the designs at issue have been in existence for decades,
> implying that the toys fall within in the public domain and cannot be copyrighted.
> But Goffa has not offered any toy actually existing in the public domain which
> Imperial may have copied. Mere conjecture is not sufficient to rebut the
> presumption of validity of Imperial's copyright. *Imperial Toy Corp. v. Goffa Int'l
> Corp.*, 988 F.Supp. 617 (E.D.N.Y. 1997)

Defendants have come forward with no evidence that any third party has prior rights so

the presumptions of validity cannot be overcome.

### 2. Defendants Copied Plaintiff's Valid Copyrighted Designs

#### a. Defendants Had Access to Plaintiff's Designs

As argued in *Plaintiff's Memo*, given the closeness of each design to Plaintiff's, any

argument by Defendants that its designs were "independent" creations is simply untenable.

*Wright II, Dec., ¶¶ 42-43, Exs. 20-21.*  Access is presumed when the two works are 'strikingly

similar." *Arnstein v. Porter*, 154 F.2d 464 (2d Cir. 1946) Defendants do not even argue that the

22

designs are not "strikingly similar." Only minor changes are identified in the various designs. *See Section C.2.f, infra.*

Defendants allege that their "independent" designs were created by a Chinese company, but no declaration or evidence of independent creation was supplied. *Kieskbas Dec., ¶ 30, Ex. E.* Defendants also indicate that "Plushez has a time-consuming creative process and quality control procedure. Plushez presents its ideas to JSF International and provides requested specifications." *Kieskbas Dec., ¶ 30.* Defendants indicate that it developed its original designs in May, 2010. *Kieskbas Dec., ¶ 5.* Defendant's do not dispute knowledge of Plaintiffs or Plaintiff's PILLOW PETS products by May, 2010. As indicated in *Plaintiff's Memo*, access can be established by demonstrating that "the infringed work has been widely disseminated." *Yurman. v. Chaindom* 1999 WL 1075942, at *6 (2d Cir, 2001). Given the vast public exposure of Plaintiff's products in the United States, Defendants, as alleged active participants in the children's toy industry are unquestionably aware of Plaintiff's unique designs. *Wright, Dec., ¶¶ 3-9, Es. A-B.*

### b. Defendants Copied Plaintiff's Original Animal Plush Designs

As indicated above, Plaintiff's copyright registrations provide it with a presumption of originality for its copyrighted designs. Defendants still argue that "any characteristic in common between Snuggly designs and CJ's designs are unprotectable material that is in the public domain." While not acknowledging copying, Defendants indicate that "here 'nearly all the similarities between the works arise from non-copyrightable elements." *Opposition, Pg. 21 (citation omitted)* Defendants define the non-copyrightable elements as follows:

1) "the ideas expressed by Snuggly/CJ in their animal designs are all general ideas. The idea of a frog; the idea of a ladybug; the idea of a bumblebee; the idea of a cow; the ideas of the other common animals are general, and all the features used by Defendants in their products are those necessary to express such general ideas in the public domain." *Opposition, Pg. 21;*
2) "the Plaintiff's designs are quite minimal and lack any 'personality' traits or unique details." *Opposition, Pg. 22*

23

3) "the idea of a square pillow with an animal head and triangle legs is not protected." *Opposition, Pg. 21;* and

4) the Velcro straps are merely functional;[5]

Plaintiff's copyrighted designs are so much more than Defendants attempt to portray. Plaintiff owns copyright registrations on nearly forty (40) different animal designs incorporating the above alleged "non-copyrightable" elements and none were rejected by the Copyright Office. *Wright II, Dec., ¶ 35.* Likewise, Defendants filed and received copyright registration for its 27 animal designs incorporating the same elements.[6] *Kieskbas Dec., ¶ 30, Ex. E.* There is no question that Plaintiff and Defendants' (substantially similar) designs are copyrightable subject matter.

