UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
CJ PRODUCTS LLC and ONTEL
PRODUCTS CORPORATION,

                Plaintiffs,

     -against-                               **MEMORANDUM AND ORDER**
                                                11-CV-0715 (RRM)(SMG)
SNUGGLY PLUSHEZ LLC and BERKANT
KEISKBAS,

                Defendants.
-----------------------------------------------------------X
**ROSLYNN R. MAUSKOPF, United States District Judge:**

      Plaintiffs CJ Products LLC ("CJ") and Ontel Products Corporation ("Ontel")

(collectively, "plaintiffs") brought this action on February 14, 2011 against defendants Snuggly

Plushez, LLC ("Snuggly") and Berkant Keiskbas ("Keiskbas") (collectively, "defendants")

alleging copyright infringement, trademark infringement, and related claims as to one of their

products. (*See* Compl. (Doc. No. 1).) In May 2011, plaintiffs moved for a preliminary

injunction. (Doc. Nos. 7-12.) The Court held an extensive preliminary injunction hearing on

June 24, 2011. For the reasons stated below, plaintiff's request for a preliminary injunction

pursuant to Rule 65 of the Federal Rules of Civil Procedure is GRANTED. This Memorandum

and Order constitutes the Court's findings of fact and conclusions of law.

## BACKGROUND

      CJ is a company that develops, produces, sells, and distributes toys. The subject of this

motion is one of its most popular products – a plush toy in the shape of an animal that unfolds

into a flat pillow known as a "Pillow Pet." This product was introduced in 2003 and branded

with several different registered trademarks, including MY PILLOW PETS®, MY PILLOW

PETS® (with logo), and IT'S A PILLOW, IT'S A PET, IT'S A PET . . . IT'S A PILLOW

PET®.  (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. (Doc. No. 21) at 6.)  CJ is in the midst of

registering the trademark PILLOW PETS™; at the time of this action the process had passed

through the United States Patent and Trademark Office ("USPTO") registration period and

stalled in the opposition period.  CJ granted to Ontel the exclusive license to manufacture,

market, advertise, promote, sell, offer to sell, and distribute the pillow pet line of products, and

an exclusive license to all related intellectual property.  (Compl. ¶¶ 23-25.)

Defendant Snuggly Plushez ("Plushez") is also a corporation that develops, produces,

sells, and distributes toys, including selling toys by website.  (*Id.* ¶¶ 31-33.)  Plaintiffs allege that

"Defendant Snuggly [Plushez] was under the de facto and sole control and served as the alter

egos of Defendant Keiskbas, who is an officer, director, or board member of this entity."  (*Id.* ¶

6.)  Plaintiffs learned that defendants were selling merchandise quite similar to their "Pillow Pet"

product line.  Likewise, when plaintiffs investigated these sales, they found that defendants were

using marks resembling those they had registered, and that they purchased and used Google

AdWords[1] to direct potential customers to their sites using these marks.

Plaintiffs now seek a preliminary injunction, enjoining and restraining defendants and

their agents from:  (1) manufacturing, copying, distributing, or selling any plush toy substantially

similar to CJ's designs for Lady Bug, VA-1-665-418; Panda, VA 1-679-223; Bumble Bee, VA

1-665-417; Penguin, VA-674-371; Bear, VA 1-715-257; Dolphin, VA 1-674-379: Frog, VA 1-

674-372; Monkey, VA 1-674-374; Duck, VA 1-715-275; and Cow, VA 1-715-272, pending

further order of this Court or a determination of the action; (2) using PILLOW PETS™, MY

PILLOW PETS®, IT'S A PILLOW, IT'S A PET, IT'S A PILLOW PET®, pillowpets.co,

"authentic pillow pets" or any confusingly similar mark, or any colorable imitations thereof, as a

trademark, service mark, trade name, domain name and website, Google AdWord or otherwise

---

[1] *See infra* Section IV.

on tags, labels or packaging, in connection with the wholesale, retail and/or Internet sale of plush toys; (3) using PILLOW PETS™, MY PILLOW PETS®, IT'S A PILLOW, IT'S A PET, IT'S A PILLOW PET®, or any confusingly similar mark, or any colorable imitations thereof, in any advertising, promotions, solicitations or Internet use (including, but not limited to, website, domain name, coupon, and/or social networks) for such wholesale, retail and/or Internet sale; (4) using the terms "authentic," "original," "official," "As Seen On TV" or other similar confusing terms in connection with the wholesale, resale and/or Internet sale of Plushez or Napies plush toys; (5) making any other false associations with Plaintiff or plaintiffs PILLOW PETS™, MY PILLOW PETS®, IT'S A PILLOW, IT'S A PET, IT'S A PILLOW PET®, products in connection with the wholesale, resale and/or Internet sale of Plushez or Napies plush toys; (6) using third party reviews of PILLOW PETS™, MY PILLOW PETS®, IT'S A PILLOW, IT'S A PET, IT'S A PILLOW PET® products; and (7) destroying, mutilating, concealing altering, transferring, or otherwise disposing of, in any manner, any books, records, documents, emails, correspondence, brochures, manuals, or other documents of any kind relating to defendants' sale of plush toys in the possession custody or control of any of the defendants until further order of this Court.

For the reasons stated below, the motion for preliminary injunction is GRANTED in its entirety.

## **STANDARD**

Whether to grant or deny a preliminary injunction lies within the sound discretion of the district court. *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 237 (2d Cir. 2001); *P & G v. Ultreo, Inc.*, 574 F. Supp. 2d 339, 344 (S.D.N.Y. 2008). A "party seeking a preliminary injunction must demonstrate (1) irreparable harm in the absence of the injunction, and (2) either

(a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (internal quotation marks and citation omitted).

Moreover, if a party seeks a "mandatory" preliminary injunction, which alters the status quo by requiring a positive act, or if a party seeks an injunction that will provide the moving party with "substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," then the moving party "must satisfy a higher standard, by showing a clear or substantial likelihood of success." *Bose Corp. v. Silonsonnic Corp.*, 413 F. Supp. 2d 339, 341 (S.D.N.Y. 2006) (internal quotation marks and citation omitted). In all cases, a preliminary injunction is an "extraordinary remedy" that should not be routinely granted. *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79, 80 (2d Cir. 1990). The party seeking the injunction carries the burden of persuasion to demonstrate, "by a clear showing," that the necessary elements are satisfied. *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).

The Second Circuit, in *eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), held that the "longstanding standard" for preliminary injunctive relief in the copyright context had been "abrogated" by the Supreme Court. *Id.* at 391. The Court held that, in addition to demonstrating (1) "either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor," plaintiffs also must demonstrate (2) a likelihood of irreparable harm; (3) that "remedies available at law . . . are inadequate"; (4) that the balance of hardships tip in his favor; and (5) that the "public interest would not be disserved" by issuing

preliminary relief. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay*, 547 U.S. at 391).

The *Salinger* court further clarified these requirements. First, with respect to the probability of success on the merits, the *Salinger* court cautioned district courts of "the difficulty of predicting the merits of a copyright claim at a preliminary injunction hearing." *Id.* at 80. Second, the court altered the burden of proof with respect to irreparable harm. Formerly, irreparable harm was presumed if a plaintiff successfully made out a prima facie case of infringement, due to the threat of market confusion. *See Pem-America, Inc. v. Sunham Home Fashions*, *LLC,* 83 F. App'x 369, 372 (2d Cir. 2003). The *Salinger* court warned that courts, in analyzing the irreparable harm prong,

> must not adopt a "categorical" or "general" rule or presume that the plaintiff will suffer irreparable harm . . . . The court must actually consider the injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury . . . .

*Salinger*, 607 F.3d at 80. Thus, in the wake of *eBay* and *Salinger*, "courts must not simply presume irreparable harm . . . [instead, a plaintiff must show that] the failure to issue a[ ] [preliminary] injunction would actually cause irreparable harm." *Id.* at 82 (citing *eBay*, 547 U.S. at 393). Irreparable harm comprises "the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Id.* at 81. In the copyright context, the plaintiff's interest in the copyrighted work at issue must be balanced against the defendant's interest in his own material – to the extent that it is not superseded by plaintiff's copyright. *Id.* at 81. Irreparable injury must be "likely in the absence of an injunction," not merely possible, given the fact that a preliminary injunction is an

"extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22-23 (2008).

Notably, though the *Salinger* court limited its holding to copyright cases, it noted that there was "no reason" that the reasoning for abrogating the preliminary injunction standard "would not apply with equal force to an injunction in *any* type of case." *Id.* at 78 n.7. While the Second Circuit has yet to decide whether the applicability of *Salinger* and *eBay* to trademark cases, several courts in our Circuit have applied the *Salinger* standard in the trademark context, and the Court will do so here. *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, No. 09 Civ. 9476, 2011 WL 1842980, at *20 (S.D.N.Y. May 13, 2011); *Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, No. 11 Civ. 0662 (NGG), 2011 WL 887993, at *2 (E.D.N.Y. Mar. 14, 2011).

## DISCUSSION

### I.    COPYRIGHT

#### A.  Likelihood of Success on the Merits

To prevail on their claim of copyright infringement, plaintiffs must establish (1) ownership in a valid copyright, and (2) infringement of the copyright by defendant. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Defendants here contest both prongs.