### c. <u>Plush Toy Animals Can Be Protected by Copyright</u>

By the initial two elements, Defendants seem to argue that no stuffed animals can be copyrightable because a duck is a duck is a duck. There are hundreds, if not, thousands of ways to design an animal plush toy, by changing coloring, appearance, shape, size, pose, feel and pattern. If this were not the case, no one would bother to file copyrights for animal plush toys or file lawsuits to enforce their rights; obviously, this is not the case. For years, Courts have issued preliminary injunctions on animal plush toys. *Imperial Toy Corp. v. Goffa Int'l Corp.*, 988 F.Supp 617 (E.D.N.Y. 1997) (preliminary injunction for stuffed whale, penguin, lion, dolphin, toucan, lobster, frog, dachshund and goldfish); *Gund Inc. v. Swank, Inc.*, 673 F.Supp. 1233 (S.D.N.Y. 1987) (preliminary injunction for stuffed lion); *Gund Inc. v. Fortunoff Inc.*, 3 U.S.P.Q.2d 1556 (S.D.N.Y. 1556) (preliminary injunction for stuffed bear); *Coquico, Inc. v. Rodriguez-Miranda* 2010 U.S. Dist. LEXIS 76386 (D.P.R. 2010) (preliminary injunction for stuffed coqui).

---

[5] The Velcro strap is the only functional feature of Plaintiff's copyrighted designs that Defendants object to.
[6] The Copyright Office does not review applications to determine if they conflict with prior applications so the Snuggly Plushez applications were simply allowed since the Office considered them copyrightable.

24

### d.   Plaintiff's Stuffed Animal Faces are Original and Protectable

For the most part, Defendants arguments tend to focus on Plaintiff's animal faces when it discusses their lack of originality.  With regard to Plaintiff's specific designs, Defendants attempt to argue that the facial designs were public domain as originating from multiple sources in China that predated Plaintiff.  However, the speculative evidence that Defendant relied upon instead confirmed that the designs originated from one source: Plaintiff's factory and was authorized by Plaintiff. *Li Dec., ¶ 1-7.*  Plaintiff's facial designs do in fact take on an oversized, oval, smiley, beady eyed, look and feel. *Wright II, Dec., ¶ 36, Exs. 20-21.* This does not detract from the design's copyrightability.  Plaintiffs' audience are children ages 3 and up so the look and feel is appropriate.  There is no question that Plaintiff's plush toys' facial proportions, size and shapes and colors are copyrightable. They are distinguishable from other plush foldable pillow toys on the market. *Wright II, Dec.,¶ 41, Exs. 16-19.*

### e.   Plaintiff's Stuffed Animal Bodies are Original and Protectable

However, the extent of Plaintiff's strong copyright rights do not end there. By the second two elements, Defendants argue that a square pillow with an extended animal head and Velcro strap is not a copyrightable element.  Plaintiffs do not claim exclusive rights to Velcro straps or plush pillows.  The body shape that the secured Velcro straps create is, however, copyrightable subject matter. *Wright II, Dec., ¶ 37.*

When the Velcro is secured, it creates a unique shaped animal, a shape which is protected by Plaintiff's copyright registrations. When the Velcro strap is released, it also creates a unique shaped animal, a shape also protected by Plaintiff's copyright registrations. An example of one of Plaintiff's designs shown lying flat and as a standing plush animal toy appears below:



*Wright II, Dec., ¶ 38.*

Plaintiff's copyright registrations cover a plush animal 3-D design, evidenced in deposit materials in both secured Velcro and released Velcro positioning. *Wright II, Dec., ¶ 39.*

Defendants reference the following third parties that use Velcro straps to convert products from pillows to standing stuffed animals: Fiesta, Kellytoy, Intelex, Bestever Hagga Pet, Animallow, Zoobies, Cudddlee Pets, Mary Meyer Animal Pillows and Cloud B.[7] Defendants reliance on competitor products is a misguided attempt to show common designs. Defendants conveniently do not show pictures of said designs since they are distinguishable body shape, legs and facial features lying down and standing. None of the designs have triangles for legs and feet, a feature that adds to the unique overall look and feel of Plaintiff's copyrighted designs. Further, the fabrics and shapes are distinguishable.[8] *Wright II, Dec., ¶¶ 40-41, 44, Exs. 16-19, 22.*

Defendant's evidence shows that there are alternatives pillow designs that use Velcro

---

[7] Animallow and Cuddlee Pets sold substantially similar products to Plaintiff's and Defendant but each recently settled with Plaintiff and agreed to cease further sales after a sell-off period. Interlex is not sold in the United States and Mary Meyer was not known to Plaintiff until brought to the attention in Defendants responsive papers. In any event, the Mary Meyer designs have different body shape, legs and facial features. Fiesta products originate from Plaintiff's factory and are no longer sold. Fiesta now sells pillow products with distinguishable body shape, legs and facial features. *Wright II, Dec., ¶¶ 8, 17, 40-41, Exs. 16-19.*