##### 1.   Copyright Ownership

Plaintiffs have submitted evidence that CJ owns various copyrights related to the pillow pet line of products, including certificates of registration for designs including Lady Bug, Panda, Bumble Bee, Penguin, Bear, Dolphin, Frog, and Monkey. (Decl. of Brian Wright in Supp. of Pl.'s Mot. ("Wright Decl. I") (Doc. No. 8) at Ex. C; Compl. ¶ 21.) The Copyright Act provides that a "certificate of a [copyright] registration made before or within five years after first

publication of the work shall constitute prima facie evidence of the validity of the copyright." 17 U.S.C. § 410(c). Absent a certificate of registration within that timeframe, the "evidentiary weight to be accorded the certificate . . . shall be within the discretion of the court." *Id.* Of the works in dispute here, eight of the ten certificates of copyright registration were obtained within five years of first publication and are thus entitled to the statutory presumption of validity.[2] Two – duck and cow – were obtained more than five years after first publication, and are not automatically entitled to a presumption of validity.[3]

CJ's eight certificates of registration issued within five years of first publication of the work constitute prima facie evidence of copyright validity. Thus, the burden to prove otherwise shifts to the defendants. *See Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir. 1985) (citation omitted). Defendants have proffered evidence purporting to show that CJ's copyrights in the works at issue are invalid because they lack originality. The main thrust of defendants' arguments, both in their submissions to the Court and in the lengthy hearing held before the Court, is that the greater part of the plaintiff's design is based on function and is not a legitimate subject for copyright, and that the rest is not original, as myriad other products look similar to CJ's product.

First, the Court notes that much of the design is not solely based on function as alleged by defendants. For example, at the preliminary injunction hearing, defendants attempted to assert that the shape was simply a "pillow shape" and was determined by function. This contention is belied both by common sense and by the many examples offered by plaintiffs showing different sized plush pillow toys that did not bear a striking resemblance to the plaintiffs' product. The

---

[2] These are: (1) Lady Bug, VA-1-665-418; (2) Panda, VA 1-679-223; (3) Bumble Bee, VA 1-665-417; (4) Penguin, VA-674-371; (5) Bear, VA 1-715-257; (6) Dolphin, VA 1-674-379: (7) Frog, VA 1-674-372; and (8) Monkey, VA 1-674-374.
[3] These are: (1) Duck, VA 1-715-275; and (2) Cow, VA 1-715-272.

purely functional aspects of the product – for example, the Velcro straps that effect the toy's transformation from pillow to sculpture – are concededly not copyrightable and are not at issue here.

As to the originality argument, Judge Eric Vitaliano pointed out in a similar context: "the mere presence of other similar products does not undercut the legitimacy of plaintiffs' copyrights. It certainly does not rebut the presumption of validity. To rebut the presumption that plaintiffs' copyrights are indeed valid, defendants are required to make a showing that the certificates of registrations are somehow invalid or that CJ does not in fact own the copyrights." *CJ Prods. LLC v. Concord Toys Int'l, Inc.*, No. 10 Civ. 5712 (ENV), 2011 WL 178610, at *3 (E.D.N.Y. Jan. 19, 2011). Second, at the hearing held before this Court, defendants pointed to a number of other products that they claimed were identical to plaintiffs' as proof that plaintiffs' products lacked originality. However, these products, as plaintiff has shown, these products are actually of plaintiffs' own design and are reproduced and sold in different formats with plaintiffs' express permission. Given this set of facts, the defendants have failed to carry their burden with respect to the works entitled to the presumption of validity.

The two registrations issued to CJ more than five years after first publication are not entitled to the statutory presumption of validity; rather, the "evidentiary weight to be accorded the certificate[s] . . . [is] within the discretion of the court." 17 U.S.C. § 410(c). The Court in its discretion concludes that these two certificates will also be considered as prima facie evidence of a valid copyright, "[i]n light of the totality of admissible evidence presented on this motion for preliminary injunction." *CJ Prods.*, 2011 WL 178610, at *4 (*citing Michael Grecco Photography, Inc. v. Everett Collection, Inc.*, 589 F. Supp. 2d 375, 382 (S.D.N.Y. 2008) (certificates of registration issued more than five years after publication are prima facie evidence

of valid copyrights because defendants did not offer any evidence suggesting that the copyrights were invalid); *Yurman Design, Inc. v. Golden Treasure Imps., Inc.*, 275 F. Supp. 2d 506, 515-16 (S.D.N.Y. 2003) (same); *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 227 n.7 (S.D.N.Y. 1988) ("Even if the certificate were . . . issued more than five years after the actual date of first publication, the court would be inclined to give the certificate the weight of prima facie evidence, as permitted under Section 410(c).")).  As Judge Vitaliano found:

> Given that the overwhelming majority of the designs within this product line are clearly entitled to the statutory presumption of validity, the Court finds that it is especially appropriate to exercise the discretion accorded it by statute and afford the same weight to the five certificates registered outside the protected harbor timeline.  Plaintiffs currently market and sell 33 versions of the pillow pet product line that are all functionally the same-they are a combination of a stuffed animal and a pillow.  That the "Buzzy Bumble Bee" design, for example, was registered within the five-year period and the "Puffy Duck" design was not, is substantively insignificant.  Both products are made and marketed as part of the identical product line.  All in all, the Court treats the certificates of registration for the . . . stale registration products as *prima facie* evidence of their validity, despite the fact that they were registered outside the five-year period.

This Court agrees with its sister court.  Apart from asking this Court to visually examine products bearing a similarity to plaintiffs' – which we now know from the hearing are products of plaintiffs' own intellectual property – defendants have submitted no evidence undermining the validity of any of the copyrights at issue.

Since there is no basis to rebut the presumption of validity here, plaintiffs have sufficiently demonstrated, for the purposes of this motion, the validity of the copyrights at issue here.

2.  <u>Infringement</u>

To establish infringement, the owner of a valid copyright must demonstrate that "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectable elements of plaintiff's." *Yurman Design*, 262 F.3d at 110 (internal quotation marks and citation omitted). The unauthorized copying may be shown by direct or indirect evidence. A plaintiff relying on indirect evidence must show that the defendant had access to the work in question, and that there exists substantial similarity between the works, such that copying "the ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard their aesthetic appeal as the same." *Boisson v. Banian, Ltd.*, 273 F.3d 262, 272 (2d Cir. 2001).

The defendant may rebut a prima facie case of infringement through the affirmative defense of independent creation, though even "subconscious" copying constitutes infringement. *Procter & Gamble Co. v. Colgate–Palmolive Co.*, 199 F.3d 74, 77 (2d Cir. 1999) (per curiam) (internal quotation marks and citations omitted); *see also Yurman Design*, 262 F.3d at 110 (citing *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) ("Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying.")).

For the purposes of this motion, plaintiffs have sufficiently demonstrated the likelihood of infringement. A visual examination of the products at issue in this case reveals that they are virtually identical. At the preliminary injunction hearing, defendants were utterly unable to articulate any substantial differences between the products, apart from a difference in eye design and, in some instances, minor variations in color. Defendants placed great emphasis on the fact that some of plaintiffs' products have three small black dots on their noses, while defendants lack those dots. On the other hand, the size, pillow shape, animal shape, overall facial look, and

manner in which the pillow folds into a three-dimensional sculpture virtually identical, and quite distinguishable from other plush foldable pillow toys available for purchase. (Decl. in Supp. of Mot. for Prelim. Inj. Order ("Wright Decl. II") (Doc. No. 23) ¶ 41, Exs. 16-19.) The differences between the products are simply dwarfed by the commonalities, such that an ordinary observer would likely be unable to distinguish them. Thus, the Court finds that plaintiffs have demonstrated a substantial likelihood of success as to copyright infringement

### B. Irreparable Harm and the Inadequacy of Remedies at Law

"A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citations omitted). A party can establish irreparable harm "if it shows that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation." *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 10 Civ. 8746, 2010 WL 4977775, at *9-10 (S.D.N.Y. Dec. 1, 2010) (internal quotations and citation omitted). Due to the requirement that the movant show "evidence of damage that cannot be rectified by financial compensation," pecuniary damages, without more, are usually insufficient. *Id.* (citation omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 37 (2d Cir. 1995).

Plaintiffs have satisfied their burden of establishing that they will suffer irreparable harm in the event that defendants continue to sell the products at issue. The *Salinger* standard for irreparable harm to plaintiff's property interest in the copyright context was based largely on the possibility of market confusion and the fact that proving "the loss of sales due to infringement is . . . notoriously difficult." *Salinger*, 607 F.3d at 81 (citation omitted). While irreparable harm is no longer presumed from these factors, plaintiffs have carried their burden here.

As articulated above, the products at issue in this case are extraordinarily similar in appearance. It is uncontested that plaintiff has spent large quantities of time, money, and effort to develop goodwill among customers, and to create an instantly recognizable toy that is highly popular among children. It is uncontroverted that plaintiffs expend approximately $1 million a month for advertising and the promotion of their product. (Prelim. Inj. Hr'g Tr. at 68-69.) The products sold by defendants, which look remarkably similar to plaintiffs' product line, have resulted and will likely result in confusion among customers, as well as lost sales and loss of goodwill for plaintiffs. *See Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1362 (Fed. Cir. 2008) (citation omitted) (loss of market position is evidence of irreparable harm). Plaintiff has put forth evidence of confusion – for example, customer reviews from Amazon.com showing that at least some consumers purchased defendants' product believing them to be plaintiffs' product. (Wright Decl. I at 12-13 & Ex. J; Prelim. Inj. Hr'g Tr. at 15.) Moreover, as this Court will discuss below, the similarity in the design of the products, coupled with the defendants' use of the "Pillow Pets" mark in their labeling and domain name, renders the likelihood of confusion extraordinarily high. Injecting the market with counterfeit products will not only result in lost sales, but will impair plaintiffs' reputation achieved through considerable time and effort. This type of harm cannot be redressed by monetary damages available at law.