[8] It should be noted that Defendants seem to acknowledge Plaintiff's rights in the shape and fabric of Plaintiff's plush toy bodies when they indicate that "there is little to no apparent aesthetic features other than the shape and fabric." *Opposition, Pg. 15.* Despite this acknowledgement, Defendants have chosen to copy said shape and fabrics by creating an 18 inch rectangular pillow with long pile fabric top and short pile fabric bottom and short pile fabric triangular corners.

straps that do not infringe Plaintiff's copyrighted designs. *Wright II, Dec., ¶¶ 40-41, 44, Exs. 16-19, 22.* It also shows that Defendants have not created an independent form of expression for its toys.  Defendants have instead appropriated Plaintiff's own unique (and extremely successful) form of expression. *Wright II, Dec., ¶¶ 42-43, Exs. 20-21.*

### f.   Defendants Fail to Prove the Respective Designs Are Not Substantially Similar

Defendants focus almost exclusively on differences in minor details to the animal faces in order to support their claim that the designs are not substantially similar.  There simply is no reason to believe that Plaintiff's unique expression of the animal faces is not copyrightable subject matter.  Defendants argue the following differences between Plushez and Pillow Pets (and other competitor) designs: "sewn fabric eyes made of quality fabric, which are unique and markedly different from the plastic button eyes that the competition use, including Plaintiff CJ"; different colors, shades and shapes from those of Plaintiff's products as well as other competitors." *Marotta Dec., ¶ 34.*  These differences are minor in light of the overall designs.  A comparison of Defendants' products and Plaintiffs' designs reveals an identical resemblance in the protected features as well as the "total concept and feel" of Plaintiffs' designs.  *Wright II, Dec., ¶¶ 42-43, Exs. 20-21.*  The fact is that without identifying tags, an ordinary observer would have great difficulty telling the two products apart.  Unless one set out to detect the disparities it is clear the aesthetic appeal of the copyrighted designs and Defendant's plush toy designs are the same.  Therefore, Defendant's plus toy designs are substantially similar and infringe Plaintiff's copyrights.  As Judge Vitaliano in indicated recently in a preliminary injunction decision for Plaintiff's Pillow Pets:

> There is no question that the products are identical. A side-by-side comparison at the preliminary injunction hearing, invited by both parties, revealed no substantial differences between the original designs and defendants' counterfeits. *CJ Prods., supra* at * 15.

### III.   IRREPARABLE HARM

Even though *Salinger and Ebay* has dispensed with a presumption of irreparable harm, this Court should follow the lead of Judge Vitaliano earlier this year who considered *Salinger* and *Ebay* to find irreparable harm:

> Plaintiffs have satisfactorily established that they are in fact suffering irreparable harm by defendants' continued sale of items that are identical to the copyrighted works. 'In the context of copyright infringement cases, the harm to the plaintiff's property interest has often been characterized as irreparable in light of possible market confusion.' *Salinger*, 607 F.3d at 81. Courts generally issue injunctions in this context because 'to prove the loss of sales due to infringement is . . . notoriously difficult.' *Id.* (quoting *Omega Importing Corp. v. Petri--Kine Camera Co.*, 451 F.2d 1190, 1195 (2d Cir. 1971) (Friendly, C.J.)). There is no question that the products are identical. A side-by-side comparison at the preliminary injunction hearing, invited by both parties, revealed no substantial differences between the original designs and defendants' counterfeits. It is unchallenged that CJ has spent substantial time, money, and effort in building and developing customer recognition, awareness, and goodwill for these products. From September 2009 to March 2010, for example, the company spent $1,350,000.00 on media and advertising. It currently spends approximately $1 million a month to continue to expand its customer base. Flooding the market with counterfeit products will not only result in lost sales, but perhaps more importantly, it will impair plaintiffs' reputation. Given that the products are virtually identical, it is highly likely that consumers will confuse them." *CJ Products, supra* at *15-16.

The harm to Plaintiffs and consumers is much more than money damages can cure. As indicated above, Defendants are attempting to genericize Plaintiff's 'PILLOW PETS" trademark. This simply cannot be remedied by money damages. The harm to Plaintiff's copyright designs is noted by Judge Vitaliano *(above)*. Finally, anytime, there are instances of false advertising and false association, the consumer is the direct loser with no damage cure.