### C.  Balance of Hardships Including the Public Interest

"A court must consider the balance of hardships between the plaintiff and defendant and issue [an] injunction only if the balance of hardships tips in the plaintiff's favor." *Salinger*, 607 F.3d at 80 (citation omitted); *eBay*, 547 U.S. at 391. Here an injunction is necessary to stop the infringement on plaintiff's products. By benefiting from the use of designs created by another author, defendants are profiting unjustly: "[o]ne who elects to build a business on a product

12

found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected." *Mint, Inc. v. Amad*, No. 10 Civ. 9395(SAS), 2011 WL 1792570, at *3 (S.D.N.Y. May 9, 2011). Defendants' business will not be severely impacted, as they have an extensive array of non-infringing products that they may continue selling. Finally, it is uncontested that there exists a strong policy in favor of defending copyrights. *See Mint, Inc. v. Amad*, 2011 WL 1792570, at *3 (citing *Motown Record Co., L.P. v. iMesh.Com, Inc.,* No. 03 Civ. 7339, 2004 WL 503720, at *7 (S.D.N.Y. Mar. 12, 2004) ("Importantly, plaintiffs assert an action to enforce their U.S. copyrights, an area in which the U.S. has a strong public interest.")). The balance of equities and public interest favors granting an injunction.

Since plaintiffs have established a substantial likelihood of success on the merits as well as satisfied the four-part test required by *Salinger*, the Court GRANTS the motion for preliminary injunction with respect to the copyright claims.

## II.    FALSE ADVERTISING: § 43(a)

### A.  Standard

While the Second Circuit explicitly limited *Salinger* to preliminary injunctions in copyright infringement actions, the court noted that *eBay* could "apply with equal force to an injunction in *any* type of case." *Salinger*, 607 F.3d at 78 n.7 (emphasis in original). While the Second Circuit has yet to decide whether the applicability of *Salinger* and *eBay* to trademark cases, several courts in our Circuit have applied the *Salinger* standard in the trademark context, and the Court will do so here. *See U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, No. 09 Civ. 9476, 2011 WL 1842980, at *20 (S.D.N.Y. May 13, 2011); *Pretty Girl, Inc. v. Pretty Girl Fashions, Inc.*, No. 11 Civ. 0662 (NGG), 2011 WL 887993, at *2 (E.D.N.Y. Mar. 14, 2011).

The Lanham Act proscribes false or misleading descriptions or representations of fact concerning "the nature, characteristics, qualities, or geographic origin of . . . goods, services, or commercial activities."  15 U.S.C. § 1125(a)(1)(B).  The Act does not regulate "all commercial speech," but it does "encompass[ ] more than the traditional advertising campaign."  *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002).  A "plaintiff must demonstrate that the statement in the challenged advertisement is false."  *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001).  Falsity may "rest on one of two theories:  (1) that the challenged advertisement is literally false, *i.e.*, false on its face, or (2) that the advertisement, while not literally false, is nevertheless likely to mislead or confuse customers."  *Tiffany (NJ) Inc. v. eBay, Inc.*, No. 04 Civ. 4607 (RJS), 2010 WL 3733894, at *1 (S.D.N.Y. Sept. 13, 2010).  Either theory requires that the plaintiff show "that the false or misleading representation involved an inherent or material quality of the product."  *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 153 n.3 (2d Cir. 2007).

### B.  Likelihood of Success on the Merits

As a threshold matter in a trademark case, plaintiffs must establish their ownership of the mark in question.  *Pan Am. World Airways, Inc. v. Flight 001, Inc.*, No. 06 Civ. 14442 (CSH), 2007 WL 2040588, at *3-4 (S.D.N.Y. July 13, 2007).  Defendants argue that plaintiffs do not own the "Pillow Pets" mark, and therefore have no ground to assert a claim for false advertising.  For the purposes of this preliminary injunction, plaintiffs have established a likelihood of success on the merits with respect to false advertising.

A claim based on literal falseness "is best supported by comparing the statement itself with the reality it purports to describe."  *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999).  Under the "false by necessary implication" doctrine, "a district court evaluating whether

an advertisement is literally false must analyze the message conveyed in full context" and find literal falsity where "the words or images, considered in context, necessarily imply a false message." *Time Warner*, 497 F.3d at 158 (internal quotation marks and citation omitted). Thus, even where "no combination of words" on the page is untrue, a message can be "literally false" if the clear meaning of the statement, considered in context, is false. *Id.* at 154-55. To be literally false, however, the message must be unambiguous; if the representation "is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false" and the advertisement is actionable under the Lanham Act only upon a showing of actual consumer confusion. *Id.* at 158. When a court finds that an advertisement is literally false, it is unnecessary to rely on extrinsic evidence of consumer deception or confusion. *Id.* at 153.

      1. <u>As Seen On TV</u>

      Defendants used the phrase "As Seen On TV" to identify the Snuggly line of plush pillow toys both on its website and on the tags affixed to its products. It is uncontested, however, that defendants have never actually marketed their products on television. There, defendants' use of the phrase was apparently to cause confusion among customers regarding the source of the product, and to reap the benefits of plaintiffs' extensive advertising campaign. Though defendants have since removed the reference to "As Seen On TV" on their website, and claim that the phrase no longer appears on their product tags, an injunction is necessary to preclude future use of any such phrase, in order to eliminate confusion in the market, and to ensure that defendants do not profit from inequitable conduct.

      The use of the slogan "As Seen On TV" is a material misrepresentation. Generally, a misrepresentation is material if it would have an effect on a consumer's purchasing decision. *Fed. Trade Comm'n v. Colgate-Palmolive Co.*, 380 U.S. 374 (1965). In the Second Circuit, the

alleged misrepresentation must be relevant to an "inherent quality or characteristic" of the product. *See Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272 (2d Cir. 1981). Here, "As Seen On TV" does, indeed, pertain to an inherent feature of the product. The phrase signifies a specific product – the "Pillow Pet" – with which the consumer is likely familiar by virtue of plantiffs' extensive television advertising and jingle. The misuse of the "As Seen On TV" slogan thus would likely affect on a consumer's purchasing decision, in that the consumer would believe the product to be the "Pillow Pet" it associates with extensive television marketing. Indeed plaintiffs' submissions show that this is the case by putting forth evidence of some cases of actual confusion. (Wright Decl. I at 12-13 & Ex. J; Prelim. Inj. Hr'g Tr. at 15.)

Accordingly, defendants' use of the "As Seen On TV" slogan is a material representation relating to an inherent feature of the product in question. Plaintiffs are likely to prevail on the merits in a Lanham Act false advertising claim against defendants.

## 2. Favorable Product Review Claims

Likewise, defendants concede that they used on their own website at least one favorable product review of *plaintiffs'* product line. For similar reasons as those stated above, these are material representations relating to an inherent feature of the product in question – namely, its quality as a toy and identity as plaintiffs' product. Though defendants have removed this material from their website, an injunction will prevent future use of reviews and will avoid confusion between the products in the future. Plaintiffs are likely to prevail on the merits in a Lanham Act false advertising claim with respect to the favorable product review claims.

## 3. "Original" and "Authentic" Claims

Plaintiff seeks to enjoin defendants' use of the words "authentic" and "official." At least some of defendants' plush toys currently bear labels designating the product as "Authentic

Pillow Pets." (Decl. of Jason Drangel in Supp. of Pl's Mot. for Order to Show Cause ("Drangel Decl.") ¶ 16, Ex. O (Doc. No. 9).) Though defendant, at the hearing before this Court, attempted to show that "official" and "authentic" are legitimate terms used in conjunction either with a generic mark (*i.e.*, pillow pets) or their own mark (*i.e.*, Plushez), these arguments ultimately fail. It is clear that the only impetus to use the terms "original" and "authentic" in conjunction with the phrase "Pillow Pets" is to unfairly reap profit from plaintiffs' extensive marketing campaign. At the hearing, defendants were utterly unable to explain why individuals would be interested in the authenticity of "Pillow Pets" in the first place, and obfuscated when asked the point at which the general public might have become interested in the phrase "Pillow Pet" as applied to a foldable plush pillow toy. It is abundantly clear, however, that the general public has become interested precisely because of the plaintiffs' extensive efforts in branding, marketing, and producing its own highly successful line of products. Thus, false statements regarding the provenance of the product and its connection to the plaintiffs' advertising efforts will influence the decision of customers to buy the product, and they are thus material. *Nat'l Basketball Ass'n v. Motorola, Inc*., 105 F.3d 841, 855 (2d Cir. 1997). Plaintiffs' submissions show that this is has happened by proffering evidence of actual confusion. (Wright Decl. I at 12-13 & Ex. J; Prelim. Inj. Hr'g Tr. at 15.)

For similar reasons as those stated above, these are material representations relating to an inherent feature of the product in question – namely, the fact that this toy is the one so heavily marketed to children via television advertisements. The Court finds that plaintiffs are likely to prevail on the merits in a Lanham Act false advertising claim against defendants with respect to the use of these phrases.

### C. Irreparable Harm and the Inadequacy of Remedies at Law

In general, the burden of demonstrating the likelihood of injury in a false advertising claim under the Lanham Act must be "demonstrated in some manner" and will not be presumed. *Time-Warner*, 497 F.3d at 161.  Indeed, this is even more salient since *Salinger*.  607 F.3d at 80 (a "court must not adopt a 'categorical' or 'general' rule or presume that the [party seeking the injunction] will suffer irreparable harm (unless such a 'departure from the long tradition of equity practice' was intended by Congress)") (quoting *eBay*, 547 U.S. at 391, 393-94).