### A.   Defendants' Claims of Laches and Estoppel Fail

#### 1.   Laches

Courts in the Second Circuit have recognized that a delay in filing suit will not rebut the presumption of irreparable harm if the plaintiff does not know how severe the infringement is

during the period in question. *See Clifford Ross Co. v. Nelvana, Ltd.*, 710 F. Supp. 517, 521 (S.D.N.Y. 1989), aff'd, 883 F.2d 1022 (2d Cir. 1989co). Similarly, a delay caused by a plaintiff's good faith efforts to investigate an infringement does not rebut the presumption of irreparable harm. *See King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992).

In this case, Plaintiffs sent a cease and desist letter to Defendants in November, 2010, one month after Defendants first started to sell products that violated Plaintiff's copyrights. *Keiskbas Dec., ¶ 5.* Plaintiffs then filed suit on February 14, 2011, and moved for injunctive relief on May 3, 2011. Defendants were only selling infringing copyrighted designs on its Plushez.com website when a warning letter was sent in November, 2010. It was not until approximately April, 2011, that Defendant set out on a more intentional course of conduct to infringe Plaintiff's trademark and confuse consumers. *See Drangel Dec., ¶¶ 4-7, Exs. A-D; Wright II, Dec., ¶ 45-49, Ex. 23.* Defendants shifted their focus from the Plushez.com website to a near mirror image PILLOWPETS.CO website where Defendants prominently used PILLOWPETS.CO ™ and "Pillow Pets" as trademarks, replaced PLUSHEZ with "Pillow Pets", prominently displayed knock-offs of the CJ's most popular PILLOW PETS products, quoted favorable reviews of Plaintiff's PILLOW PETS products and included an "As Seen on TV reference on its website." *Drangel Dec., ¶¶ 4-7, Exs. A-D.* Defendants have already discontinued its most indefensible actions by removing references to "As Seen on TV" and the favorable considerable reviews associated with Plaintiffs. *Opposition, Pg. 44.* This activity has occurred only very recently. A review of website tracking software shows that it was not until April, 2011 that Defendants' false advertising and false association activities (*See Section 2.B.4, supra*) began to exponentially increase visitor attendance to Defendants' Pillowpets.co website. *Wright II, Dec., ¶ 45-49, Ex. 23.* There simply was no delay in action by Plaintiffs.

### 2.    Estoppel

Defendants seems to contend that by disclaiming PILLOW PETS apart from CJ's MY PILLOW PETS marks, CJ somehow represented that it had no objection to other companies using the words "pillow" and "pets" in its brand names.  As indicated above, CJ's disclaimers do not serve as a concession that, when combined, PILLOW PETS, is merely generic or even descriptive as applied to CJ's goods.  Moreover, there was no reasonable basis for Defendants to rely on CJ's disclaimers as a free pass to proceed to use its trademark PILLOW PETS.  In fact, to do so was simply fool hardy.  First, it is fundamental trademark law that even descriptive terms which have been disclaimed can acquire secondary meaning.  Second, on February 19, 2010, CJ filed with the USPTO a new application for the trademark PILLOW PETS per se for stuffed plush toys, among other items. *Wright II, Dec., ¶ 3.*  Defendants did not begin its preliminary design work of its PILLOW PETS products until, at the earliest, May, 2010. *Keiskbas Dec. , ¶ 5.*  Accordingly, even a cursory review of the USPTO records prior to Defendants launch in October, 2010 would have revealed that CJ filed for PILLOW PETS as a trademark, believed it was a trademark, and would act to enforce its rights in and to said mark. *Keiskbas Dec., ¶ 5.*  Based on the foregoing and since "[e]stoppel is a drastic remedy and must be utilized sparingly", there is simply no good reason why the Court should invoke the doctrine of equitable estoppel. *See Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 948 (S.D.N.Y. 1997).

### IV.    CONCLUSION

The indisputable evidence establishes Defendants' willful, persistent and illegal copyright infringement, false advertising and false association and unfair competition.    Plaintiffs respectfully submit that their motion for Preliminary Injunction be granted.

EPSTEIN DRANGEL LLP

Dated: 6/10/11

By: _____
Jason M. Drangel (JMD 7204)
Attorneys for Plaintiff
60 East 42nd Street, Suite 2410
New York, NY 10165
Tel: 212-292-5390
Fax: 212-292-5391