To demonstrate irreparable harm in a Lanham Act case, a party "must show two things: (i) that the parties are competitors in the relevant market, and (ii) that there is a logical causal connection between the alleged false advertising and its own sales position." *Zeneca Inc. v. Eli Lilly & Co.*, No. 99 Civ. 1452 (JGK), 1999 WL 509471, at *36 (S.D.N.Y. July 19, 1999) (internal quotation marks and citations omitted).

The parties here are certainly competitors in the plush toy market; thus, the sales of one party's products would certainly impact the sale of the other party's product.  "[P]rospective loss of this good will alone is sufficient to support a finding of irreparable harm." *New York City Triathlon*, 704 F. Supp. 2d at 343.  There is, further, a logical causal connection between the advertising here and defendants' sales position.  As shown, defendants' false advertising is clearly an attempt to usurp the brand recognition built by plaintiffs over many years through considerable effort and a multi-million dollar marketing campaign.  "Flooding the market with counterfeit products will not only result in lost sales, but perhaps more importantly, it will impair plaintiffs' reputation.  Given that the products are virtually identical, it is highly likely that consumers will confuse them." *CJ Prods.*, 2011 WL 178610, at *15-16.  The same is true in this case.  Since proving the "loss of sales due to infringement is . . . notoriously difficult," an injunction is the proper vehicle by which to prevent further damage. *Salinger*, 607 F.3d at 81.

The Court finds that plaintiff has satisfactorily demonstrated irreparable harm on their false advertising claim for the purposes of this motion.

### D.  Balance of Hardships Including the Public Interest

The balance of equities here is weighted in favor of plaintiffs.  Defendants are unable assert an equitable interest in continuing a false advertising campaign.  *See Zeneca, Inc. v. Eli Lilly & Co.*, No. 99 Civ. 1452 (JGK), 1999 WL 509471, at *41 (S.D.N.Y. July 19, 1999).

Likewise, the public interest is also served by a preliminary injunction.  "'In exercising their sound discretion, courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction.'"  *Winter*, 129 S.Ct. at 376-77 (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312, (1982)).  The public has a strong interest in receiving accurate information, especially when it comes to products marketed specifically for children.  *See Novo Nordisk A/S v. Becton Dickinson & Co.*, 997 F. Supp. 470, 478 (S.D.N.Y. 1998); *see also CJ Prods.*, 2011 WL 178610, at *6. "[T]he public interest is served by preventing customer confusion or deception."  *Osmose, Inc. v. Viance*, *LLC*, 612 F.3d 1298, 1321 (11th Cir. 2010).

Thus, the balance of hardships tips in favor of the plaintiff.  Accordingly, the motion for preliminary injunction is GRANTED with respect to the false advertising claims.

### III.    FALSE DESIGNATION OF ORIGIN: § 43(A) OF LANHAM ACT

### A.  Standard

Section 43(a) of the Lanham Act expressly prohibits the "use[] in commerce of any word, term, name, symbol, or device . . . or any false designation of origin" that is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods,

services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1)(A). In order to vindicate a claim for false designation under the Lanham Act, the plaintiff must satisfy a two-part test, showing that: (1) the plaintiff has a valid trademark entitled to protection; and (2) a likelihood that the defendant's mark will cause confusion in the marketplace. *See Pretty Girl*, 2011 WL 887993, at *2, 4 (citing *Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961)). Both registered and unregistered marks can constitute valid trademarks under § 43(a). *See Pretty Girl*, 2011 WL 887993, at *3.

"The central consideration in assessing a mark's protectability, namely its degree of distinctiveness, is also a factor in determining likelihood of confusion." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 115 (2d Cir. 2006) (citing *Playtex Prods. v. Georgia–Pac. Corp.*, 390 F.3d 158, 161 (2d Cir. 2004)). "To be valid and protectable, a mark must be capable of distinguishing the products it marks from those of others." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 344 (2d Cir. 1999). Thus, the first step in analyzing the merits of a trademark claim is to determine whether plaintiff's trademark is entitled to protection. *See Strange Music v. Strange Music*, 326 F. Supp. 2d 481, 486 (S.D.N.Y. 2004) (citation omitted).

Courts in the Second Circuit determine whether a mark is distinctive – and thus entitled to protection – with reference to the classification scheme developed by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976). *See Strange Music*, 326 F. Supp. 2d at 486-87 (citing *Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 212 (2d Cir. 1985)). *Abercrombie & Fitch* classifies marks along a four-category spectrum, as (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. *See Kangadis, Inc. v.*

*Euphrates, Inc.*, 378 F. Supp. 2d 162, 165 (E.D.N.Y. 2005). At one end of the spectrum, generic

marks "are not entitled to protection under the trademark laws." *See id.* "A generic term is one

that refers, or has come to be understood as referring, to the genus of which the particular

product is a species." *See Abercrombie & Fitch*, 537 F.2d at 9. On the other end of the spectrum

are suggestive, or arbitrary or fanciful marks, which are considered inherently distinctive and

deserving of protection. *See Paddington Corp. v. Attiki Imps. & Distribs.*, 996 F.2d 577, 584 (2d

Cir. 1993). A suggestive mark "requires imagination, thought, and perception to reach a

conclusion as to the nature of [the] goods." *Hasbro Inc., v. Lanard Toys, Ltd.*, 858 F.2d 70, 73

(2d Cir. 1988) (citing *Thompson Med.*, 753 F.2d at 216).

A descriptive mark describes a product, and "conveys an immediate idea of the

ingredients, qualities or characteristics of the goods." *Abercrombie & Fitch*, 537 F.2d at 11.

They are only protectable if they acquire "secondary meaning, *i.e.*, that despite describing the

nature of the goods in question, such marks have come to be associated by the purchasing public

over time with a single, albeit anonymous, source." *Sunenblick v. Harrell*, 895 F. Supp. 616, 624

(S.D.N.Y. 1995). In determining whether a mark has acquired secondary meaning, the Second

Circuit has set forth a number of non-exhaustive factors to consider: (1) advertising

expenditures; (2) sales success; (3) unsolicited media coverage of the product; (4) attempts to

plagiarize the mark; (5) the length and exclusivity of the mark's use; and (6) consumer studies

linking the name to a source. *See Thompson Med.*, 753 F.2d at 217. No one factor is

determinative, and not all factors need to be proved. *See New York State Soc'y of Certified Pub.*

*Accountants v. Eric Louis Assocs., Inc.*, 79 F. Supp. 2d 331, 340 (S.D.N.Y. 1999) (citing *Centaur*

*Commc'ns Ltd. v. A/S/M Commc'ns, Inc.*, 830 F.2d 1217, 1221 (2d Cir. 1987) (*abrogated on*

*other grounds by Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1044 (2d Cir. 1992)).

Once a trademark is registered with the USPTO, it carries a presumption of validity; that is, the trademark is considered to be, at a minimum, descriptive with secondary meaning. *See* 15 U.S.C. §§ 1057(b),[4] 1115(a); *see, e.g.*, *Pretty Girl*, 2011 WL 887993, at *4 ("Registration by the PTO without proof of secondary meaning creates the presumption that the mark is more than merely descriptive, and, thus, that the mark is inherently distinctive.") (quoting *Lane Capital*, 192 F.3d at 345); *Heisman Trophy Trust v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 326 (S.D.N.Y. 2009) (same); *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 247 (S.D.N.Y. 1999) ("The Second Circuit has made it 'clear that a decision by the USPTO to register a mark without proof of secondary meaning affords a rebuttable presumption that the mark is more than merely descriptive.'") (quoting *Arrow Fastener Co. Inc. v. The Stanley Works*, 59 F.3d 384, 393 n.6 (2d Cir. 1995). The presumption is rebuttable; once the presumption is established the burden shifts to the defendant to show that the trademark is generic. *See Blue & White Food Prods. Corp. v. Shamir Food Indus., Ltd.*, 350 F. Supp. 2d 514, 518 (S.D.N.Y. 2004).

**B. Likelihood of Success on the Merits**

1. Validity of Trademarks

*a. Registered Trademarks*

Plaintiffs own the following registered trademarks: "MY PILLOW PETS®," "IT'S A PILLOW, IT'S A PET, IT'S A PILLOW PET®," and "My Pillow Pets®" (with logo). (Compl. at 4; Pl.'s Reply Supp. Mot. Prelim. Inj. at 6.) These trademarks are registered with the USPTO,

---

[4] According to the statute, "[a] certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate." 15 U.S.C. §1057(b).

and are thus entitled to a presumption of validity without a showing of secondary meaning. Defendants have not offered sufficient evidence to rebut this presumption. As a result, plaintiffs are likely to succeed in showing that their registered trademarks are entitled to protection under the Lanham Act for the purposes of this motion.

### b. Incompletely Registered Trademarks

This case is complicated somewhat by the fact that one of the marks at issue is not technically registered. Pillow Pets™ has not successfully navigated the trademark process to completion. Instead, while plaintiffs have moved through the publication process, at the time of the preliminary injunction hearing it remained in the opposition period, having been objected to as generic by defendants. As a result, defendants here argue that plaintiff's "Pillow Pets" mark is not registered, it is generic or descriptive, and is not entitled to protection. (Def.'s Mem. Law Opp'n Pl.'s Mot. Prelim. Inj. at 26, 34.) They claim that a "pillow pet is . . . both a type of pet and a type of pillow, i.e. a plush stuffed animal that converts into a bed pillow. Therefore, a 'pillow pet' is but a subset of each genus and is totally lacking in distinctiveness."[5] As such, defendant claims that the mark is weak and is not entitled to protection. (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Prelim. Inj. at 34.)

Plaintiffs argue that "Pillow Pets" is suggestive. (Prelim. Inj. Hr'g Tr. at 65-66.) According to plaintiff, "Pillow Pets" is "a combination of two terms, pillow and pet. A pillow is a pillow. A pet is a domesticated animal [and] . . . has multiple definitions. . . . When you combine the two terms, it simply has no meaning." (*Id.* at 66.) Plaintiffs further argue that "for something to be generic, it has to be the actual meaning of the product," and that the term

---

[5] Defendant further argues that the term "Pillow Pets" is generic since in plaintiff's earlier trademark application of "MY PILLOW PETS" the term "pillow pets" was disclaimed. (Def.'s Mem. of Law in Opp'n to Pl.'s Mot. for Prelim. Inj. at 34.) A disclaimer is not an acknowledgment of descriptiveness and has no effect on plaintiff's subsequent registration of "Pillow Pets." *See* 15 U.S.C. § 1056(b).

"Pillow Pets" has no inherent meaning.  (*Id.*)  In arguing that "pillow pets" is not merely descriptive, the plaintiff states that:

> [w]ithout knowing the product, would you know what that means, Pillow Pets?  If you never heard of the product, you would need something to get you to what that product is.  You would have to see the product, hear about the product. That makes something suggestive, suggests in your mind something [sic.] but not necessarily sure what it is.  Descriptive would absolutely describe what the product is.  If this was a pet pillow and it was called a Pet Pillow, you would maybe believe there is a pillow for your pet at home. This is not a pet pillow.

(*Id.* at 66-67.)

Though it is true that the full weight of the presumption of validity afforded to marks that have traversed the entirety of the USPTO process is not automatically conferred on marks that are stalled in the opposition period, "[t]he mere fact that a mark was passed to publication has been said to be entitled to some weight."  Callmann on Unfair Competition, Trademarks, and Monopolies § 26:5, 4th ed. 2011 (citing *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 148 n.11 (2d Cir. 1997)).  Indeed, the present case bears some resemblance to the *Genesee Brewing* case.  There, the plaintiff's trademark "JW Dundee's Honey Brown Lager" was published without a disclaimer of "Honey Brown," and when a motion for preliminary injunction came before the court, "Genesee's trademark ha[d] encountered opposition and ha[d] yet to be registered."  124 F.3d at 141.  The very fact of sending the mark to publication without a disclaimer meant that the trademark examiner at the USPTO had determined plaintiff's use of "Honey Brown" to be at least descriptive with secondary meaning.  *Id.* at 148 n.11.  The court decided that "[w]hile it is true that the mark has yet to be registered, and therefore is not entitled to the statutory presumption of validity . . . we nonetheless accord weight to the initial conclusions of the Trademark Office."  *Id.* at n.11 (citing *Arrow Fastner*, 59 F.3d at 392-93 &

n.6 ; *D.M. & Antique Import Corp. v. Royal Saxe Corp.*, 311 F. Supp. 1261, 1274 (S.D.N.Y. 1970)).  In light of the fact that "Pillow Pets™" has been approved for registration by the USPTO, the Court accords weight to the USPTO's finding that the mark is more than merely descriptive.

Indeed, even if the weight accorded to the USPTO findings on the issue of validity were not probative, "Pillow Pets™" would still be entitled to protection under common law trademark principles, as discussed below.  For the purposes of this motion, the Court finds that plaintiffs are likely to succeed in showing "Pillow Pets™" deserves protection, by showing that the mark is at least descriptive with secondary meaning.

The term "Pillow Pet" has no inherent meaning, and does not describe the genus of a particular class.  As plaintiffs point out in their papers, the genus at issue here is plush stuffed toys, not pillow pets.  It would be perverse indeed to suggest that the very efforts that render the brand "Pillow Pets" to be associated with the plaintiffs' product rendered the term generic.  (Pl.'s Reply Supp. Mot. Prelim. Inj. at 5.)  Thus, the  mark is not generic.

Instead of rendering the term generic, plaintiffs' efforts have instead bestowed upon that term at least secondary meaning.  Plaintiffs' $1 million dollar monthly advertising investment led plaintiff to substantial success in sales of their Pillow Pets product.  As plaintiffs have shown, the product was:  (1) a top selling toy during the recent holiday season; (2) gained recognition on Toys R Us 2010 Hot Holiday Toys List as well as on numerous other holiday gift list websites; (3) completely sold out at Toys R Us and at many major retailers, and; (4) was the most searched term on Wal-Mart and "Toys R Us" website.  (Prelim. Inj. Hr'g Tr. at 69-71; Wright Decl. I Ex. B (Doc. No. 8).)  In addition, plaintiffs' product has garnered significant media attention and accolades within the industry.  (*Id.* at 65.)  Plaintiffs have vigorously asserted their intellectual

property rights in the face of substantial copying, sending out many warning letters and initiating litigation against eleven companies, among other anti-counterfeiting measures. (Prelim. Inj. Hr'g Tr. at 48; Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 10.)  These factors weigh heavily in favor of plaintiff's likelihood of proving that their mark is entitled to protection.

Moreover, defendants' response to this evidence is, to say the least, underwhelming.  The link between "Pillow Pets" as a toy product obviously signifying a foldable plush toy animal is anything but apparent to the consumer.  Indeed, at the hearing defendants were unable to explain why customers would associate this mark with the product in question.  Plaintiffs have established their likelihood of proving secondary meaning – that is, even at this early stage, they have firmly linked the product at issue with the intended brand name.

The Court finds that plaintiffs are likely to succeed in showing that Pillow Pet™ is a valid trademark entitled to protection.

### 2. Likelihood of Confusion

The court must next consider whether the defendants' use of the trademarks at issue is likely to cause confusion, as "[t]he ultimate inquiry in most actions for false designation of origin . . . is whether there exists a 'likelihood that an appreciable number of ordinary prudent purchasers [will] be misled, or indeed simply confused, as to the source of the goods in question.'"  *Thompson Med.*, 753 F.2d at 216 (quoting *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978)).  To determine whether a mark is likely to cause confusion in the marketplace turns on an assessment of the *Polaroid* factors, as follows:

> [The] strength of the mark, the degree of similarity between the marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Id.* at 213.  No single factor is dispositive.  *Id.* at 214.

a.  *Strength of the Mark*[6]

"The strength of a trademark is assessed with reference to its distinctiveness."  *Pretty Girl*, 2011 WL 887993, at *4.  Given that plaintiff's "Pillow Pets" mark has weight due to its publication by the USPTO, and the fact that plaintiffs have provided significant evidence to suggest the mark is at least descriptive with secondary meaning, the strength of the mark weighs in plaintiff's favor.[7]  Furthermore, plaintiffs' other trademarks, due to their registration, are presumed to be distinctive and highly protectable.  *See id.*  The strength of plaintiff's mark supports plaintiffs' likelihood of success on the merits.

b.  *Similarity Between Two Marks*

Under this factor, the Court analyzes the extent of similarity between the marks to determine whether it is likely to cause confusion among consumers in the marketplace.  *See Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 130 (S.D.N.Y. 1993).  Here, the "Pillow Pets" mark at least is quite similar to the "Plushez Pillow Pets" mark, and the similarities between them have not been diminished in terms of their appearance on labels and on the parties' websites.  Given the prominence with which Snuggly uses the term "Pillow Pets" on their labeling, website, and in AdWords, the similarity is quite noticeable.  Under the circumstances, the Court finds the similarity of the marks slightly favors plaintiffs' likelihood of success on the merits.

c.  *Proximity of Products in the Marketplace*

This factor turns on whether the products are in competition with each other in the marketplace.  *See Pretty Girl*, 2011 WL 887993, at *5 (citing *Cadbury Beverages, Inc. v. Cott*

---

[6] To determine the strength of the mark for the purpose of determining likelihood of confusion, the court applies the *Abercrombie & Fitch* continuum.
[7] *See supra*, Part 1.a.

*Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)). The products here are in direct competition with each other. Accordingly, this factor favors the plaintiffs' likelihood of success on the merits.

### d. Likelihood that Prior Owner will "Bridge the Gap"

There is no evidence of bridging the gap, as plaintiff and defendant operate in the same market. *See Pretty Girl*, 2011 WL 887993, at *5. ("This factor concerns the likelihood that a plaintiff that is not in direct competition with the defendant at the time a suit is brought will later expand the scope of its business so as to enter the defendant's market") (citing *Arrow Fastner*, 59 F.3d at 397).

### e. Evidence of Actual Confusion

Evidence of actual confusion is "particularly relevant" to whether a likelihood of confusion exists. *Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 745 (2d Cir. 1998). However, "a likelihood of confusion is actionable even absent evidence of actual confusion." *1-800 Contacts, Inc. v. WhenU.com*, 309 F. Supp. 2d 467, 491 (S.D.N.Y. 2003) *rev'd on other grounds*, 414 F.3d 400, 406 (2d Cir. 2005); *see Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 286 (S.D.N.Y. 1998) ("'actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source.'") (quoting *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d Cir. 1986)). Plaintiff has put forth some evidence of confusion, even at this early stage in the action. For example, the record contains numerous customer reviews from Amazon.com that indicate that some consumers purchased defendants' product under the false impression that they were purchasing plaintiffs' "Pillow Pets" product. Such comments include: "I bought this thinking it was a real pillow pet but the brand is something else. . . [m]y only complaint is that the description acts like it is an actual Pillow Pet

and it is not" and "[t]his 'pillow pet' is NOT the brand name pillow pet that you are expecting!!!
I accidentally bought this 'pillow pet' on my smart phone only to realize later that it was a
complete fake when I checked my order on my computer."  (Wright Decl. I at 12-13 & Ex. J;
Prelim. Inj. Hr'g Tr. at 15.)

The likelihood of confusion is also high given the defendants use of the Pillow Pets™
mark in their domain name.  Plaintiffs allege that the defendants' use of their pillowpets.co
domain name also constitutes a violation of the Lanham Act.  (Pl.'s Mem. of Law in Supp. of
Mot. for Prelim. Inj. at 3; Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 2, 17-18.)  Before the
passage of the 1999 Anticybersquatting Consumer Protection Act ("ACPA"), the use of a
plaintiff's trademark in a defendant's domain name was generally analyzed under ordinary
Lanham Act trademark principles.  *See First Jewellery Co. of Can., Inc. v. Internet Shopping
Network LL*, No. 99 Civ. 11239 (LMM), 2000 WL 122175, at *5 (S.D.N.Y. Feb. 1, 2000).
However since the ACPA's passage, such claims are generally brought under that statute.  15
U.S.C. § 1125(d); *see generally* Callmann on Unfair Competition, Trademarks, and Monopolies
§§ 22:36, 22:38 (4th ed. 2011).  Indeed, plaintiffs have already filed a motion to amend their
complaint to add such a claim.  (Pl.'s Letter (Doc. No. 27) at 1.)  Regardless, the Court here
notes that the "application of the *Polaroid* factors is simple because the defendant has adopted a
mark – namely, the website domain name – that incorporates or is strikingly similar to another
mark."  *See, e.g.*, *Brookfield Commc'ns, Inc. v. W. Coast Entmn't Corp.*, 174 F.3d 1036 (9th Cir.
1999) ; *N.Y. State Soc'y of Certified Pub. Accountants v. Eric Louis Assocs.*, 79 F. Supp. 2d 331,
340 (S.D.N.Y. 1999) (defendant used "www.nysscpa.com" despite the fact that the New York
State Society of Certified Public Accountants had a trademark in "NYSSCPA"); *Planned*

*Parenthood Fed'n of Am. v. Bucci*, No. 97 Civ. 0629 (KMW), 1997 WL 133313, at *7 n. 9

(S.D.N.Y. Mar. 24, 1997) (defendant used "www.plannedparenthood.com").

The use of the plaintiffs' trademark in defendants' domain name increases consumer

confusion and is likely to be a trademark violation in itself. This factor favors the plaintiffs'

likelihood of success on the merits.

### f.  *Sophistication of Relevant Consumer Group*

This factor examines the extent to which a buyer evaluates a product before purchase.

*See Kraft Gen. Foods, Inc. v. Allied Old English, Inc.*, 831 F. Supp. 123, 133 (S.D.N.Y. 1993).

"Where the purchasers of a products are highly trained professionals, they know the market and

are less likely than untrained consumers to be misled or confused by the similarity of different

marks." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003). In contrast, ordinary

retail customers are not assumed to spend the same amount of care as professional buyers. *See*

*Pretty Girl*, 2011 WL 887993, at *6. Generally, the more inexpensive the product, the less

careful the retail consumer is presumed to be. *Id.*

Purchasing inexpensive toys for children does not require any sophistication on the part

of the buyer. *See Pretty Girl*, 2011 WL 887993, at *6 (holding "[p]urchasing 'fashionable yet

affordable ladieswear'" does not require any heightened degree of sophistication). This factor

favors the plaintiffs' likelihood of success on the merits.

### g.  *Bad Faith and Quality of Product*

There is nothing in the record, beyond plaintiffs' own conclusory accusations, to

conclusively show that defendants' product is inferior to plaintiffs. Similarly, plaintiffs have

offered no conclusive evidence to show that defendant intentionally infringed on their trademark.

However, these two factors are less important when determining the issue of consumer confusion

at the preliminary injunction stage. *See Pretty Girl*, 2011 WL 887993, at *6 (citing *Virgin Enters.*, 335 F.3d at 151 ("Neither factor is of high relevance to the issue of likelihood of confusion.")). Thus these factors weigh in favor of neither party at this stage.

### C. Irreparable Harm and Inadequacy of Remedies at Law

As noted, before *Salinger*, a plaintiff seeking a preliminary injunction in a trademark action was presumed to have sufficiently shown irreparable harm by "a showing that a significant number of consumers [were] likely to be confused about the source of the goods identified by the allegedly infringing mark." *Pretty Girl*, 2011 WL 887993, at *2 (quoting *Virgin Enters.*, 335 F.3d at 146). However, applying *Salinger* to trademark actions means that plaintiffs are no longer entitled to a presumption of irreparable injury. *See U.S. Polo Ass'n,*, 2011 WL 1842980, at *20; *Pretty Girl*, 2011 WL 887993, at *2.

"Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *U.S. Polo Ass'n*, 2011 WL 1842980, at *20 (quoting *New York City Triathlon*, 704 F. Supp. 2d at 343). Here, plaintiffs have established a solid reputation and garnered substantial goodwill among its customers through its extensive marketing and advertising campaigns, as well as through word of mouth recommendations from its dedicated consumers. (Prelim. Inj. Hr'g Tr. at 17.) Defendants, by employing plaintiffs' trademark, have attempted to directly profit from the goodwill and reputation that plaintiffs' have cultivated for their product. Due to the high likelihood of confusion – and instances of actual confusion – between defendants' and plaintiffs' products, plaintiffs' reputation and goodwill will be substantially damaged without the issuance of a preliminary injunction. Furthermore, the damage to plaintiffs' goodwill and reputation cannot be

quantified, as it is unknown how many potential customers plaintiffs will lose from their loss of reputation and goodwill due to consumers confusing their products with defendants' products. (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at 28.) Therefore, remedies at law are not adequate to compensate plaintiffs for their injuries. *See Pretty Girl*, 2011 WL 887993 at *7 (citing *Nw. Nat'l Co. of Milwaukee, Wisc. v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991)).

### D. Balance of Hardships Including the Public Interest

The equities weigh in plaintiffs' favor. Consumer confusion and potential loss to plaintiffs in terms of reputation, goodwill, and sales threaten to cause plaintiffs serious continuing harm. The harm to defendants is mitigated by the fact that defendants can continue to market their non-infringing products under the Plushez name, or whatever other name they choose.

Likewise, "[t]he consuming public has a protectable interest in being free from confusion, deception and mistake." *U.S. Polo Ass'n*, 2011 WL 1842980, at *21 (citing *New York City Triathlon*, 704 F. Supp. 2d at 344 ("[T]he public has an interest in not being deceived – in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality.")). Due to the likelihood of confusion, and instances of actual confusion, in this case, the public interest would be served by issuing a preliminary injunction. This factor weighs in plaintiffs' favor.

Plaintiffs have established a substantial likelihood of success on the merits as well as satisfied the four-part test required by *Salinger*. The Court GRANTS the motion for preliminary injunction with respect to the false designation of origin claim.

## IV.    GOOGLE ADWORDS

Plaintiffs allege that defendants, in an effort to mislead and confuse consumers, violated

§ 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by purchasing plaintiffs' trademarks through

the Google AdWords program ("AdWords"), which triggers sponsored advertising linked to

defendants' website whenever the plaintiffs' trademarks are searched.  AdWords has been

defined by one Second Circuit court as:

> Google's program through which advertisers purchase terms (or keywords). When
> entered as a search term, the keyword triggers the appearance of the advertiser's ad
> and link. An advertiser's purchase of a particular term causes the advertiser's ad and
> link to be displayed on the user's screen whenever a searcher launches a Google
> search based on the purchased search term. Advertisers pay Google based on the
> number of times Internet users "click" on the advertisement, so as to link to the
> advertiser's website.

*Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 125 (2d Cir. 2009) (internal footnote omitted).

By purchasing the phrases "Pillow Pets" and "My Pillow Pets" through the Google

AdWords program, plaintiffs allege that defendants intentionally misled and confused customers

in violation of the Lanham Act.  Consumers searching for the plaintiffs' product who enter

"Pillow Pet" or "My Pillow Pet" as a search term would be directed to a results page where, in a

"Sponsored Links" section of the page, usually above the objective results, users would see

defendants' advertisement.  Plaintiffs argue that, since defendant knew that using plaintiffs'

trademarks without permission would result in consumers being misdirected to defendants'

website – indeed, they contend that this was the desired result – defendants should be barred

from using "Pillow Pets" and "My Pillow Pets" as AdWords.  (Pl.'s Google AdWords Letter at 3

(Doc. No. 24).)  Defendant argues that the "use of keyword advertising is permissive descriptive

use or comparative advertising protected by the First Amendment," and, since "Pillow Pets" is an

unprotectible unregistered mark, enjoining the use of "Pillow Pets" as keywords in the Google

AdWords program would "unduly monopolize commercial speech."[8]  (Def.'s Google AdWords Letter at 1 (Doc. No. 26).)  For the following reasons, plaintiffs' motion is GRANTED.

### A.  Likelihood of Success on the Merits

To establish infringement plaintiff must show a protectable interest in the mark, and (1) that defendant's use of plaintiff's mark constitutes a "use in commerce" under the Lanham Act, and (2) this unauthorized use is likely to cause consumer confusion.  *See* 15 U.S.C. § 1125(a)(1)(A); *Rescuecom*, 562 F.3d at 128, 130.

### 1.  Validity of Trademark and Use in Commerce

The Court has already determined the likelihood of plaintiffs' success in showing a protectable interest in the marks at issue.  *See supra*.  Likewise, there is no dispute that defendants' use of the mark to purchase AdWords to advertise its products for sale on the Internet constitutes "use in commerce" under the Lanham Act.  *See Rescuecom*, 562 F.3d at 127 (holding that Google's sale of trademarks for use as search keywords constitutes use in commerce); *Hearts on Fire Co., LLC v. Blue Nile, Inc.*, 603 F. Supp. 2d 274, 280-83 (D. Mass. 2009) ("In light of the Lanham Act's language and the broader purposes of the trademark statute, there is little question that the purchase of a trademarked keyword to trigger sponsored links constitutes a "use" within the meaning of the Lanham Act."); J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* §§ 23:11.50, 25:70:25 (4th ed. 2010) (suggesting same).

---

[8] As the commercial speech doctrine of fair use is subject to the same essential inquiry with consumer confusion playing a central role, the court declines to address this argument.  *See Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 102 (2d Cir. 2010)  (stating nominative fair use "allows '[a] defendant [to] use a plaintiff's trademark to identify the plaintiff's goods so long as there is no likelihood of confusion about the source of [the] defendant's product or the mark-holder's sponsorship or affiliation.'") (quoting *Merck & Co. v. Mediplan Health Consulting, Inc.*, 425 F. Supp. 2d 402, 413 (S.D.N.Y. 2006)).

2. <u>Likelihood of Confusion</u>

The sine qua non of any trademark case is whether the defendant's use of the trademark is likely to cause consumer confusion. *Rescuecom*, 562 F.2d at 130-31 (citation omitted). The Second Circuit has yet to adopt a particular approach for determining the issue of consumer confusion when a competitor uses a trademark to purchase keywords to advertise its products for sale on the Internet, and those courts that have addressed this issue have employed slightly different methods of analyzing consumer confusion.

For example, the Ninth Circuit – the only Circuit to have considered this issue – uses its version of the Second Circuit *Polaroid* factors in order to determine the issue of consumer confusion, stressing the need for flexibility in application in the Internet context. *Network Automation Inc. v. Advanced Sys. Concepts, Inc*., 638 F.3d 1137, 1149, 1154 n.6 (9th Cir. 2011). The majority of other courts at the district court level have likewise applied their Circuit's functional equivalent of the *Poloroid* factors. *See, e.g.*, *1-800 Contacts, Inc. v. Lens.com, Inc.*, 755 F. Supp. 2d 1151, 1174 (D. Utah 2010); *Rosetta Stone Ltd. v. Google, Inc*.,730 F. Supp. 2d 531, 540-541 (E.D. Va. 2010); *Fagnelli Plumbing Co., Inc. v. Gillece Plumbing and Heating, Inc.*, No. 2:10 Civ. 00679 (AJS), 2010 WL 2994163, at *6 (W.D. Pa. July 27, 2010); *Morningware, Inc. v. Hearthware Home Prods., Inc.*, 673 F. Supp. 2d 630, 636 (N.D. Ill. 2009); *Hysitron Inc. v. MTS Sys. Corp.*, No. Civ. 07-01533 (ADM), 2008 WL 3161969, at *3 (D. Minn. Aug. 1, 2008). Though the District of Massachusetts crafted a unique set of non-exhaustive

factors[9] specifically tailored to Internet searches, this special analysis supplemented without supplanting the traditional, *Polaroid*-like analysis. *Hearts on Fire*, 603 F. Supp. 2d at 289.

Thus, the Court will follow the majority approach and apply the *Polaroid* factors in considering whether defendants' use of plaintiffs' trademark as a search engine keyword violates the Lanham Act. This analysis mirrors the above analysis of plaintiffs' false designation of origin claim.[10] As above, the majority of these factors weigh in favor of plaintiffs' likelihood of success on the merits; thus, the Court will not reiterate those reasons here.[11] However, two factors – similarity of the marks and actual confusion – warrant independent analysis in the AdWords context and thus are addressed separately below.

### a. Similarity Between the Marks

When examining the similarity of the marks in the AdWords context, "[t]he court must consider the degree of similarity between [p]laintiff[s]'[] service mark and the [Pillowpets.co] advertisements appearing on the search-results page." *1-800 Contacts, Inc.*, 755 F. Supp. 2d at 1175. Here, the plaintiffs have submitted Google screen shots taken on March 30, 2011 which displayed the following, listed as the second sponsored link for the search term "pillow pets":

> Official PillowPets.CO- Soft Chenille Plush Pillow Pets
> Low Prices, New Styles Now in stock
> www.pillowpets.co

Plaintiff also attached screen shots taken from an April 27, 2011 Yahoo search of "pillow pets" which displayed the following as the first sponsored link:

---

[9] These factors consist of: (1) the overall mechanics of web-browsing and Internet navigation, in which a consumer can easily reverse course; (2) the mechanics of the specific consumer search at issue; (3) the content of the search results webpage that was displayed, including the content of the sponsored link itself; (4) downstream content on the Defendant's linked website likely to compound any confusion; (5) the web-savvy and sophistication of the Plaintiff's potential customers; (6) the specific context of a consumer who has deliberately searched for trademarked [product] only to find a sponsored link to a [product] retailer; and, in light of the foregoing factors, (7) the duration of any resulting confusion. *Id.*

[10] *See supra* Part 2.

[11] With the exception of bridging the gap, which is not relevant here, and bad faith and quality of defendants' product, which are the two least important factors. *See id.*

> PillowPets.Co™
> Official Site. SuperSoft chenille plush pillow pets Now in Stock!
> www.pillowpets.co

(Drangel Decl. Ex. E.)  These advertisements, which link directly to defendants' pillowpets.co website, are virtually identical to plaintiff's "Pillow Pets" trademark in appearance, sound, and meaning.  Moreover, the defendants' website, to which consumers are referred, is virtually identical to the plaintiffs' website, using the same color, format, fonts, and phrases – including the mark "Pillow Pets."  A consumer is highly likely to be misled by the totality of these circumstances.  Thus this factor weighs strongly in favor of plaintiffs' likelihood of success on the merits.

### b.  Evidence of Actual Confusion

As discussed previously, plaintiff has submitted evidence of actual confusion by consumers purchasing what they believed to be plaintiffs' advertised product.  (Wright Decl. I at 12-13 & Ex. J; Prelim. Inj. Hr'g Tr. at 15.)  Moreover, in the website context, courts have applied the doctrine of initial interest confusion, which posits that a likelihood of confusion can arise when "a consumer who searches for the plaintiff's website with the aid of a search engine is directed instead to the defendant's site because of a similarity in the parties' website address." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 462 n.13 (2d Cir. 2004).  Thus "[e]ven if the customer quickly becomes aware of the competing source's actual identity and can rectify the mistake, the damage to the first user" may already have been done.  *BigStar Entmn't, Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 207 (S.D.N.Y. 2000). This damage can occur in three ways:

> [(1) in]  the  original  diversion  of  the  prospective  customers'
> interest; [(2) in] the potential consequent effect of that diversion on
> the customer's ultimate decision whether or not to purchase caused
> by an erroneous impression that two sources of the produce maybe
> associated;  and  [(3) in]    the  initial  credibility  which  may  be
> accorded by the interested buyer to the junior user's products—

> customer consideration that may otherwise be unwarranted and
> that may be built on the strength of the senior user's mark,
> reputation and goodwill.

*Id.* (citing *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1063-64 (9th

Cir. 1999)).  Yet "[b]ecause consumers diverted on the Internet can more readily get back on

track than those in actual space, thus minimizing the harm to the owner of the searched-for site,

Internet initial interest confusion requires a showing of intentional deception."  *Savin*, 391 F.3d.

at 462 n.13.

Here, plaintiffs' argue that "the deceptive use of 'Official Pillowpets.co' in Google

AdWords Advertisements is simply confusing consumers . . . A review of website visitor data

clearly shows that [d]efendants' actions are reaping the benefits of consumer confusion with

consumers being misdirected to the Pillowpets.co website, since [d]efendants' site Pillowpets.co

is ranked nearly as high as [p]laintiffs' website."  (Pl.'s Reply in Supp. of Mot. for Prelim. Inj. at

17.)  Plaintiffs attach a graph from the website Quantcast.com, a site that collects data on domain

name traffic, as evidence of confusion.  (Wright Decl. II (Doc. No. 23) ¶¶ 45-49, Ex. 23.)   The

graph provides an estimate of website traffic, and shows defendants' pillowpets.co site reaching

23,500 visitors a month domestically with plaintiffs' mypillowpets.co reaching 24,600 visitors a

month domestically.  This precipitous rise at the time the defendants began to use the "pillow

pets" mark points to a substantial likelihood that defendants took advantage of plaintiffs'

substantial advertising campaign in  lieu of mounting their own.

More importantly on the issue of intentional deception, plaintiffs further argue that in

> approximately April, 2011 . . . [d]efendants set out a more
> intentional course of conduct to infringe on [p[laintiff[s]'[]
> trademark and confuse consumers. Defendants shifted their focus
> from the Plushez.com website to a near mirror image
> PILLOWPETS.CO website where [d]efendants prominently used
> PILLOWPETS.CO[] and "Pillow Pets" as trademarks, replaced

> PLUSHEZ with 'Pillow Pets,' [and] prominently displayed knock-
> ofs of the CJ's most popular products.

(Drangel Decl. ¶¶ 4-7, Ex. A-D.)

In support of this claim, plaintiffs have also provided screen shots of the respective

websites showing that they are substantially similar in color and format, with the plaintiffs'

trademark "Pillow Pets" prominently featured on defendants' website.  (*See id.*)  Furthermore,

the attached Quantcast.com graph shows a steep increase in traffic to the pillowpets.co website in

April 2011, when plaintiffs' allege that defendants changed their website to appear strikingly

similar to plaintiffs' website.  (Wright Decl. II ¶¶ 45-49, Ex. 23.)

Given the totality of all these similarities – in which defendants use a phrase substantially

similar to plaintiffs' mark, in order to direct consumers to a website that uses plaintiffs' mark in a

confusing manner and looks substantially similar to the plaintiffs' website, and which sells

products that are substantially similar in appearance and price to those copyrighted by plaintiffs –

the Court concludes that this factor weighs heavily in favor of plaintiffs' likelihood of success on

the merits.

### B.  Irreparable Harm and Inadequacy of Remedies at Law

As above, the Court applies the *Salinger* analysis to this trademark claim.  Here, plaintiffs

have established a solid reputation and garnered substantial goodwill among its customers

through its extensive marketing and advertising campaigns, as well as through word of mouth

recommendations from its dedicated consumers.  (Prelim. Inj. Hr'g Tr. at 17.)  Defendants, by

purchasing "Pillow Pets" through Google AdWords program, have attempted to profit from

plaintiffs' successful efforts marketing their product.  As is readily apparent, consumers are

confused when the keyword "pillow pets" triggers a sponsored link to defendants' pillowpets.co

website (which looks substantially similar to plaintiffs'), plaintiffs' reputation and goodwill will

be damaged absent an injunction. Furthermore, the damage to plaintiffs' goodwill and reputation cannot be quantified, as it is unknown how many potential customers plaintiffs will lose from loss of reputation and goodwill due to consumers confusing their products with defendants' products. (Pl.'s Reply Supp. Mot. Prelim. Inj. at 28.) Therefore, remedies at law are not adequate to compensate plaintiffs for their injuries. *See Pretty Girl*, 2011 WL 887993 at *7 (citing *Nw. Nat'l Co. of Milwaukee, Wisc. v. Alberts*, 937 F.2d 77, 80 (2d Cir. 1991)).

### C.  Balance of Hardships and Public Interest

The analysis of these two factors mirrors that under the general false designation of origin claim. *See supra* Part III.D-E. As such, the balance of hardships weighs in plaintiffs' favor, and the public interest would be served by the issuance of a preliminary injunction.

For the reasons stated above, plaintiffs' motion to enjoin defendants' use of the terms "Pillow Pets" and "My Pillow Pets" in the Google AdWords program to trigger sponsored links is GRANTED.

## V.      LACHES AND ESTOPPEL

### A.  Laches

Defendants have alleged that injunctive relief is barred by laches, "an unreasonable delay in asserting a right that prejudices the opposing party." *Times Mirror Magazines, Inc. v. Field & Stream Licenses Co.*, 294 F.3d 383, 395 (2d Cir. 2002) (quoting *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192 (2d Cir. 1996). Where a plaintiff's delay in asserting intellectual property rights was unreasonable, a Court may, in its discretion, deny the injunctive relief sought. Generally, however, delay due to a good faith investigation, or by virtue of failure to realize the extent of the infringement, does not defeat equitable relief. *See King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992); *Clifford Ross Co. v. Nelvana, Ltd.*, 710 F. Supp. 517, 521

(S.D.N.Y. 1989), *aff'd*, 883 F.2d 1022 (2d Cir. 1989). Moreover, "if the likelihood of confusion is inevitable, or so strong as to outweigh the effect of plaintiff's delay . . . a court may in its discretion grant injunctive relief." *Times Mirror Magazines*, 294 F.3d at 395 (quoting *Kason Indus., Inc. v. Component Hardware Grp., Inc.*, 120 F.3d 1199, 1207 (11th Cir. 1997)).

Plaintiffs sent defendants a cease and desist letter in November 2010, approximately a month after defendants first engaged in the infringing conduct at issue. (Berkant Keiskbas Decl. in Opp'n to Proposed Mot. for Prelim. Inj. Order ("Keiskbas Decl.") (Doc. No. 16) ¶ 5.) On February 14, 2011, plaintiffs filed this lawsuit. In April 2011 defendant started to use the Pillowpets.co website to sell "Pillow Pets" products, allegedly spurning its own Plushez brand, and using misleading phrases such as "As Seen On TV" and favorable reviews properly attributed to plaintiffs' product. (Mem. in Opp'n to Mot. for Prelim. Inj. (Doc. No. 15) at 44.). Plaintiffs moved for injunctive relief on May 3, 2011. This timing does not amount to unreasonable delay. Plaintiffs explain that their efforts required the gathering of information, and they aggressively pursued injunctive relief immediately upon learning of the significant increase in infringing activities taking place in April 2011. Thus, the defendants' argument to dismiss this motion on the basis of laches is DENIED.

**B. Estoppel**

Likewise, defendants' argument based on estoppel is meritless. Estoppel, or "acquiescence" "requires proof of three elements: (1) the senior user actively represented that it would not assert a right or a claim; (2) the delay between the active representation and assertion of the right or claim was not excusable; and (3) the delay caused the defendant undue prejudice." *Times Mirror Magazines*, 294 F.3d at 395 (quoting *SunAmerica Corp. v. Sun Life Assurance Co.*, 77 F.3d 1325, 1334 (11th Cir. 1996)). For example,"[i]f a trademark owner tells a potential

defendant that it will not assert a claim of infringement based on the use of a particular mark, and the recipient of that assurance relies on the assurance to its substantial detriment . . . estoppel will bar the trademark owner from subsequently claiming infringement." *PRL USA Holdings, Inc. v. U.S. Polo Ass'n, Inc.*, 520 F.3d at 113 (citation omitted).

Defendants argue that plaintiffs should not receive equitable relief based on their reasonable reliance on disclaimers made by CJ earlier in the trademark registration process. "Disclaimer is a well recognized practice in trademark registration. Often the mark submitted for registration is a composite term, consisting of registrable subject matter in conjunction with matter which was . . . unregistrable. The Patent Office administratively began the practice of allowing such unregistrable matter to be disclaimed, so that the mark as a whole might be registered, although as a complete term the mark included unregistrable descriptive matter." *Genesee Brewing Co.*, 124 F.3d at 141 n.2 (citation omitted).

However, the disclaimer of certain words in earlier marks does not constitute waiver of the trademark itself, or of a later-registered trademark – a disclaimer is not an acknowledgment of descriptiveness and has no effect on plaintiff's subsequent registration of "Pillow Pets." *See* 15 U.S.C. § 1056(b) ("No disclaimer . . . shall prejudice or affect the applicant's or registrant's rights then existing or thereafter arising in the disclaimed matter, or his right of registration on another application if the disclaimed matter be or shall have become distinctive of his goods or services."). Moreover, "[t]he disclaimed elements of a mark . . . are relevant to the assessment of similarity . . . . because confusion is evaluated from the perspective of the purchasing public, which is not aware that certain words or phrases have been disclaimed." *Shen Mfg. Co., Inc. v. Ritz Hotel, Ltd.*, 393 F.3d 1238 (Fed. Cir. 2004), *cert. denied,* 126 S. Ct. 357 (2005). With respect to "Pillow Pets™" in particular, nothing was disclaimed at all, and "[i]n sending the mark

to publication without requiring [disclaimer of any words]. . . the trademark examiner must have found those words to be protectable as applied to [the] product [in question, since] . . . a trademark examiner may not send a mark to publication unless all unprotectable matter has been disclaimed." *Id.* at 148 n.11. Last, given the chronology of events, it was simply not reasonable for defendants to have relied on any alleged representations by plaintiffs, who were attempting at that time to complete registration of their "Pillow Pets" trademark.

"Estoppel is a drastic remedy and must be utilized sparingly." *Keane Dealer Servs., Inc. v. Harts*, 968 F. Supp. 944, 948 (S.D.N.Y. 1997). The Court declines to preclude equitable relief based on this argument.

## VI.  BOND

According to Federal Rule of Civil Procedure 65(c), "[n]o preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper. . . ." Fed. R. Civ. P. 65(c). The Court has broad discretion in the matter of setting the sum for security. *Doctor's Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996). "In fixing the amount of security required, a court is not required to order security in respect of claimed economic damages that are no more than speculative. Moreover, the burden is on the party seeking security to establish a rational basis for the amount of the proposed bond." *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F. Supp. 2d 552, 556 (S.D.N.Y. 2006) (internal citation and footnotes omitted). This "rational basis" must be relevant to the purpose of the bond requirement itself, which is to provide security for payment of "costs . . . and pecuniary injury that may accrue during the period in which a wrongfully issued equitable order remains in effect." 11A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2954 (2d ed. 2011).

Neither party addresses the issue of bond; however, based on the factors set forth above, and so that defendants may seek compensatory recourse in the event they are wrongfully enjoined, the Court finds that security in the amount of $100,000 to be fitting and proper.

## CONCLUSION

For all of the reasons set forth above, plaintiffs' motion for a preliminary injunction is granted, the terms of which are contained in an order to be filed separately.  This matter is re-committed to the Magistrate Judge for the supervision of discovery.

SO ORDERED.


Dated: Brooklyn, New York
   August 22, 2011

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge